2 ᴛᴏ Cᴛ

ORIGINAL

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

FILED
HARRISBURG, PA

JUN 0 6 2002

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

63
6/7/0

|  |  |  |
|---|---|---|
| JEFFREY L. HANES, | : | Case No. 1:00-CV-2003 |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | Judge Rambo ✓ |
|  | : |  |
| APPLE CHEVROLET, INC. and TERRY | : |  |
| STEWART, President/Owner, Jointly and | : |  |
| Severally, | : |  |
| Defendants | : |  |

**EXHIBITS TO**

**DEFENDANTS' STATEMENT OF**
**UNDISPUTED MATERIAL FACTS**

2

Q    Was it -- Was this seminar after you already had your license?

A    Yes.

Q    So you were already working under Metro at this point?

A    Yeah.  I believe I was.  Yeah, that's correct.

Q    Okay.  What was your role in the seminar?

A    My role?  I had no role in the seminar.

Q    You were just attending?

A    That's correct.

Q    Is this just a one-day seminar?

A    Yes.

Q    How did you travel to and from Philadelphia to attend that seminar?

A    I drove.

Q    What did you drive?

A    A van.

Q    Was that your van?

A    No.

Q    Okay.  Whose van was it?

A    I rented it.

Q    Okay.  From whom?

A    Apple Chevrolet.

**Q    Were you the person who made the rental reservation?**

**A    No.**

**Q    Who did?**

**A    Jesse Pohlig.**

**Q    Who was Jesse Pohlig?**

**A    He was considered a regional manager.**

**Q    For whom?**

**A    Metro.**

**Q    Okay.  Why did Jesse rent the van?**

**A    So we could have a way to go to Philly.  He asked me to rent it.  I didn't have a credit card at the time so he used his.**

Q    How did you become acquainted with Mr. Pohlig?

A    Through Metro.

Q    How long had you known him?

A    Probably a year or so.

Q    Did Mr. Pohlig also live here in York?

A    No.

Q    Do you know where he lived?

A    He lived in New Jersey.

Q    Okay.  What was Mr. Pohlig's role in this seminar?

A    Attending.

Q    Okay.  Was he in the van with you?

A    No.

Q    Okay.  Who drove the van?

A    Me.

Q    Both ways?

3

12

Q    Was it -- Was this seminar after you
already had your license?
A    Yes.
Q    So you were already working under
Metro at this point?
A    Yeah.  I believe I was.  Yeah, that's
correct.
Q    Okay.  What was your role in the
seminar?
A    My role?  I had no role in the
seminar.
Q    You were just attending?
A    That's correct.
Q    Is this just a one-day seminar?
A    Yes.
Q    How did you travel to and from
Philadelphia to attend that seminar?
A    I drove.
Q    What did you drive?
A    A van.
Q    Was that your van?
A    No.
Q    Okay.  Whose van was it?
A    I rented it.
Q    Okay.  From whom?
A    Apple Chevrolet.
**Q    Were you the person who made the
rental reservation?**
**A    No.**
**Q    Who did?**
**A    Jesse Pohlig.**
**Q    Who was Jesse Pohlig?**
**A    He was considered a regional manager.**
**Q    For whom?**
**A    Metro.**
**Q    Okay.  Why did Jesse rent the van?**
**A    So we could have a way to go to
Philly.  He asked me to rent it.  I didn't have
a credit card at the time so he used his.**
Q    How did you become acquainted with
Mr. Pohlig?
A    Through Metro.
Q    How long had you known him?
A    Probably a year or so.
Q    Did Mr. Pohlig also live here in
York?
A    No.
Q    Do you know where he lived?
A    He lived in New Jersey.
Q    Okay.  What was Mr. Pohlig's role in
this seminar?
A    Attending.
Q    Okay.  Was he in the van with you?
A    No.
Q    Okay.  Who drove the van?
A    Me.
Q    Both ways?

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY L. HANES,                          :
           Plaintiff,                 :      Case No. 1:00-CV-2003
                         :
     v.                                 :      Judge Rambo
                         :
APPLE CHEVROLET, INC. and TERRY            :
STEWART, President/Owner, Jointly and      :
Severally,                                 :
           Defendants                 :

## REQUEST FOR ADMISSIONS
## OF DEFENDANTS' DIRECTED TO PLAINTIFF

Defendants, Apple Chevrolet, Inc. and Terry Stewart, by their attorneys, CGA Law Firm, (Countess Gilbert Andrews P.C.), request that Plaintiff, Jeffrey L. Hanes, admit, pursuant to the provisions of the Federal Rule of Civil Procedure 36, the matters set forth below:

## INSTRUCTIONS

a.     The facts set forth below shall be deemed admitted unless the Plaintiff serves upon Defendants a sworn Answer or Objection within thirty (30) days after Plaintiff is served with these Requests for Admission.

b.     If Objection is made to any fact whose admission is requested, the reason for that objection shall be stated.

c.     Each Answer shall admit or deny the matter, or set forth in detail the reasons why an admission or denial cannot truthfully be made.

d.     A denial of any matter shall fairly meet the substance of the requested admission.

e.    When good faith requires the Plaintiff qualify an Answer or denial, only a part of the matter to which an admission is requested, the Plaintiff shall specify so much of the requested admission as is true, and qualify or deny the remainder.

f.    Plaintiff may not give lack of knowledge or information as a reason for failure to admit or deny, unless Plaintiff states that reasonable inquiry has been made and that the information known or readily obtainable to the Plaintiff is insufficient to enable the Plaintiff to admit or deny.

g.    Plaintiff may not object to a requested admission on the grounds that the request presents a genuine issue for trial.

## REQUESTED ADMISSIONS

1.    Admit that Exhibit "A" attached to this Request is a true and correct copy of the two-page rental agreement;  `Deny. No exhibit was so attached.`

2.    Admit that the credit card provided to Defendant Apple upon which to place charges for the rental van belonged to the co-driver, Jesse Pohlig;  `Admit.`

3.    Admit that the co-driver, Jesse Pohlig, agreed to return the van on or before 4:00 `Deny Jesse Pohlig was a driver.` p.m. on November 14, 1998;  `Lack of knowledge of Mr. Pohligs. agreement, since the contract is not readily obtainable.`

4.    Admit that, upon pick-up of the van on November 13, 1998, Defendant again reminded Plaintiff of the 4:00 p.m. return time;  `Admit clerk asked Plaintiff to try to have vehicle back by 4pm, but no later than 5pm.`

5.    Admit that the van was returned at approximately 5:30 p.m. on November 14, 1998;  `Deny. Van was returned between 10=15 minutes after 5pm.`

6.    Admit that Plaintiff was yelling, screaming, gesticulating, and shouting obscenities and vulgarities at one or more of Defendant's employees upon Plaintiff's return of the van on November 14, 1998;    **Deny.**

7.    Admit that Plaintiff told Defendant's employee that she was treating white customers better and that the employee denied same;    **Deny.**

8.    Admit that Plaintiff blocked Defendant's employee's vehicle in the parking lot such that she was unable to leave;    **Deny.**

9.    Admit that Defendant summoned the police because Plaintiff would not leave Defendant's premises when Plaintiff was asked to do so;    **Deny.**

10.    Admit that, at the District Justice hearing, Plaintiff admitted that Defendant's employee did not make the comments Plaintiff alleged in his York City Human Relations Commission Complaint that she made;    **Deny.**

11.    Admit that a customer was waiting for the van when Plaintiff returned it on November 14, 1998;    **Admit.**

12.    Admit that when Plaintiff initially called Defendant Plaintiff said Plaintiff was 20 minutes away;    **Admit, but Plaintiff further said that he was stuck in traffic, which thereby extended his travel time.**

13.    Admit that Plaintiff had an attorney prepare the Complaint for Plaintiff in this

                    Objection.   Relevance.

case; and

14.    Admit that Plaintiff suffered no damages from the incident alleged in Plaintiff's

                    Deny.

Complaint.

Respectfully submitted,

**CGA Law Firm**
Countess Gilbert Andrews P.C.

By: _____

Sara A. Austin, Esquire
I.D. No. 59052
29 North Duke Street
York, PA  17401
(717) 848-4900



16

incident happened.

Q    Okay.  You mentioned Mark Green was also in the van that day?

A    That's correct.

Q    Okay.  And what was Mark Green there for?

A    He was going for information like I was.

Q    Okay.  Do you recall what his occupation was?

A    He's a CBS news reporter.

Q    Was he associated with Metro?

A    He was taking classes at that time.

Q    Had you known him prior to that day?

A    Yes.

Q    How long did you know him?

A    Since high school.

Q    Was he in your class then?

A    No.

Q    Had you kept in touch with him since high school?

A    Yeah.

Q    Okay.  Would you say you had a social relationship, business relationship, both?

A    Well, we had a social relationship, then business relationship as far as the Metro thing, other than that --

Q    Okay.  And where was Mr. Green sitting in the van on the way to and from Philadelphia?

A    I don't know exactly.  He was in the back.  I know that for sure.

Q    So he was somewhere behind you with Mr. Weathers.?

A    I don't know where he was.

Q    Okay.  What is his race?

A    Black, African American.

Q    Okay.  And there was also a Dave someone in the vehicle, right?

A    Yeah.

Q    What was he there for that day?

A    He came with Jim -- well, Dimitrios.

Q    Okay.

A    And I don't know -- I don't even know his last name.  I don't know -- I never seen him no more.

Q    Had you met him prior to that day?

A    Yeah.

Q    Do you know what his occupation was at the time?

A    Not -- not right offhand, no.

Q    And you said you've had no contact with Dave since that day?

A    No.

Q    And what is Dave's race?

A    He's white.

Q    **Okay.  Where did you pick up the van?**

17

```
     A      Apple Chevrolet.
     Q      What day?
     A      The 13th, I guess, the day before
Saturday.
     Q      Friday, November 13th?
     A      Yeah, I picked it up Friday.
     Q      What time?
     A      It was in the afternoon.
     Q      Do you recall when?
     A      Yeah, it was about noon.
     Q      Did Mr. Pohlig go with you?
     A      No.
     Q      Okay.  Who else was present when you
picked up the van?
     A      Present?  Nobody was present.
Somebody took me to go get the van, but they
weren't in the building.  I was on my lunch
break, actually.
     Q      Okay.  I assume there were one or
more Apple employees there when you picked it
up?
     A      In the building?
     Q      There when you picked up the van.
     A      There was employees in the building
if that's what you mean.
     Q      How did you get the van?  Was it just
there and you got into it and drove away?  What
did you do to get this van?
     A      I signed a paper for it.
     Q      Okay.  How did you get the papers?
     A      From the lady that was there.
     Q      Okay.  So there was someone behind
the counter?
     A      Yes.
     Q      Okay.  Do you recall what this person
looked like?
     A      She was a white lady.
     Q      Do you recall her hair color?
     A      Light brown, brown.  I don't know.
     Q      Okay.  Now, are you guessing, or
you're sure of that?
     A      I don't know, you know, different
colors of hair.  It looks brown to me.
     Q      Okay.  Do you recall her name?
     A      No.
     Q      Okay.  Did you have any type of
discussions with her when you got there about
what time the van was to be returned and on
what day?
     A      Yeah.  Yes, I did.
     Q      Okay.  Tell me about that
conversation.
     A      Well, she told me, have the van back
at four o'clock.  Then I said, well, I'm going
to Philadelphia.  I'll do my best.  I said, you
know traffic can be hectic.  I don't know what
to predict what the traffic is going to be
```

11

1    14th of '98?

2        A    Yes.

3        Q    Maybe I need to clarify.  When is the first

4    time John Schriver came to Apple Chevrolet to rent a van

5    for November 14th of '98?

6        A    He called to make a reservation.

7        Q    When did he call to make a reservation?

8        A    I don't remember.

9        Q    So you don't remember if it was a day before

10   or two days before or a week before?

11       A    I don't remember.

12       Q    So you don't remember if it was November 14th?

13       A    The 14th?

14       Q    Yes.  That was actually the day of this

15   allegation.

16       A    He made the reservation in advance of that

17   date.

18       Q    Okay.  And did he speak with you personally?

19       A    Yes.

20       Q    And how did he reserve the vehicle?

21       A    Verbally with a credit card.

22       Q    Can you describe your duties?

23       A    I run the rental department.  I am the only

24   person in the rental department.  I handle all customers,

25   all phone calls, all paperwork, all maintenance and

24

1    out again for Mr. Schriver.

2        Q    Do you always make such contacts to explain

3    when a van is due or when a van is going out?

4        A    If it's a situation that the van is coming

5    back and going out on the same day, yes, because I am

6    working with some part-time people, so just so they know

7    what to do.

8        Q    How often does that happen?

9        A    Once in a while.

10       Q    What is that?  Once a month?  Once a year?

11       A    It depends.  Sometimes once a month.

12       Q    Have you ever during any of those times run

13   into a situation where a customer may not have been back

14   exactly on time for the other customer to get the van?

15       A    No.

16       Q    So in renting any vehicle, there never was a

17   situation where the vehicle was being brought in and

18   going out at the same day and time frame where a customer

19   was late bringing the van back?

20       A    No.

21       Q    Or a vehicle back?

22       A    No.

23       Q    And what is it that you communicated to Mr.

24   Hanes in reference to the return of the vehicle?

25       A    That it had to be back by 4 o'clock.  There



17

```
A     Apple Chevrolet.
Q     What day?
A     The 13th, I guess, the day before
Saturday.
Q     Friday, November 13th?
A     Yeah, I picked it up Friday.
Q     What time?
A     It was in the afternoon.
Q     Do you recall when?
A     Yeah, it was about noon.
Q     Did Mr. Pohlig go with you?
A     No.
Q     Okay.  Who else was present when you
picked up the van?
A     Present?  Nobody was present.
Somebody took me to go get the van, but they
weren't in the building.  I was on my lunch
break, actually.
Q     Okay.  I assume there were one or
more Apple employees there when you picked it
up?
A     In the building?
Q     There when you picked up the van.
A     There was employees in the building
if that's what you mean.
Q     How did you get the van?  Was it just
there and you got into it and drove away?  What
did you do to get this van?
A     I signed a paper for it.
Q     Okay.  How did you get the papers?
A     From the lady that was there.
Q     Okay.  So there was someone behind
the counter?
A     Yes.
Q     Okay.  Do you recall what this person
looked like?
A     She was a white lady.
Q     Do you recall her hair color?
A     Light brown, brown.  I don't know.
Q     Okay.  Now, are you guessing, or
you're sure of that?
A     I don't know, you know, different
colors of hair.  It looks brown to me.
Q     Okay.  Do you recall her name?
A     No.
Q     Okay.  Did you have any type of
discussions with her when you got there about
what time the van was to be returned and on
what day?
A     Yeah.  Yes, I did.
Q     Okay.  Tell me about that
conversation.
A     Well, she told me, have the van back
at four o'clock.  Then I said, well, I'm going
to Philadelphia.  I'll do my best.  I said, you
know traffic can be hectic.  I don't know what
to predict what the traffic is going to be
```

24

1    out again for Mr. Schriver.

2        Q    Do you always make such contacts to explain

3    when a van is due or when a van is going out?

4        A    If it's a situation that the van is coming

5    back and going out on the same day, yes, because I am

6    working with some part-time people, so just so they know

7    what to do.

8        Q    How often does that happen?

9        A    Once in a while.

10       Q    What is that?  Once a month?  Once a year?

11       A    It depends.  Sometimes once a month.

12       Q    Have you ever during any of those times run

13   into a situation where a customer may not have been back

14   exactly on time for the other customer to get the van?

15       A    No.

16       Q    So in renting any vehicle, there never was a

17   situation where the vehicle was being brought in and

18   going out at the same day and time frame where a customer

19   was late bringing the van back?

20       A    No.

21       Q    Or a vehicle back?

22       A    No.

23       Q    And what is it that you communicated to Mr.

24   Hanes in reference to the return of the vehicle?

25       A    That it had to be back by 4 o'clock.  There

25

1    was another customer that had a prior reservation that

2    was picking the van up at 4:00.

3         Q    Did you say anything to the effect that as

4    close to 4:00 as possible, but no later than 5 o'clock?

5         A    No.

6         Q    And didn't he in fact explain to you that he

7    was going to Philadelphia and there may be some traffic

8    problems?

9         A    He said he was going to Philly.

10        Q    Didn't he in fact explain to you that in

11   Philadelphia sometimes there is traffic problems?

12        A    No.

13        Q    Did he mention any potential difficulties with

14   traffic or anything like that at all?

15        A    I don't remember.

16        Q    Okay.  Now, I do have to instruct you because

17   I saw you look to Sara Austin.  Again, you are under oath

18   to try to testify truthfully and also to answer from your

19   own knowledge, not to look to anybody else.

20             ATTY. AUSTIN:  I would like --

21   BY ATTY. THOMPSON:

22        Q    Was there any indication as to him discussing

23   the potential for being late?

24        A    No.

25             ATTY. AUSTIN:  I would like to note on the

6

18

like.

    Q     Now, this was four p.m. the next day, Saturday, November 14th; correct?

    A     That's correct.

    Q     Okay.  And after this discussion you signed the rental agreement?

    A     That's correct.

    Q     Okay.  Did you have any questions about the rental agreement before you signed it?

    A     Not that I really recall.  I can't recall.  We just talked general.

    Q     If you had any questions at that time, would you have asked them?

    A     I guess, if I'd had them.

    Q     Okay.  I'm showing you a two-page, double-sided document.  Do you recall seeing that document?  I understand there may be some highlights on it also.  If you want to take a moment to look at that document and tell me if you recognize it.

    A     (Witness reviews document).

    Q     Have you seen that document before?

    A     Yeah.  It has my signature on it, yeah.

    Q     Your signature is on both pages?

    A     Yeah.

    MS. AUSTIN:  Okay.  Just for the record, I'm going to ask your counsel to look at the copies I've made of this document so that we don't have to introduce the original as an exhibit.  I'd rather introduce this copy.  I did have to put this on legal size to fit it.

    MR. CARDENAS:  The only concern I have is, was all this highlight something that was made -- that was there when he signed it, or is this just after the fact?  Is that highlight from --

    THE WITNESS:  That was after.  I know that was after.

    MR. CARDENAS:  All the highlights and I mean, specifically, even, like, the yellow highlights, because then I would think that it would be important -- that it would be important to have -- if you want to introduce a copy, then a colored copy.  Because then that would be -- I think that may be significant.

    MS. AUSTIN:  Okay.  And we may be able to resolve this.

BY MS. AUSTIN:

    Q     Mr. Hanes, do you recall if any of the pink or yellow highlights were on there when you signed it?

    A     I'm pretty sure it wasn't highlighted like that.

    MS. AUSTIN:  Okay.  Then we will be happy to stipulate that none of the highlights

# APPLE CHEVROLET
1200 Loucks Road    (717) 848-1300
YORK, PA 17404

**Stock No.** CK 715T

**CAR RENTAL CONTRACT** 18370

## NO CARS WILL BE CHECKED IN AFTER 8:30 P.M.

**LESSEE (PRINT)** APPLE CHEVROLET/GEO
1202 LOUCKS RD.
P. O. BOX 7326

**ADDRESS** YORK, PA  17404

**CITY** -    **STATE**    **ZIP** 843-9853 -

**FIRM NAME** JEFF HAYNES    **PHONE**

**DRIVER** 516 W. KING ST.    (755-1374)    PA-TA

**HOME ADDRESS** YORK    PA    **PHONE** 17404    **ZIP**

**CITY** 21 255 216    **STATE** A    **ZIP** 5-30-99

**DRIVER'S LICENSE NO.**    **STATE**    **DATE EXPIRES**

By: X                          Lessee    By: X                          Lessee

THE OPERATION OF THE VEHICLE BY ANY DRIVER UNDER 21 YEARS OF AGE IS PROHIBITED.

**MAKE** 95 CHEVROLET
**MODEL** 15 PASS (TEAL)    **VIN. NO.** 082289
**LICENSE NO.** BNX 9772 AM    BY
**DATE AND TIME OUT** 11-13-98    **DATE AND TIME DUE IN** 11-14-98
**DATE AND TIME RETURNED**

| | | | | |
|---|---|---|---|---|
| RATE PER DAY | 59.00 | DAYS | 1 | $ 59.0 |
| DAILY RATES BASED ON 24 HOURS FROM DEPARTURE OR ANY PART THEREOF | | | | |
| ODOMETER READING: | IN | 22080 | | |
| ODOMETER READING: | OUT | 21855 | | |
| RATE 20¢ PER MILE | | 225 | | |
| SPLIT 75 FREE/DAY | | 112.5 | | |
| TOTAL MILEAGE | | 112.5 | | $ 22 50 |
| DAY RATE PLUS MILEAGE | | | | $ 81.50 |
| SALES TAX: | 8% | | | $ 6.52 |
| GAS CHARGES $12 1/4 TANK | | | | $ |
| INSURANCE $10/DAY WAIVER | | | | $ 10 00 |
| $2/DAY STATE RENTAL TAX | | | | 2 00 |
| **TOTAL CHARGES** | | | | $ 100.02 |
| DEPOSIT | | | | $ |
| TOTAL CHARGES LESS DEPOSIT | | | | $ |
| REFUND | | | | $ |

| | OUT | IN - SUBJECT TO CHARGE |
|---|---|---|
| BODY | | |
| INTERIOR | / | |
| RADIO | / | Charge - Visa |
| HEATER-A/C | / | Auth # 464090 |
| GLASS | / | |
| TIRES | / | |
| GRILL | / | |
| GAS | FULL | GAS Full |

**PLEASE REPLACE GAS USED - THANK YOU**

# No Smoking!

X _____
CUSTOMER SIGNATURE

DEPT. _____    AUTH # _____

RO # _____    PO # _____

| | | INVOICE | UNIT | / | CUST. | |
|---|---|---|---|---|---|---|
| **ACCOUNT TITLE** | | | ACC'T. NO. | AMOUNT | | |
| BASIC INCOME RENTAL CARS | | | | | | |
| MILEAGE INCOME RENTAL CARS | | | | | | |
| CUSTOMER PURCHASED GAS | | | | | | |
| OTHER CUSTOMER CREDITS | | | | | | |
| | TAX | | | | | |
| | SOURCE 300 | CHARGE SALES | | | | |
| | SOURCE 300 | CASH SALES | | | | |

LESSEE AGREES TO RENT THE ABOVE CAR SUBJECT TO THE TERMS AND CONDITIONS STATED ABOVE AND ON REVERSE SIDE.

**IMPORTANT - READ BEFORE SIGNING**

In consideration of the mutual promises and covenants herein contained, the undersigned customer rents from the owner the automobile described above, and the customer agrees, by his signature hereon, to rent the automobile subject to the terms and conditions on the reverse side hereof, which the customer acknowledges to have read and which provisions, by reference hereto, are incorporated into this agreement.

**REPAIR ORDER NO.** _____    **SERVICE ADVISOR** Cathy Largen    **RENTER'S SIGNATURE** X

ADAMS II • (717) 697-6727

## CLEAN UP CHARGE OF $75.00 TO BE ADDED IF VEHICLE NOT RETURNED CLEAN

# RENTAL AGREEMENT

006975

In this Agreement, the words "you" and "your" refer to the customer signing this Agreement. The word "Lessor" refers to the corporation or person providing the vehicle. This Agreement covers your rental of the vehicle(s) described below. When you sign this Agreement, you agree to all the conditions on both sides of this Agreement. This Agreement will not exceed two (2) months.

| CUSTOMER: FIRST        INITIAL        LAST | OTHER DRIVER(S) |
|---|---|
| JEFF        HAYNES | 1. NAME   JESSE POHLIG |
| LOCAL ADDRESS:   NO. STREET   CITY/TOWN   STATE   ZIP<br>516 W. KING ST        YORK | ADDRESS   754 ADAMS AVE MAYS LAND |
| TEL. #        ☐ RENT   HOW LONG<br>              ☐ OWN | DATE OF BIRTH   LICENSE NO.   STATE   EXPIRES<br>10-31-46  PG16640067 10462  4-30-0 |
| PERMANENT   NO. STREET   CITY/TOWN   STATE   ZIP<br>ADDRESS: | 2. NAME |
| TEL. #        ☐ RENT   HOW LONG<br>              ☐ OWN | ADDRESS |
| SOCIAL SECURITY NO. | DATE OF BIRTH   LICENSE NO.   STATE   EXPIRES |

| DRIVERS LICENSE NO.        STATE | VEHICLE: |
|---|---|
| 21 255 216        PA | |
| DATE ISSUED   EXPIRES   DATE OF BIRTH<br>        6-30-99  6,4,67 | YEAR  MAKE  MODEL  COLOR  STOCK NUMBER |
| EMPLOYER NAME        HOW LONG<br>METRO | VIN        LICENSE PLATE NO. |
| ADDRESS   TELEPHONE NO. | EXTERIOR: OUT BODY ___ FENDERS ___ TIRES # |
| CREDIT REFERENCE:   NUMBER   EXPIRES<br>MAJOR CREDIT CARD<br>NAME   5416 9107 9033 0969 x 5/0 | OUT WHEELCOVERS ___ LIGHTS |

## PHYSICAL DAMAGE INSURANCE DEDUCTIBLES

You will be responsible for insurance deductibles if you do not purchase a Collision Damage Waiver (CDW).

These deductibles are:

Collision        $_____
Comprehensive   $_____

**NOTICE: PURCHASE OF THE COLLISION DAMAGE WAIVER IS NOT REQUIRED. AUTO INSURANCE YOU HAVE IN EFFECT MAY COVER THE SAME LOSSES AS THE COLLISION DAMAGE WAIVER. BY SIGNING THIS RENTAL AGREEMENT, YOU MAY BECOME RESPONSIBLE FOR ANY DAMAGE TO THE VEHICLE EVEN IF YOU ARE NOT AT FAULT.**

I have read and understand the above notice and I ☐ do ☐ do not desire to purchase a CDW.

_____ CUSTOMER INITIALS        DATE

| INTERIOR: OUT UPHOLSTERY ___ RADIO ___ MATS |
|---|
| IN |
| OUT ACCESSORIES |
| IN |
| ODOMETER: OUT 21855  FUEL: ☐ F ☐ ¾ ☐ ½ ☐ ¼ ☐ E |
| IN              FUEL: ☐ F ☐ ¾ ☐ ½ ☐ ¼ ☐ E |
| MILEAGE DRIVEN: |

| VEHICLE |
|---|
| DATE AND TIME OUT   11-13-98 |
| DATE AND TIME IN |
| TOTAL RENTAL TIME |
| DATE DUE—EXPIRATION OF CONTRACT   11-14-98 |

| RENTAL RATES | | CHARGES |
|---|---|---|
| HOURLY | @ $ | $ |
| DAY | @ $ | $ |
| WEEK | @ $ | $ |
| MONTH | @ $ | $ |
| SPECIAL | @ $ | $ |
| MILES | @   ¢ PER MI. | $ |
| SALES TAX | % | $ |
| CDW: DAY @ $ | | $ |
| GAS CHGS. | | $ |
| MISC. CHGS. | | $ |
| DISCOUNT | % | $ (           ) |
| TOTAL MILEAGE & RENTAL CHARGES | | $ |
| SUB TOTAL | | $ |
| LESS CREDITS (REPAIRS, ETC.) | | $ (           ) |
| TOTAL | | $ |

| CHECK TYPE OF RENTAL IF        SERVICE RENTAL ☐<br>OPERATOR AGED 21 THROUGH 24   INSURANCE REFERRAL ☐ |
|---|
| BUSINESS USE WITH        VEHICLE PROVIDED IN ACCORDANCE<br>MAJOR CREDIT CARD ☐   WITH GMPP PROVISIONS ☐ |

**UNDER NO CIRCUMSTANCES SHALL ANYONE UNDER 21 YEARS OF AGE OPERATE THIS VEHICLE.**

YOU ARE LIABLE FOR ALL PARKING AND DRIVING VIOLATIONS AND MUST TURN IN ALL PARKING SUMMONSES WITH PAYMENT UPON "CHECK-IN."

ALL DRIVERS MUST POSSESS A VALID OPERATOR'S LICENSE.

The rental of the vehicle to any person under 25 years of age is strictly prohibited, unless specifically authorized by the Lessor.

By your signature, you warrant that the information on vehicle use and other drivers is accurate and complete. Further, you represent that you have read, understand and agree with the terms and conditions stated on this Agreement.

X _____ CUSTOMER SIGNATURE        DATE   11-13-98

| LESSOR HAS AUTHORIZED CUSTOMER<br>AGE 21 THROUGH 24?        ☐ YES ☐ NO |
|---|

LESSOR SIGNATURE

| LESS CASH DEPOSITS | | | |
|---|---|---|---|
| DATE REC'D. | | AMT. | ( ) |
| / / | $ | | |
| / / | $ | | |
| INSURANCE PAYMENT DUE | | $ | |
| BALANCE DUE OR REFUND DUE | | $ | |

| | PAID BY | CASH | CHECK | CHARGE |
|---|---|---|---|---|
| | (✓) | | | |

TELEPHONE NO:

5° ALT/20

(751-1371)
PAGER

JEFF HAYNES
P/U FRI (11/13)
5 PM
BACK SAT 4





**PENNSYLVANIA DRIVER'S LICENSE**



21 285 216

105D

| | | |
|---|---|---|
| Issued 03/13/98 | Birth Date 06/04/67 | Expires 06/30/99 |
| Sex M | Height 5' 10" | Eyes BRO | Dups 00 |
| Class C | Endorsements --- | |

Com./Med. Restrictions
*/*

516 W KING STREET
YORK    PA 17404

JEFFERY LYNN HANES

7

13

1    van?

2        A    I think black.  I'm almost positive

3    they were all black.

4        Q    Okay.  What time did you leave York

5    that day?

6        A    Morning.  I think it was morning.

7        Q    Do you recall what time?

8        A    Like around -- If I don't recall,

9    should I take a guess?

10       Q    Nope.  I don't want you to guess.

11       A    It was morning.

12       Q    Okay.

13       A    That's all I remember.

14       Q    Okay.  And **from where did you leave?**

15       **A    West Market Street outside the Metro**

16   **building.**

17       **Q    Okay.  Did you know at that point**

18   **what time the van needed to be back to York**

19   **that day?**

20       **A    No.**

21       Q    Okay.  Did -- **At any point during the**

22   **day did you find out what time the van needed**

23   **to be returned?**

24       **A    Yes.**

25       Q    **When?**  When did you find out?

14

1      A      Like I think it was around two or

2      three in the afternoon.

3      Q      Okay.  How did you find out?

4      A      From Jeff saying we have to leave

5      because we have to have the van back by five.

6      Q      He said five?

7      A      Yeah.

8      Q      Okay.  What time did you arrive back

9      at the dealers?

10     A      It was after five.

11     Q      Do you recall was it a lot after, a

12     little after?

13     A      Like 15 to 20 minutes.

14     Q      Okay.  Who was there when you arrived

15     in the rental area?

16     A      I think they were either closing or

17     they were closed because the only person that

18     was there it looked like employees, but they

19     looked like -- it was a gentleman I guess that

20     parks the cars that was, like, on the outside

21     because when we arrived we asked him what he

22     wants us to do with the van, and he said just

23     leave it there.  I'll get to it.  And then

24     there was an employee inside the area, you

25     know, where you register.



13

1    van?

2        A    I think black.  I'm almost positive

3    they were all black.

4        Q    Okay.  What time did you leave York

5    that day?

6        A    Morning.  I think it was morning.

7        Q    Do you recall what time?

8        A    Like around -- If I don't recall,

9    should I take a guess?

10       Q    Nope.  I don't want you to guess.

11       A    It was morning.

12       Q    Okay.

13       A    That's all I remember.

14       Q    Okay.  And from where did you leave?

15       A    West Market Street outside the Metro

16   building.

17       Q    Okay.  Did you know at that point

18   what time the van needed to be back to York

19   that day?

20       A    No.

21       Q    Okay.  Did -- At any point during the

22   day did you find out what time the van needed

23   to be returned?

24       A    Yes.

25       Q    When?  When did you find out?

14

1      A      Like I think it was around two or

2   three in the afternoon.

3      Q      Okay.  How did you find out?

4      A      From Jeff saying we have to leave

5   because we have to have the van back by five.

6      Q      He said five?

7      A      Yeah.

8      Q      Okay.  What time did you arrive back

9   at the dealers?

10      A      It was after five.

11      Q      Do you recall was it a lot after, a

12   little after?

13      A      Like 15 to 20 minutes.

14      Q      Okay.  Who was there when you arrived

15   in the rental area?

16      A      I think they were either closing or

17   they were closed because the only person that

18   was there it looked like employees, but they

19   looked like -- it was a gentleman I guess that

20   parks the cars that was, like, on the outside

21   because when we arrived we asked him what he

22   wants us to do with the van, and he said just

23   leave it there.  I'll get to it.  And then

24   there was an employee inside the area, you

25   know, where you register.

10

1     Philadelphia?

2          A    **We got to Philadelphia about, like,**

3     **quarter to nine.  It started at about 9:00, so**

4     **we got there about a quarter to nine.**

5          Q    Okay.  And the conference was two

6     days.  It was that day and also the next day?

7          A    We just stayed for that day.

8          Q    Okay.

9          A    At that point in time, I don't know

10    if it was for the next day or not.

11         Q    Okay.  **And do you know what time the**

12    **van was supposed to be returned to the dealer**

13    **that day?**

14         A    **About five p.m. that day.**

15         Q    **And who told you that?**

16         A    Who told me?  I heard that over --

17    **When we were on our way back, I heard him**

18    **talking about it over the phone.**

19         Q    Okay.  **Prior to that, did you know**

20    **what time it was supposed to be returned?**

21         A    Prior to that -- Off the top of my

22    head, I can't remember.  I'm not sure.  **He did**

23    **mention that we wasn't all gonna stay for the**

24    **whole thing because he had to get the van back**

25    **in time, so --**

Q    Okay.  **Do you know what time you were to return the van?**

A    I'd have to check my notes.  I believe it was 5:00.

Q    I just want what you recall.

A    Okay.  5:00.

Q    And how do you know that?

A    Just looking over my disposition (sic) and **kind of remembering the conversation and Jeff saying we need to have the van back by five.**

Q    Okay.  Do you -- What time did you leave Philadelphia on the 14th?

A    I don't recall.

Q    Do you know if it was morning, afternoon?

A    It was afternoon.

Q    Okay.  Do you recall at any point during the travel from Philadelphia to York any phone calls made between Mr. Hanes and the rental dealership?

A    Yes.

Q    Okay.  Do you know -- Do you have any idea what time the phone call or calls took place?

A    No, I do not.  I just know it was in the afternoon.

Q    Okay.  **Do you know who initiated those phone calls?  Who made the first call?**

A    **I believe Mr. Hanes called.**

Q    Okay.  **Why did he call?**

A    **I believe because there was heavy traffic.**

Q    Okay.  Where was that traffic?  Do you know where you were?

A    We could have been in Lancaster.  It could have been anywhere during the journey,

9

pretty much the same, turnpike down to 30.

Q    What time was it when you realized
that you would be late returning the van to
Apple?

A    Well, I guess when she called me or
something.  I didn't realize I was going to be
late.

Q    So it wasn't until you got a call
from Apple?

A    I was in traffic, and I didn't know
how long the traffic was going to move or
whatever.  So I didn't know if I was going to
be late.

Q    Okay.  But you said someone from
Apple called you?

A    That's correct.

Q    When was that?

A    Maybe four, 3:50, something -- 3:30
on, something like that.

Q    Okay.  So you don't know exactly
when.  You know it was sometime after 3:30?

A    Not right off the top of my head.
But I do have it written down somewhere, but,
no.  As of right now, no, I don't.

Q    Okay.  Now, did you have a cell phone
with you that -- that the person from Apple was
able to call you?

A    That's correct.

Q    Okay.  Where were you when you
received that phone call, that first phone call
from the person at Apple?

A    In traffic.

Q    Do you remember where on the way
back?  Were you in Bensalem?  Were you in --
obviously, you were somewhere between the
seminar and York.  Do you recall where you
were?

A    Out on the other side of Lancaster,
somewhere between Philly and Lancaster.  I
don't know exactly.

Q    On the far side of Lancaster?

A    That's correct.

Q    Okay.  What happened after the person
from Apple called you?  Were there any further
contacts between you and Apple?

A    Did I talk to her anymore?

Q    Yes.

A    Yes.

Q    Okay.  Who made -- Who initiated the
next contact, you or Apple?

A    I called -- I called several times,
and I would get, like, the voice message and
then I did get to her to call her and let her
know how I was making out in traffic and
everything.

Q    Do you recall when you made those
calls?

33

7

and the return of the rental vehicle.

1

2          A     I contacted him first.

3          Q     And when was that?

4          A     It was a little after 4 o'clock.

5          Q     So the first time you called was after 4:00?

6          A     (Nods head)

7          Q     Who was present when you called?

8          A     The other customer waiting on the van.

9          Q     Do you have any knowledge of the changes that

10 were made on the rental contract to Jeffrey L. Hanes?

11         A     Yes.

12         Q     And explain those changes.

13         A     The rental manager called me that morning

14 stating that that van had to be back by 4:00 p.m. and I

15 had to record the mileage and the gas on the next rental

16 agreement for the next customer.

17         Q     Who was that that contacted you?

18         A     Kathy Sargen.

19         Q     Now, how was that a change?

20         A     I am not sure what time they picked it up that

21 morning the previous day.  They picked it up that

22 afternoon, which it would usually be returned the

23 following afternoon at the same time, but this one had to

24 be returned earlier.

25         Q     And when was that change communicated?

10

36

conversation?

A    I just asked him -- I explained that the rental van was to be back by 4:00 and I have the customer there waiting on it, and how far away was he, how soon would he be back, and that the rental agreement was supposed to be -- it states that it was supposed to be returned by 4:00.  And I was informed that I have to charge him for two days because of it being late.

Q    So in the very first conversation, you had already been informed to charge him for two days?

A    Yes.

Q    So before you even spoke with Mr. Hanes, you had already spoken with and got your instructions from Kathy Sargen?

A    From Kathy Sargen and the sales managers.

Q    And who was that?

A    Rick Sargen and Matt Kugle.

Q    Okay.  So then they were present in and out of the service department then?

A    No, I called them on the phone.

Q    So you not only called Matt, but you also called Rick and then you also called Kathy?

A    I talked to Kathy that morning when she called me.  And then I -- I am sorry.  I did call her to let her know that the van was not back to see if there was

//

37

1    something else I could give the other customer instead of

2    that van.

3        Q    And then did you call Kathy before or after

4    you called Rick and Matt?

5        A    Before.

6        Q    So then after you spoke with Kathy, she told

7    you to charge him for two days, then you spoke with Rick

8    and Matt Kugle?

9        A    Yes.

10        Q    Now, after that initial conversation, did you

11    have another conversation with Mr. Hanes?

12        A    Yes, he called back.

13        Q    And what was the substance of that

14    conversation?

15        A    He said if he was going to be charged for two

16    days, he was going to keep the van for two days.

17        Q    Okay.  Then what action did you take?

18        A    I asked him to return the van.  And if he

19    would just return the van today, I would only charge him

20    for one day.

21        Q    Did you tell him you don't have any authority,

22    but I am just going to do this anyway?

23        A    Yes.

24        Q    When did you tell him that?

25        A    During the conversation.  I said I was advised

12

37

something else I could give the other customer instead of that van.

Q    And then did you call Kathy before or after you called Rick and Matt?

A    Before.

Q    So then after you spoke with Kathy, she told you to charge him for two days, then you spoke with Rick and Matt Kugle?

A    Yes.

Q    Now, after that initial conversation, did you have another conversation with Mr. Hanes?

A    Yes, he called back.

Q    And what was the substance of that conversation?

A    He said if he was going to be charged for two days, he was going to keep the van for two days.

Q    Okay.  Then what action did you take?

A    I asked him to return the van.  And if he would just return the van today, I would only charge him for one day.

Q    Did you tell him you don't have any authority, but I am just going to do this anyway?

A    Yes.

Q    When did you tell him that?

A    During the conversation.  I said I was advised

38

8

1   that I had to charge for two days, but if he brings the

2   van back so I can give it to the other customer, I would

3   charge him for one day.

4       Q    But you didn't say I don't actually have the

5   authority to do this?

6       A    Probably not, no.

7       Q    Then who else did you speak to in reference to

8   that after that conversation?

9       A    Probably one of the managers, Rick or Matt,

10  because I knew Mr. Hanes was very upset and it was close

11  to closing time.  I knew that I would be back there

12  alone.

13      Q    Was Rick Sargen or Matt Kugle expected to

14  leave before you got off?

15      A    They would leave -- they would usually leave

16  at 5:00.  They close the dealership.  I just wanted to

17  let one of them know that I had to sit and wait on a

18  customer to bring a rental back.

19      Q    Okay.  So you weren't afraid at that time,

20  were you?

21      A    No.

22           (Discussion held off the record)

23           (Previous question and answer read by the

24  reporter)

25  BY ATTY. THOMPSON:

13

A    I don't know.  I guess somewhere in the neighborhood of -- after 3:30 or something like that.

Q    How often did you make these calls to Apple?

A    I might have made two or three calls, maybe.  I would say two to three calls, easily.

Q    And what did you say during these calls?

A    I said, I'm running late.  I'm in traffic.  Traffic's backed up, and we're not -- I don't think I'm going to make it back by the time.

Q    Do you recall when you made your last call to Apple prior to actually getting back to Apple?

A    When you say do I remember --

Q    Do you remember what time you made that last call prior to actually getting back to Apple?

A    Maybe a quarter of five, somewhere in that area.

Q    Where were you at that time?

A    We were on our way in, maybe Columbia, Lancaster County, somewhere in that neighborhood.

**Q    What time did you actually arrive back at Apple?**

**A    I think 5:10, 5:15.**

(Hanes Deposition Exhibit Number 2 was marked for identification).

BY MS. AUSTIN:

**Q    I'm showing you a two-page document that has been marked as Exhibit 2.  This document was received by you, through your counsel, as part of the discovery process.**

A    Um-hum.

**Q    Can you look at this and tell me if you recognize it?**

A    Yep.

**Q    What is that?**

A    It's a copy of my prior phone bill.

**Q    Okay.  If you'll look on page 2, I've highlighted one of the items.  Can you tell me the phone number that you called in that highlighted call?**

A    That was Apple Chevrolet.

**Q    Okay.  And what time was that call?**

A    It says 5:13 p.m.

**Q    Okay.  Do you know why you would have -- And is that on November 14th?**

A    That's correct.

**Q    Do you know why you would have been calling Apple at 5:13 p.m. on that day?**

A    Yes.

14

1    A    Like I think it was around two or

2    three in the afternoon.

3    Q    Okay.  How did you find out?

4    A    From Jeff saying we have to leave

5    because we have to have the van back by five.

6    Q    He said five?

7    A    Yeah.

8    Q    Okay.  What time did you arrive back

9    at the dealers?

10    A    It was after five.

11    Q    Do you recall was it a lot after, a

12    little after?

13    A    Like 15 to 20 minutes.

14    Q    Okay.  Who was there when you arrived

15    in the rental area?

16    A    I think they were either closing or

17    they were closed because the only person that

18    was there it looked like employees, but they

19    looked like -- it was a gentleman I guess that

20    parks the cars that was, like, on the outside

21    because when we arrived we asked him what he

22    wants us to do with the van, and he said just

23    leave it there.  I'll get to it.  And then

24    there was an employee inside the area, you

25    know, where you register.

13

1    when you arrived back at the dealer's that day?

2        A    About ten after five.

3        Q    Who was there when you arrived?

4        A    The lady, that's who I seen in the

5    beginning, and the manager were there also.

6    The person that was supposed to be renting the

7    van right after us was waiting out front.

8        Q    Okay.  When you got the van back to

9    the dealer's premises, who went inside the

10    rental area?

11        A    Jeff went inside and then everybody

12    got out of the van.  Jeff left first and I

13    dragged along in the back.

14        Q    Okay.  So it was just you and Mr.

15    Hanes that went in or everyone?

16        A    I think, off the top of my head, I'm

17    pretty sure someone else might have went in,

18    but I'm not sure.  At least they were closer

19    than me.  He was actually the one that went to

20    return everything to the lady.

21        Q    Okay.  And -- but you also went into

22    the rental area you said?

23        A    Yes.

24        Q    Okay.  And how far were you away from

25    Mr. Hanes in the rental area?

23

    A    I don't know.  I guess somewhere in the neighborhood of -- after 3:30 or something like that.

    Q    How often did you make these calls to Apple?

    A    I might have made two or three calls, maybe.  I would say two to three calls, easily.

    Q    And what did you say during these calls?

    A    I said, I'm running late.  I'm in traffic.  Traffic's backed up, and we're not -- I don't think I'm going to make it back by the time.

    Q    Do you recall when you made your last call to Apple prior to actually getting back to Apple?

    A    When you say do I remember --

    Q    Do you remember what time you made that last call prior to actually getting back to Apple?

    A    Maybe a quarter of five, somewhere in that area.

    Q    Where were you at that time?

    A    We were on our way in, maybe Columbia, Lancaster County, somewhere in that neighborhood.

    **Q    What time did you actually arrive back at Apple?**

    **A    I think 5:10, 5:15.**

    (Hanes Deposition Exhibit Number 2 was marked for identification).

BY MS. AUSTIN:

    **Q    I'm showing you a two-page document that has been marked as Exhibit 2.  This document was received by you, through your counsel, as part of the discovery process.**

    A    Um-hum.

    Q    Can you look at this and tell me if you recognize it?

    A    Yep.

    Q    What is that?

    A    It's a copy of my prior phone bill.

    Q    Okay.  If you'll look on page 2, I've highlighted one of the items.  Can you tell me the phone number that you called in that highlighted call?

    A    That was Apple Chevrolet.

    Q    Okay.  And what time was that call?

    A    It says 5:13 p.m.

    Q    Okay.  Do you know why you would have -- And is that on November 14th?

    A    That's correct.

    Q    Do you know why you would have been calling Apple at 5:13 p.m. on that day?

    A    Yes.

24

Q    Why?
A    Because I was letting her know I was putting gas in it, and I was right on 30, coming down the highway.  I just got done putting gas in, filling it up, and I was actually, right on 30, to let her know I was coming right there.
Q    Okay.  So as of the time of that phone call, 5:13 p.m., you were not yet back at Apple?
A    That's a possibility, yes.
Q    Okay.  What did you do when you got back to Apple?
A    What did I do?  What do you mean?
Q    You arrived at Apple's business premises.
A    Right.
Q    I assume you turned the van into the parking lot?
A    That's correct.
Q    What did you do?
A    Well, I -- When I got out, I seen the manager locking the gates.  I asked him did he want the van; he said hold on.  Then I went inside.
Q    Do you know who that manager was?
A    That was Matt.
Q    When you say Matt, you mean Matt Kugel?
A    That's correct.
Q    Okay.  Had you seen him prior to that date?
A    Never.  No, no.
Q    Did Matt take over the van from you after he was locking the gates?
A    Like I said, I went inside to turn the keys in.  He just told me to hold up, as far as that.  He just continued to do what he was doing as far as locking some gates or doors.  He was locking up, doing some things.
Q    Where was the van at that time?
A    I pulled it out front.
Q    So the van was still in the lot there?
A    Yeah.
Q    Okay.  And you said you went inside the building?
A    That's correct.
Q    Okay.  Who else was inside the building there when you went in?
A    As far as employees?
Q    Anyone.
A    There was another customer waiting, and the lady behind the counter.
Q    Okay.  Did you go in alone, or did anyone else from the van come in with you?
A    Everybody came in.



18.   Any and all documents evidencing any medical consultations, treatment, diagnoses, or prescriptions arising out of or resulting from the incident alleged in Plaintiff's Complaint.

A copy of said document, which is confidential and not to be used for any other purpose apart from this litigation, is attached and incorporated herein.

19.   Any and all documents identified in your Response to Defendant's First Set of Interrogatories to Plaintiff, if not already produced in response to a prior request herein.

A copy of "Receipt of Payment" given to Plaintiff on or around March 10, 1999, and "Detail of Usage charges" is attached and incorporated herein.

**CGA Law Firm**
Countess Gilbert Andrews P.C.

By: _____
Sara A. Austin, Esquire
I.D. # 59052
29 North Duke Street
York, PA 17401
(717) 848-4900

Attorney for Defendants

DATED: July 11th, 2001

11

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF: **YORK**



**RECEIPT OF PAYMENT**

**COMMONWEALTH OF**

**PENNSYLVANIA**

Mag. Dist. No.:
**19-1-02**

DJ Name: Hon.
**RICHARD E. MARTIN, II**
Address: **577 MARYLAND AVENUE**
**SUITE 2**
**YORK, PA**
Telephone: **(717) 771-4792    17404**

VS.
NAME and ADDRESS

DEFENDANT:
**HANES, JEFFERY LYNN**
**54  N. RICHLAND**
**APT. 1-NORTH**
**YORK, PA 17404**

**JEFFERY L. HANES**
**54  N. RICHLAND**
**APT. 1-NORTH**
**YORK, PA 17404**

Docket No.: **NT-0000822-98**
Date Filed:  **11/16/98**



**18 §5503 §§A3 DISORDER CONDUCT OBSCENE LANG/GEST**
(Charge)

| RECEIPT NO:    **055950** | DATE:    **3/10/99** | PAGE:    **1** |
|---|---|---|

| SOURCE: **PAID AT WINDOW** | AMOUNT RECEIVED: | $ **25.00** |
|---|---|---|
| METHOD: **PAID BY CASH** | AMOUNT APPLIED: | $ **25.00** |
| CHECK#: | COLLATERAL APPLIED: | $ **.00** |
| | CHANGE: | $ **.00** |
| MANUAL RECEIPT#: | | |
| CITATION#:    **P1177542-2** | NEXT PAYMENT AMOUNT: | **25.00** |
| COSTS INCLUDED ON: | NEXT PAYMENT DATE: | **3/26/99** |
| | NEXT PMT TYPE: **TIME PAYMENT** | |

| PAYMENT DESCRIPTION | BALANCE FWD | AMT APPLIED | CURRENT BAL |
|---|---|---|---|
| JUDICIAL COMPUTER PROJECT | 1.50 | 1.50- | .00 |
| POSTAGE | 3.00 | .29- | 2.71 |
| MUNICIPAL FINE 301 | 150.00 | 14.02- | 135.98 |
| POSTAGE | 3.00 | .28- | 2.72 |
| POSTAGE | 3.00 | .28- | 2.72 |
| COUNTY SERVER FEES | 14.45 | 1.35- | 13.10 |
| CONSTABLE EDUC & TRAINING | 5.00 | .47- | 4.53 |
| COURT COST    COMM-COST | 5.79 | .54- | 5.25 |
| COURT COST    67-CTY | 21.42 | 2.00- | 19.42 |
| COMMONWEALTH COST- HB627 | 5.79 | .54- | 5.25 |
| CRIME VICTIM COMPENSATION | 15.00 | 1.40- | 13.60 |
| CRIMES COMMISSION | 15.00 | 1.40- | 13.60 |
| DOMESTIC VIOLENCE | 10.00 | .93- | 9.07 |
| TOTAL | ==============<br>252.95 | ==============<br>25.00- | ==============<br>227.95 |

CURRENT BALANCE DUE      227.95

RECVD FROM HANES, JEFFERY LYNN
THANK YOU!  DLS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| or Billing Inquiries | | Account Name | | Account Number | | | | Invoice Date | |
| all 1-888-461-3030 | | JEFFREY L HANES | | 648486    -1 | | | | Jan 06, 1999 | |

### Detail of Usage Charges (717-332-0375)

| Line | Date | Time | Call From | Call To | | No Called | Call Type | Rate Prd | Min | Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| 122 | 11-13 | 8:01A | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 123 | 11-13 | 8:48A | PCS1-PA | YORK | PA | 717-845-9773 | | P | 1 | 0.36 |
| 124 | 11-13 | 9:00A | PCS1-PA | YORK | PA | 717-845-9773 | | P | 1 | 0.36 |
| 125 | 11-13 | 9:19A | PCS1-PA | YORK | PA | 717-848-5896 | | P | 6 | 2.16 |
| 126 | 11-13 | 10:54A | PCS1-PA | YORK | PA | 717-757-7811 | | P | 2 | 0.72 |
| 127 | 11-13 | 10:55A | PCS1-PA | YORK | PA | 717-851-8166 | | P | 1 | 0.36 |
| 128 | 11-13 | 11:01A | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 4 | 1.44 |
| 129 | 11-13 | 11:04A | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 1 | 0.36 |
| 130 | 11-13 | 11:05A | PCS1-PA | YORK | PA | 717-845-2000 | | P | 3 | 1.08 |
| 131 | 11-13 | 11:08A | PCS1-PA | GETTYSBURG | PA | 717-334-4318 | | P | 4 | 1.44 |
| 132 | 11-13 | 12:03P | PCS1-PA | YORK | PA | 717-843-3389 | | P | 9 | 3.24 |
| 133 | 11-13 | 12:16P | PCS1-PA | YORK | PA | 717-851-8166 | | P | 1 | 0.36 |
| 134 | 11-13 | 1:37P | PCS1-PA | YORK | PA | 717-846-0329 | | P | 2 | 0.72 |
| 135 | 11-13 | 1:40P | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 136 | 11-13 | 3:11P | PCS1-PA | YORK | PA | 717-751-1374 | | P | 1 | 0.36 |
| 137 | 11-13 | 3:12P | PCS1-PA | YORK | PA | 717-843-2364 | | P | 2 | 0.72 |
| 138 | 11-13 | 4:36P | PCS1-PA | YORK | PA | 717-843-9853 | | P | 1 | 0.36 |
| 139 | 11-13 | 6:36P | PCS1-PA | YORK | PA | 717-751-1374 | | P | 1 | 0.36 |
| 140 | 11-13 | 6:37P | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 141 | 11-13 | 6:39P | PCS1-PA | YORK | PA | 717-845-4541 | | P | 2 | 0.72 |
| 142 | 11-13 | 6:42P | PCS1-PA | YORK | PA | 717-851-8166 | | P | 1 | 0.36 |
| 143 | 11-13 | 6:43P | PCS1-PA | YORK | PA | 717-843-9853 | | P | 1 | 0.36 |
| 144 | 11-13 | 7:15P | PCS1-PA | YORK | PA | 717-846-7024 | | O | 7 | 0.70 |
| 145 | 11-13 | 7:32P | PCS1-PA | WILMINGTON | DE | 302-777-4439 | D | P | 14 | 5.04 |
| 146 | 11-13 | 7:46P | PCS1-PA | YORK | PA | 717-846-1224 | | O | 3 | 0.30 |
| 147 | 11-13 | 9:25P | PCS1-PA | YORK | PA | 717-848-4635 | | O | 2 | 0.20 |
| 148 | 11-13 | 9:30P | PCS1-PA | YORK | PA | 717-851-9063 | | O | 1 | 0.10 |
| 149 | 11-13 | 9:31P | PCS1-PA | YORK | PA | 717-851-9063 | | O | 1 | 0.10 |
| 150 | 11-13 | 9:33P | PCS1-PA | YORK | PA | 717-845-9773 | | O | 1 | 0.10 |
| 151 | 11-13 | 9:35P | PCS1-PA | YORK | PA | 717-851-9061 | | O | 1 | 0.10 |
| 152 | 11-13 | 9:35P | PCS1-PA | YORK | PA | 717-851-9063 | | O | 1 | 0.10 |
| 153 | 11-13 | 9:38P | PCS1-PA | YORK | PA | 717-751-1374 | | O | 1 | 0.10 |
| 154 | 11-13 | 9:39P | PCS1-PA | INCOMING | CL | 717-332-0375 | | T | 1 | 0.10 |
| 155 | 11-13 | 9:40P | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 156 | 11-13 | 9:42P | PCS1-PA | YORK | PA | 717-751-1374 | | O | 1 | 0.10 |
| 157 | 11-13 | 9:43P | PCS1-PA | YORK | PA | 717-751-1374 | | O | 1 | 0.10 |
| 158 | 11-13 | 10:11P | PCS1-PA | YORK | PA | 717-843-9853 | | O | 1 | 0.10 |
| 159 | 11-13 | 11:36P | PCS1-PA | YORK | PA | 717-848-4635 | | O | 2 | 0.20 |
| 160 | 11-14 | 7:51A | PCS1-PA | YORK | PA | 717-843-3389 | | W | 1 | 0.01 |
| 161 | 11-14 | 8:02A | PCS1-PA | STEWARTSTN | PA | 717-993-3316 | | W | 2 | 0.02 |
| 162 | 11-14 | 8:09A | PCS1-PA | STEWARTSTN | PA | 717-993-3316 | | W | 1 | 0.01 |
| 163 | 11-14 | 8:37A | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 164 | 11-14 | 9:03A | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 4 | 1.44 |
| 165 | 11-14 | 9:46A | PA/NJ/DE | STEWARTSTN | PA | 717-993-3316 | | W | 5 | 0.05 |
| 166 | 11-14 | 9:52A | PA/NJ/DE | CAMDEN | NJ | 609-504-2119 | D | P | 4 | 1.44 |
| 167 | 11-14 | 10:13A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 168 | 11-14 | 10:14A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 169 | 11-14 | 11:41A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 2 | 0.02 |
| 170 | 11-14 | 11:42A | PA/NJ/DE | GETTYSBURG | PA | 717-334-7001 | | W | 1 | 0.01 |
| 171 | 11-14 | 11:43A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 172 | 11-14 | 11:44A | PA/NJ/DE | GETTYSBURG | PA | 717-334-7401 | | W | 5 | 0.05 |
| 173 | 11-14 | 11:57A | PA/NJ/DE | YORK | PA | 717-848-5896 | | W | 1 | 0.01 |
| 174 | 11-14 | 11:58A | PA/NJ/DE | YORK | PA | 717-845-9773 | | W | 5 | 0.05 |
| 175 | 11-14 | 12:02P | PA/NJ/DE | YORK | PA | 717-845-8146 | | W | 15 | 0.15 |
| 176 | 11-14 | 12:17P | PA/NJ/DE | YORK | PA | 717-851-8166 | | W | 1 | 0.01 |
| 177 | 11-14 | 12:19P | PA/NJ/DE | YORK | PA | 717-851-8166 | | W | 1 | 0.01 |
| 178 | 11-14 | 12:26P | PA/NJ/DE | NEWARK | NJ | VOICE MAIL | | T | 1 | 0.10 |
| 179 | 11-14 | 12:27P | PA/NJ/DE | YORK | PA | 717-845-6611 | | W | 4 | 0.04 |
| 180 | 11-14 | 3:20P | PA/NJ/DE | YORK | PA | 717-848-1300 | | W | 1 | 0.01 |
| 181 | 11-14 | 3:22P | PA/NJ/DE | YORK | PA | 717-848-1300 | | W | 2 | 0.02 |

| | | | | |
|---|---|---|---|---|
| Call Type: | CF=Call Forwarding | CW=Call Waiting | D=Domestic | DO=Voice Dial/Voice Mail Outdial |
| | F=Fax/Data | I=International | R=Roaming | 3C=3 Way Conference |
| | TN=Telephone Notification | | | |
| Rate Prd: | O=Off Peak | P=Peak | T=Mobile Terminating | M=Multiple Periods    W=Weekend |

Page 7

| Account Name | Account Number | Invoice Date |
|---|---|---|
| JEFFREY L HANES | 648486  -1 | Jan 06, 1999 |

### Detail of Usage Charges (717-332-0375)

| Line | Date | Time | Call From | Call To | | No Called | Call Type | Rate Prd | Min | Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| 182 | 11-14 | 3:26P | PA/NJ/DE | YORK | PA | 717-848-1300 | | W | 3 | 0.03 |
| 183 | 11-14 | 3:29P | PA/NJ/DE | 800 SERV | CL | 800-537-8477 | | W | 2 | 0.02 |
| 184 | 11-14 | 3:32P | PA/NJ/DE | STEWARTSTN | PA | 717-993-3316 | | W | 1 | 0.01 |
| 185 | 11-14 | 3:33P | PA/NJ/DE | YORK | PA | 717-854-2398 | | W | 2 | 0.02 |
| 186 | 11-14 | 3:34P | PA/NJ/DE | NEWARK | NJ | VOICE MAIL | | T | 1 | 0.10 |
| 187 | 11-14 | 4:22P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 188 | 11-14 | 4:23P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 2 | 0.02 |
| 189 | 11-14 | 4:25P | PCS1-PA | YORK | PA | 717-843-9853 | | W | 1 | 0.01 |
| 190 | 11-14 | 4:27P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 191 | 11-14 | 4:27P | PCS1-PA | YORK | PA | 717-848-1300 | | W | 2 | 0.02 |
| 192 | 11-14 | 4:30P | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 3 | 1.08 |
| 193 | 11-14 | 4:42P | PCS1-PA | YORK | PA | 717-843-9853 | | W | 3 | 0.03 |
| 194 | 11-14 | 4:49P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 2 | 0.02 |
| 195 | 11-14 | 5:13P | PCS1-PA | YORK | PA | 717-848-1300 | | W | 1 | 0.01 |
| 196 | 11-14 | 5:34P | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 8 | 2.88 |
| 197 | 11-14 | 5:44P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 198 | 11-14 | 5:56P | PCS1-PA | YORK | PA | 717-843-3389 | | W | 5 | 0.05 |
| 199 | 11-14 | 6:08P | PCS1-PA | MAYS LDG | NJ | 609-625-5610 | D | P | 5 | 1.80 |
| 200 | 11-14 | 6:15P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 201 | 11-14 | 6:16P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 202 | 11-14 | 6:17P | PCS1-PA | YORK | PA | 717-845-5527 | | W | 1 | 0.01 |
| 203 | 11-14 | 6:58P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 3 | 0.03 |
| 204 | 11-14 | 7:12P | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 205 | 11-14 | 7:14P | PCS1-PA | YORK | PA | 717-846-4026 | | W | 1 | 0.01 |
| 206 | 11-14 | 7:16P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 2 | 0.02 |
| 207 | 11-14 | 7:45P | PCS1-PA | YORK | PA | 717-848-5014 | | W | 3 | 0.03 |
| 208 | 11-14 | 7:50P | PCS1-PA | YORK | PA | 717-845-9504 | | W | 1 | 0.01 |
| 209 | 11-14 | 7:51P | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 210 | 11-14 | 7:52P | PCS1-PA | HARRISBURG | PA | 717-985-0559 | | W | 1 | 0.01 |
| 211 | 11-14 | 9:00P | PCS1-PA | HARRISBURG | PA | 717-985-0559 | | W | 5 | 0.05 |
| 212 | 11-14 | 9:47P | PCS1-PA | YORK | PA | 717-854-0932 | | W | 1 | 0.01 |
| 213 | 11-14 | 9:49P | PCS1-PA | YORK | PA | 717-848-3321 | | W | 7 | 0.07 |
| 214 | 11-14 | 9:56P | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 215 | 11-14 | 11:20P | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 216 | 11-14 | 11:46P | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 217 | 11-14 | 11:53P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 218 | 11-14 | 11:54P | PCS1-PA | YORK | PA | 717-846-1224 | | W | 2 | 0.02 |
| 219 | 11-15 | 1:21A | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 220 | 11-15 | 1:42A | PCS1-PA | YORK | PA | 717-848-4635 | | W | 1 | 0.01 |
| 221 | 11-15 | 1:44A | PCS1-PA | YORK | PA | 717-852-9238 | | W | 1 | 0.01 |
| 222 | 11-15 | 1:49A | PCS1-PA | YORK | PA | 717-852-9238 | | W | 1 | 0.01 |
| 223 | 11-15 | 1:50A | PCS1-PA | YORK | PA | 717-846-2772 | | W | 1 | 0.01 |
| 224 | 11-15 | 1:52A | PCS1-PA | YORK | PA | 717-848-4635 | | W | 2 | 0.02 |
| 225 | 11-15 | 1:54A | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 226 | 11-15 | 1:55A | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 227 | 11-15 | 11:40A | PCS1-PA | MAYS LDG | NJ | 609-625-5611 | D | P | 1 | 0.36 |
| 228 | 11-15 | 11:41A | PCS1-PA | MAYS LDG | NJ | 609-625-5610 | D | P | 1 | 0.36 |
| 229 | 11-15 | 11:43A | PCS1-PA | GETTYSBURG | PA | 717-334-4318 | | W | 1 | 0.01 |
| 230 | 11-15 | 11:44A | PCS1-PA | YORK | PA | 717-848-5896 | | W | 10 | 0.10 |
| 231 | 11-15 | 11:54A | PCS1-PA | YORK | PA | 717-848-4635 | | W | 2 | 0.02 |
| 232 | 11-15 | 12:01P | PCS1-PA | YORK | PA | 717-848-5896 | | W | 2 | 0.02 |
| 233 | 11-15 | 12:19P | PCS1-PA | YORK | PA | 717-852-3130 | | W | 7 | 0.07 |
| 234 | 11-15 | 12:47P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 1 | 0.01 |
| 235 | 11-15 | 1:08P | PCS1-PA | YORK | PA | 717-846-0351 | | W | 1 | -0.01 |
| 236 | 11-15 | 2:44P | PCS1-PA | VOICE MAIL | | | | T | 2 | FREE |
| 237 | 11-15 | 2:45P | PCS1-PA | YORK | PA | 717-848-9220 | | W | 1 | 0.01 |
| 238 | 11-15 | 2:46P | PCS1-PA | VOICE MAIL | | | | T | 2 | FREE |
| 239 | 11-15 | 2:51P | PCS1-PA | YORK | PA | 717-843-9853 | | W | 1 | 0.01 |
| 240 | 11-15 | 3:08P | PCS1-PA | YORK | PA | 717-848-4635 | | W | 2 | 0.02 |
| 241 | 11-15 | 3:12P | PCS1-PA | YORK | PA | 717-846-7024 | | W | 1 | 0.01 |

| Call Type: | CF=Call Forwarding | CW=Call Waiting | D=Domestic | | DO=Voice Dial/Voice Mail Outdial |
|---|---|---|---|---|---|
| | F=Fax/Data | I=International | R=Roaming | | 3C=3 Way Conference |
| | TN=Telephone Notification | | | | |
| Rate Prd: | O=Off Peak | P=Peak | T=Mobile Terminating | M=Multiple Periods | W=Weekend |

15

A    Off to the side.  Some of them was probably behind me.  I can't put them right on the spot where they were actually standing.

Q    Okay.  Do you recall if they were at the counter with you?

A    Dimitrios was up there.

Q    Okay.  And where was the lady from Apple?

A    She was behind the counter.

Q    Were there any other doors into or out of that area?

A    There might have been another door.

Q    Do you recall where it was?

A    No.

**Q    So after you came in and went to the counter, then what did you do?**

**A    I turned the keys in.**

**Q    Okay.  Did you then leave?**

**A    No.**

**Q    What happened?**

**A    We had some discrepancy about the bill.**

**Q    Okay.  Who's we?**

**A    Me and the lady behind the counter.**

**Q    Okay.  What discussion did you have?**

**A    About her charging me for two days. When we talked on the phone previously, she said she was going to charge me two days.**  So I said, well, no use in me trying to fight this traffic and get back, and I said just go ahead and charge it, and I'll just keep the van for two days.

Q    And what was her response then?

A    We had a couple conversations.  I think she said let me call you back, or -- I knew the customer was there.  I think she said, well, let me call you back.  I think she had to make a phone call or something.  I'm not sure.

Q    So this was while you were still on your way back to Apple?

A    Yeah.

Q    Okay.

A    You're asking me about the conversation, but it was about the conversation that we had on the phone.

Q    Okay.

**A    Then we had the discussion when I got back about the bill.**

**Q    Okay.  And was this a discussion in normal tones of voice?  Did it get heated? Tell me about it.**

**A    It was in normal tones of voice, and then after, you know, I was going to be charged two days and the van was gone, you know, I was upset about that, because I wasn't going to pay for something I didn't use.  Because she originally told me she was charging me one day**

64

14

1     Q    So were you referring to Jeffrey Hanes or were

2    you referring to other customers you also dealt with?

3     A    Probably all of them, but this was the one

4    that drew the last straw with me.

5     Q    And why was that?

6     A    Because I was being accused of saying stuff

7    that I didn't say.  It just got into a long, drawn-out

8    thing that didn't need to even happen because there was

9    no reason for it.

10    Q    When did you become aware that the two-day

11    charge -- well, when Jeffrey Hanes came in, you told him

12    you were still charging him for two days.  Is that right?

13    A    I told him I was informed I had to.

14    Q    But previously, you had told him you were only

15    going to charge him for one day?

16    A    Yes, because I took that upon myself to do

17    that.

18    Q    And after the time -- so were you told that

19    you actually had to charge him for two days before he

20    came in?

21    A    Yes.

22    Q    And you didn't call him to say, look, I got to

23    charge you for these two days, I want you to know that?

24    A    The first -- he did know that.  And then he

25    called back and I said, listen, if you just bring the van

27

6

1    A    I don't remember.

2    Q    So then it is possible since you don't

3    remember?

4    A    I don't know.

5    Q    So when was the first time that Joann called

6    you after the fact that you explained the terms?

7    A    About 4:30 in the afternoon.

8    Q    And what was the content of that conversation?

9    A    She called to tell me that the van wasn't back

10   yet and my other 4 o'clock customer was there and what

11   should she do.

12   Q    And what did you advise her?

13   A    To look on the contract to find a cell phone

14   number to see if she could call to find out where their

15   location was, when the van would be back.

16   Q    Did you give her any other instruction?

17   A    Not at that point.

18   Q    At that time, did you give her any instruction

19   as to what he needed to be charged or anything like that?

20   A    There was another -- when she called me back

21   to tell me, you know, that he was running late, I had

22   told her then about it would go into a two-day charge.

23   Q    At the time of the rental, did you advise Mr.

24   Hanes that if he was not back by 4 o'clock, that he would

25   be charged for another day?

7    1    charge two days instead of the one day?

2        A    We discussed that before he got back.  And

3    then when the scuttle broke out, I told her that I would

4    square away things with Mr. Pollack on Monday.

5        Q    So if I understand your testimony now, you are

6    saying first you had a conversation where you told her he

7    has to be charged two days, then you had a conversation

8    where she told you she told him only one day, then you

9    had another conversation where you told her you have to

10    charge two days.  And that was all before he came back?

11        A    No, no.

12        Q    Okay.  So explain where there is a difference.

13        A    We had a conversation when he was en route.  I

14    told her to charge him two days because he was late in

15    picking up the van.  And then she called me back later

16    when the scuttle broke out and said, you know, what was

17    going on.  And I said, well, I would get with Mr. Pollack

18    on Monday.

19        Q    Okay.  So she didn't call you before he

20    arrived to say she was only going to charge for one day?

21        A    I don't remember.  I don't remember a time

22    when she called.  I mean --

23        Q    But you remember those times?

24        A    I talked to her I know at least two times.  I

25    don't remember.

27

A    Off to the side.  Some of them was probably behind me.  I can't put them right on the spot where they were actually standing.

Q    Okay.  Do you recall if they were at the counter with you?

A    Dimitrios was up there.

Q    Okay.  And where was the lady from Apple?

A    She was behind the counter.

Q    Were there any other doors into or out of that area?

A    There might have been another door.

Q    Do you recall where it was?

A    No.

Q    So after you came in and went to the counter, then what did you do?

A    I turned the keys in.

Q    Okay.  Did you then leave?

A    No.

Q    What happened?

A    We had some discrepancy about the bill.

Q    Okay.  Who's we?

A    Me and the lady behind the counter.

Q    Okay.  What discussion did you have?

A    About her charging me for two days. When we talked on the phone previously, she said she was going to charge me two days.  So I said, well, no use in me trying to fight this traffic and get back, and I said just go ahead and charge it, and I'll just keep the van for two days.

Q    And what was her response then?

A    We had a couple conversations.  I think she said let me call you back, or -- I knew the customer was there.  I think she said, well, let me call you back.  I think she had to make a phone call or something.  I'm not sure.

Q    So this was while you were still on your way back to Apple?

A    Yeah.

Q    Okay.

A    You're asking me about the conversation, but it was about the conversation that we had on the phone.

Q    Okay.

A    Then we had the discussion when I got back about the bill.

Q    Okay.  And was this a discussion in normal tones of voice?  Did it get heated? Tell me about it.

A    It was in normal tones of voice, and then after, you know, I was going to be charged two days and the van was gone, you know, I was upset about that, because I wasn't going to pay for something I didn't use.  Because she originally told me she was charging me one day

when I brought the van back.  And I was upset because she lied to me in order to get me to bring the van back.  That's the way I took it.

Because we had several conversations, and then when I got there, then she said she was going to charge me, so I got upset about being charged for something that I'm not using.

Q     Now, you said at that point the van was already gone?

A     I don't know if it was actually gone. I did turn the keys in, and I said, well, just give me the keys back and then you can charge me two days.  I have no problem with that.

Then I think the customer that was there had left the room with the manager to go out to the van, and -- prior.

Q     Okay.  Now, was it just you and the lady behind the counter that were involved in this discussion, or were there other people involved?

A     Me and her was doing the discussing.

Q     Okay.  Now, you said some point you got angry because you had been told you were going to be charged two days, and the keys or the van were no longer available to you.

What happened at that point after you got angry?

A     I told her I'm not being charged for two days because I didn't use the van for two days, and I'm not paying for two days.

Q     At this point were you still speaking in a calm tone?

A     I might have been getting loud, probably then.

Q     How about the lady behind the counter, was she still speaking in a calm tone?

A     I guess it started getting loud for both of us because I didn't want to be billed, and she seemed like she was upset for waiting on me being late.

Q     Okay.  Were you both talking slowly to be understood?  Were you both talking quickly?  How was that conversation or discussion proceeding?

A     I guess just general talking.  I didn't look at it as fast or slow.

Q     Okay.  How did you know that she was upset waiting for you?  I think those were your words.

A     Well, after we got into the disagreement of me paying, I said, I'm not paying.  I was consistently saying, I'm not paying.  I said -- You know, I said, I'm not paying until you give me the keys back.  I said, you're going to have to bill my -- the credit card is not my credit card, but I said I'm not paying.  And she -- She said, you're

60

13

1    out.  And then after that was since 4 o'clock.

2         Q    Now, what was going on that he said, why are

3    you so nice to the other customer?

4         A    Because I was trying to explain to the

5    customer where the van was at and what they needed to do

6    before they brought the van back as far as filling the

7    tank of gas up.

8         Q    When did you explain that to the customer?

9         A    As soon as I got the keys.

10         Q    So you hadn't explained where the van was at

11    prior to Mr. Hanes coming?

12         A    No, because I wasn't sure where they were

13    going to park it.

14         Q    Okay.  So when you say where the van was at,

15    you are talking about where it was parked --

16         A    Right.

17         Q    -- after it came in?  And you are saying

18    because Mr. Hanes asked you, why were you so nice to him,

19    that's in your tone of voice?

20         A    Pardon me?

21         Q    Was your tone of voice still loud with John

22    Schriver?

23         A    I wouldn't think so, no.

24         Q    So when he referred to why are you so nice,

25    was you using a different tone of voice with John

61

13

1    Schriver than Jeffrey Hanes?

2          A    At that point, yes.

3          Q    And so when he asked you, why are you so nice,

4    you responded because I waited on you or --

5          A    I just tried to explain to him, we have been

6    sitting here waiting for him, yes.

7          Q    And what was your tone of voice at that time?

8          A    Stern.

9          Q    Was it also loud as you were previously?

10         A    Probably not quite as loud.  It was loud.

11         Q    Not as loud?

12         A    It was loud, but I wouldn't say --

13         Q    Was it louder than what you were talking with

14   John Schriver?

15         A    Yes.

16         Q    So after talking to John Schriver, Jeffrey

17   Hanes asked you about that and then you became loud?

18         A    We all were loud.  It was a constant loud.

19   The tone just never changed.

20         Q    But in between that time, you had communicated

21   with John Schriver.  Is that right?

22         A    Yes.

23         Q    But your tone was not the same with John

24   Schriver?

25         A    No, because he was listening.  He was letting

14

1    Q    So were you referring to Jeffrey Hanes or were

2    you referring to other customers you also dealt with?

3    A    Probably all of them, but this was the one

4    that drew the last straw with me.

5    Q    And why was that?

6    A    Because I was being accused of saying stuff

7    that I didn't say.  It just got into a long, drawn-out

8    thing that didn't need to even happen because there was

9    no reason for it.

10    Q    When did you become aware that the two-day

11    charge -- well, when Jeffrey Hanes came in, you told him

12    you were still charging him for two days.  Is that right?

13    A    I told him I was informed I had to.

14    Q    But previously, you had told him you were only

15    going to charge him for one day?

16    A    Yes, because I took that upon myself to do

17    that.

18    Q    And after the time -- so were you told that

19    you actually had to charge him for two days before he

20    came in?

21    A    Yes.

22    Q    And you didn't call him to say, look, I got to

23    charge you for these two days, I want you to know that?

24    A    The first -- he did know that.  And then he

25    called back and I said, listen, if you just bring the van

14

1    back, I will only charge you for one day.

2        Q    And I am asking you, did you -- but after

3    that, you were told no, you really have to charge him for

4    two days.  Is that right?

5        A    That's right.

6        Q    That is right?

7        A    That's right.

8        Q    Okay.  But the last thing you told Jeffrey

9    Hanes is he would only be charged for one day.  Is that

10   correct?

11       A    Yes.

12       Q    Did you -- once you received alternative

13   instructions, did you call back, call him back and say, I

14   really got to charge you for these two days?

15       A    No, I didn't, because he said he would be

16   there within twenty minutes.  He should have been there

17   any time.  At that point, he should have been there

18   within minutes.

19       Q    But he wasn't there?

20       A    No, he wasn't there.

21       Q    And you didn't call him?

22       A    No, I didn't.

23       Q    So you didn't tell him, there is a change, I

24   have to charge you the two days?

25       A    No.

66

14

1    Q    So from your knowledge, your last

2    conversation, he came in expecting a one-day charge?

3    A    Yes.

4    Q    Did you speak with Terrence Stewart shortly

5    after November 14th of '98?

6    A    Yes, Terry called me.

7    Q    And what was the substance of that

8    conversation?

9    A    Just about he was sorry that I went through

10   something like that and asked me if I -- if there was any

11   way I would return to work.  And I said, not at that

12   position, no.

13   Q    Did you explain to him that it wasn't just

14   that situation, it was dealing with customers in general?

15   A    No.

16   Q    So when is the first time that you said that

17   it wasn't just that situation, it was the fact that I

18   deal with these type of customers in general?

19   A    I deal with these customers every day like

20   that in general, but this was the situation that made me

21   quit, that I decided to quit, that I no longer wanted to

22   work under this situation.

23   Q    Well, my question was, when did you advise

24   someone that it wasn't just this situation?

25   A    It never came up.

15

1       Q      Okay.  At the rental desk there?

2       A      At the desk, yes.

3       Q      And was that person male or female?

4       A      Female.

5       Q      Okay.  Anyone else there?

6       A      I can't remember anybody else.

7       Q      Okay.

8       A      I think there might have been in

9   behind them -- I don't know how it is now; but

10  there was like the rental area, and there was

11  like some computers back there.  I think I

12  might have seen like another employee back

13  there, but he might have been sweeping.  I

14  don't know.

15      Q      Okay.  But not in that rental room

16  right there?

17      A      No.  Not where the confrontation went

18  on.

19      Q      Okay.  When you guys got back with

20  the van, how many people went inside the rental

21  area?

22      A      Excuse me.  **There was another**

23  **gentleman with the lady waiting at the rental**

24  **area.**

25      Q      Okay.  On your side of the counter or

16

1    on her side?

2        A    On our side.

3        Q    Okay.

4        A    Which that was -- I mean, do you need

5    to ask me the question?  But we found out that

6    was the gentleman that was waiting for the

7    van --

8        Q    Okay.

9        A    -- to take it.

10        Q    Okay.

11        A    Not the employee.  **He was waiting**

12    **because he had rented the van.**

13        Q    Okay.  Great.  Thank you.  **When you**

14    **all got there with the van, how many people**

15    **came inside the rental area?**

16        A    **We all went inside,** four or five

17    people?

18        Q    Okay.  **Why** did you all go inside?

19        A    **Because we were waiting for Jeff's**

20    **brother-in-law to come pick us up.**

21        Q    Okay.

22        A    Because the reason he called his

23    brother-in-law is because the lady told Jeff

24    that -- just bring the van because it was after

25    five, and she was -- There was like some

25

back of the dealership.

Q    If you would be able to say a number of feet or yards, what is that, the distance?

A    In between the two?

Q    Yes.

A    Twenty yards would be my guess.

Q    And your guess is based on working there virtually daily for ten or so years?

A    (Nods head)

Q    Now, did you advise or instruct anyone what to do or what to say in reference to the incidents on November 14th of 1998?

A    Not that I recollect, no.

Q    What was your involvement on November 14th of '98?

A    Joann Hall called me and -- I don't recollect all the details, but I recollect at one point her asking me to come back and help her with a customer.

And I recall going back to a disagreement over a rental charge.  I recollect Jeffrey Hanes and Joann being in the cashier area, those two being the ones having the disagreement.

Q    Now, can you -- go ahead.  I will let you finish.

A    I recollect trying to mediate and relieve a

6.     Admit that Plaintiff was yelling, screaming, gesticulating, and shouting obscenities and vulgarities at one or more of Defendant's employees upon Plaintiff's return of the van on November 14, 1998;   Deny.

7.     Admit that Plaintiff told Defendant's employee that she was treating white customers better and that the employee denied same;   Deny.

8.     Admit that Plaintiff blocked Defendant's employee's vehicle in the parking lot such that she was unable to leave;   Deny.

9.     Admit that Defendant summoned the police because Plaintiff would not leave Defendant's premises when Plaintiff was asked to do so;   Deny.

10.     Admit that, at the District Justice hearing, Plaintiff admitted that Defendant's employee did not make the comments Plaintiff alleged in his York City Human Relations Commission Complaint that she made;   Deny.

11.     Admit that a customer was waiting for the van when Plaintiff returned it on November 14, 1998;   Admit.

12.     Admit that when Plaintiff initially called Defendant Plaintiff said Plaintiff was 20 minutes away;   Admit, but Plaintiff further said that he was stuck in traffic, which thereby extended his travel time.

when I brought the van back. And I was upset because she lied to me in order to get me to bring the van back. That's the way I took it.

Because we had several conversations, and then when I got there, then she said she was going to charge me, so I got upset about being charged for something that I'm not using.

Q    Now, you said at that point the van was already gone?

A    I don't know if it was actually gone. I did turn the keys in, and I said, well, just give me the keys back and then you can charge me two days. I have no problem with that.

Then I think the customer that was there had left the room with the manager to go out to the van, and -- prior.

Q    Okay. Now, was it just you and the lady behind the counter that were involved in this discussion, or were there other people involved?

A    Me and her was doing the discussing.

Q    Okay. Now, you said some point you got angry because you had been told you were going to be charged two days, and the keys or the van were no longer available to you.

What happened at that point after you got angry?

A    I told her I'm not being charged for two days because I didn't use the van for two days, and I'm not paying for two days.

Q    At this point were you still speaking in a calm tone?

A    I might have been getting loud, probably then.

Q    How about the lady behind the counter, was she still speaking in a calm tone?

A    I guess it started getting loud for both of us because I didn't want to be billed, and she seemed like she was upset for waiting on me being late.

Q    Okay. Were you both talking slowly to be understood? Were you both talking quickly? How was that conversation or discussion proceeding?

A    I guess just general talking. I didn't look at it as fast or slow.

Q    Okay. How did you know that she was upset waiting for you? I think those were your words.

A    Well, after we got into the disagreement of me paying, I said, I'm not paying. I was consistently saying, I'm not paying. I said -- You know, I said, I'm not paying until you give me the keys back. I said, you're going to have to bill my -- the credit card is not my credit card, but I said I'm not paying. And she -- She said, you're

9

10

1    Hanes was questioning you about the bill?

2        A    It was a lot of other things besides just

3    being questioned about the bill.

4        Q    And what was that?

5        A    Well, he was very upset, and just being

6    accused of different things.

7        Q    And what actual statements were you making

8    during that time?

9        A    I tried to explain the bill to him, what was

10   told to me that I had to do for the rental contract, for

11   the billing.  I explained to him -- I also explained to

12   him that the other customer was waiting at the dealership

13   since like quarter of -- between quarter of and 4 o'clock

14   to pick up his rental, this same van that Jeffrey had.

15       It was just everybody was very upset and I was

16   being accused of treating the other person better than

17   what I was treating Jeffrey Hanes.

18       Q    When you say everybody was very upset, who is

19   that?  Who was everybody?

20       A    Jeffrey Hanes, myself, Matt.

21       Q    And when you were describing yourself as being

22   upset, describe what occurred.  How was your voice?  How

23   did you look?  What was going on?

24       A    It was very loud.  I can't explain how I

25   looked.  I don't know how.

46

Q     When you say it was very loud, are you saying I was very loud?

A     All three of us were very loud.

Q     Okay.

A     It's like I would start to explain things, I couldn't even finish my sentences.  It just got to a point where it kept going on and on and on and on, that I just wanted to leave.

I mean, there was no exchange.  All I had to do was take the keys and the paperwork.  That's all we needed to do.  The rental department was going to bill whoever was assigned to this rental.  But it just got into a big mess and it just kept going on and on and on and on.

Q     So did you at any time tell Mr. Hanes, well, come back at another time and speak to another manager or anything like that?

A     Matt did.

Q     And what was his words?

A     That he will talk to Kathy about this and they will contact him Monday.

Q     Did Matt make any other statements?

A     He also tried to calm Jeffrey Hanes down.

Q     And what did he say?

A     That he would just take the rental agreement

15

1    like, you say, in between the door.  He came

2    over, conversation started out.  Once it

3    started getting like loud, I started to walk

4    closer.  And as I started to walk closer,

5    that's when everything erupted.  It was started

6    to erupt.  By the time I got there, both

7    tempers flared up, and a few choice words were

8    being said.

9         Q     What was being said?

10        A     Well, actually what I heard was

11   basically -- When he came back to return the

12   van, the lady mentioned, I waited on your black

13   and she said -- I started to move a little

14   closer.  He said, what do you mean?  You waited

15   on my black what?  Finish what you were saying.

16   Did you wait on my black ass?  I'm like whoa.

17              And at that point in time the manager

18   came out, and he threatened about notifying the

19   police and everything.  It was settled, and

20   eventually we ended up -- everybody ended up

21   leaving.  She came out.  When I was walking out

22   the door, we waited on our car for about 20

23   minutes, she came out right in back of us.  And

24   then when the car was pulling up, she came out

25   and sped right off.  She was like right beside

21

1    think Jeff just wanted to sign the paper that

2    -- you know how when you return something back?

3    And that's when the lady said that she was

4    going to charge for two days, and that's when

5    things just -- You know, he was like, well, you

6    said if we bring it back it was going to be

7    like one day.  And she was, like, well -- You

8    know, it was just like a little bit of

9    bickering between the employee and Jeff.

10        Q    Okay.  **Now, how far away from them**

11   **were you standing?**

12        A    **Maybe like two, three feet, four**

13   **feet.**

14        Q    Okay.  And what happened as they were

15   going around about that?

16        A    **It just got a little bit heated** over

17   that, you know, one day, two day.  Jeff said,

18   well, why did you say on the phone that you

19   were only going to charge for one day, and, you

20   know, if I could have had it for the second

21   day, I could take everybody -- I would have

22   took everybody to their destination.  I

23   wouldn't have my brother-in-law coming, and

24   this and that.  And she just like blew up a

25   little bit.  **That lady said, well, I've been**

Q    Okay.  Do you know what time it was when you arrived at the dealership on the return from Philadelphia?

A    I think it was around five.

Q    Who was there in the rental area when you returned the van?

A    A lady.

Q    Anyone else?

A    At the time -- A manager came out later on, but that was -- I think there might have been like one or two other people back in the office or whatever, but only -- she's the only one I remember, and then there was a manager coming out later on.

Q    Okay.  Did you, yourself, go into that rental area?

A    Yes.

Q    Did everyone else in the van go into the rental area?

A    Yes.

Q    Okay.  Why did you all go into the rental area?

A    I'm not really sure.  We just all did.

Q    Okay.  Okay.  What happened when you all went into the rental area to return the van?

A    I guess there was some hostilities there.  Conversations started.  It seemed like it was pretty calm.

Q    Between who?

A    Between Mr. Hanes and whoever the sales lady was.

Q    Okay.  You said it started calm?

A    Yeah, and it's like it got heated after a while.  I thought maybe there was some miscommunication somewhere.

Q    Did you hear anything that was said?

10

1    talking about charging for two days, and **they**

2    **got into some argument about why are you**

3    **charging?**  She told him that on the phone

4    coming from Philadelphia that I didn't have to

5    pay for another day, and he said he was going

6    to keep the van if he had to pay for another

7    day, and she said that she was sitting here

8    waiting -- I was sitting here waiting on your

9    black and she stopped short of saying whatever.

10   After that and black and everybody was like

11   looking and she said -- He said, black what?

12   He told her black what?  Black what?  And she

13   said I don't need this shit.  I don't need this

14   shit, and was gathering her stuff up, and got

15   in the car.  **Some other man came out too,**

16   **during this here too.**  I don't know who he was,

17   but he came out, and --

18       Q    Is this another employee or customer?

19       A    No, it was an employee.  It had to be

20   an employee because --

21       Q    Okay.

22       A    Yeah.  He came out and then she went

23   and got into her car, and just like took off.

24       Q    Okay.  Now, **who was inside when you**

25   **guys all went inside?**

18

46

10

1    Q    When you say it was very loud, are you saying

2 I was very loud?

3    A    All three of us were very loud.

4    Q    Okay.

5    A    It's like I would start to explain things, I

6 couldn't even finish my sentences.  It just got to a

7 point where it kept going on and on and on and on, that I

8 just wanted to leave.

9    I mean, there was no exchange.  All I had to

10 do was take the keys and the paperwork.  That's all we

11 needed to do.  The rental department was going to bill

12 whoever was assigned to this rental.  But it just got

13 into a big mess and it just kept going on and on and on

14 and on.

15    Q    So did you at any time tell Mr. Hanes, well,

16 come back at another time and speak to another manager or

17 anything like that?

18    A    Matt did.

19    Q    And what was his words?

20    A    That he will talk to Kathy about this and they

21 will contact him Monday.

22    Q    Did Matt make any other statements?

23    A    He also tried to calm Jeffrey Hanes down.

24    Q    And what did he say?

25    A    That he would just take the rental agreement

53

1      Q   So you thought that implied, okay, I am done

2  with you now, I have everything I need from you now, so

3  you can leave?

4      A   Yes.

5      Q   Now, as far as John Schriver, the other person

6  to rent that vehicle, how long was he present?

7      A   He came to the dealership about ten of 4:00.

8      Q   No, I am asking actually so I can direct you,

9  once Jeffrey Hanes arrived, how long was John Schriver

10  present?

11     A   I would say not even five minutes.

12     Q   Okay.  So basically, Jeffrey Hanes handed you

13  the keys and you handed the keys to John Schriver and he

14  left, or somebody handed the keys to John Schriver?

15     A   I handed the keys to John Schriver, yes.

16     Q   And then he left?

17     A   Yes.

18     Q   Once he had the keys?

19     A   Yes.

20     Q   So was he a party to this conversation between

21  you?

22     A   Yes.

23     Q   John Schriver could hear the conversation

24  between you?

25     A   Yes.

200

38

1    that I had to charge for two days, but if he brings the

2    van back so I can give it to the other customer, I would

3    charge him for one day.

4         Q    But you didn't say I don't actually have the

5    authority to do this?

6         A    Probably not, no.

7         Q    Then who else did you speak to in reference to

8    that after that conversation?

9         A    Probably one of the managers, Rick or Matt,

10    because I knew Mr. Hanes was very upset and it was close

11    to closing time.  I knew that I would be back there

12    alone.

13         Q    Was Rick Sargen or Matt Kugle expected to

14    leave before you got off?

15         A    They would leave -- they would usually leave

16    at 5:00.  They close the dealership.  I just wanted to

17    let one of them know that I had to sit and wait on a

18    customer to bring a rental back.

19         Q    Okay.  So you weren't afraid at that time,

20    were you?

21         A    No.

22              (Discussion held off the record)

23              (Previous question and answer read by the

24    reporter)

25    BY ATTY. THOMPSON:

back of the dealership.

Q    If you would be able to say a number of feet or yards, what is that, the distance?

A    In between the two?

Q    Yes.

A    Twenty yards would be my guess.

Q    And your guess is based on working there virtually daily for ten or so years?

A    (Nods head)

Q    Now, did you advise or instruct anyone what to do or what to say in reference to the incidents on November 14th of 1998?

A    Not that I recollect, no.

Q    What was your involvement on November 14th of '98?

A    Joann Hall called me and -- I don't recollect all the details, but I recollect at one point her asking me to come back and help her with a customer.

And I recall going back to a disagreement over a rental charge.  I recollect Jeffrey Hanes and Joann being in the cashier area, those two being the ones having the disagreement.

Q    Now, can you -- go ahead.  I will let you finish.

A    I recollect trying to mediate and relieve a

26

5

1    tension-filled situation.  I recollect trying to reason

2    with Jeffrey Hanes to try to calm all parties involved

3    down.  I recollect that not happening, so I recollect

4    informing Jeffrey Hanes that I was going to call the

5    police to help mediate the situation.  I recollect him

6    informing me to go ahead and do so, so I did.

7         I recollect a number of others being in the

8    cashier area at that time.  The number, I do not

9    recollect.  I recollect Jeffrey Hanes and the others that

10   were there leaving.  I recollect Joann leaving.  I

11   recollect the police coming.  I recollect telling them

12   what happened.

13        I recollect there was a customer waiting there

14   for a rental van that was being returned by Jeffrey

15   Hanes.  I recollect speaking to Kathy Sargen on the phone

16   because Joann Hall had asked me to go out and check the

17   van over when it came back from being out.  I recollect

18   noticing or making note of damage that was on the van and

19   I remember speaking to Kathy on the phone about it and

20   her telling me that it was damage that was there, not to

21   worry about it.

22        I recollect the subject of charges incurred

23   for the rental as being what the disagreement was about,

24   the van not being returned on time.  I recollect trying

25   to put those charges aside.  I recollect trying to inform

27

the parties involved not to worry about the charges, that
we would square them away later, because obviously it was
a tension-filled situation in my opinion and I felt it in
the best interest of all involved to just handle it in
that way.

       Q    Now, you said that Joann called you?

       A    Yes, ma'am.

       Q    Do you recall around about the time of her
first call to you in reference to any rental action?

       A    No, ma'am.

       Q    Do you remember the number of times she called
you?

       A    No, ma'am.

       Q    Do you know if she just called you the one
time when Mr. Hanes was present?

       A    I honestly don't remember the number.

       Q    Any specific reason why you don't remember
that but you remember all other details?

       A    I am sure I don't remember all other details.
I am sure there is a lot of them I left out.  I am sorry.
It has been so long.  I just don't remember.

       Q    Now, you said that she called you and told you
that Mr. Hanes was present and upset?

       A    She didn't name him, no, that's not correct.

       Q    I didn't say that she named him.  But she told

63

13

1    cashier charges for a rental?

2         A    No.

3         Q    Have you ever done it before?

4         A    I have the authority to -- I have the

5    authority to make decisions whether to let a customer --

6    yeah, I have the authority to reduce a charge on a

7    customer's bill.

8         Q    Now, I asked, have you ever done it before?

9         A    For a rental?

10        Q    Yes.

11        A    I don't recall.

12        Q    Okay.  But you recall you have the authority?

13        A    Absolutely.

14        Q    And who gave you the authority?

15        A    Terry Stewart.

16        Q    And when was that?

17        A    When I became sales manager.

18        Q    Did you -- on November 14th of '98 or prior

19   to, did you recall who Jeffrey Hanes was by his name?

20        A    Say the question again, please.  I am sorry.

21        Q    Was it the name Jeffrey L. Hanes that

22   refreshed your recollection of your high school days?

23        A    When I went back to the cashier area, no, I

24   didn't know his name.  I recognized Jeffrey Hanes because

25   I recognized him from high school.

64

13

14

1    Q    Okay.  From ninth grade?

2    A    Um-hum.

3    Q    14 years old?

4    A    Yeah.

5    Q    Okay.  And how many years had you seen him

6  from '98?

7    A    I don't know if I ever did or if I didn't.  I

8  don't recall.

9    Q    I am actually asking you at the time of

10  November 14th of '98, how many years had passed since you

11  had last seen Jeffrey Hanes?

12    A    I don't know.

13    Q    Why not?

14    A    I don't recall.  I don't recall --

15    Q    When is the last time you do recall seeing him

16  before November of '98?

17    A    High school, ninth grade.

18    Q    So how many years would that have been?

19    A    Seventeen?  I don't know.

20    ATTY. THOMPSON:  Before I say that's all, I

21  want to make sure that's all.

22    ATTY. AUSTIN:  That's fine.

23  BY ATTY. THOMPSON:

24    Q    Just to clarify, did the other persons in

25  Jeffrey Hanes' party say anything to you or Joann Hall

22

paying.  She stated that I was going to pay for the two days.  I said, well, you told me this, and I said that's what I'm going by.

I said, basically, you told me -- You tricked me into getting here.  She said, I didn't trick you into bringing the van back, which I know she did and felt she did.  And then she went into, I waited on your black -- and then she didn't finish her sentence.  I stated -- I said, you want me to finish it?  My black ass.  That's all I said.  And then she said, I didn't say that.  I said, you didn't say black ass, but you said black.

Q    What was her response, if any?
A    When I said that?
Q    Yes.
A    She said, she didn't say black ass.  And then I don't know if Matt came in, Kugel, the manager came in at that time.  She was upset because I was telling him what she said.  I said, I know you said it.  And, bottom line, I clarified what she said to her, and she had a disagreement.  And she said, eff this place.  I don't need this.  She kept going on and on using profanity.  And like I said, Matt came in the room.  I don't know if she was cussing at that particular time, when he walked in.

And I told him, I said, I'm not paying.  I said the same thing to him.  I'm not paying two days.  And, basically, he said, well -- and then -- I'm trying to think.  He came in.  I don't know if he -- She made a call, like I said, to him.  He came in, and he came in like he was already under the -- whatever she told him, he came in like with a attitude, so I said to him, once again.  I'm not paying.  I don't care.  And then --
Q    Where did she make the call from to him?
A    I think there's a phone right there at the desk.  There's a phone on that desk, I believe.
**Q    So you knew she was calling someone?**
**A    Yeah.**
**Q    Did you hear her -- what she said?**
**A    Not exactly.  I think she said just come over here.  I'm having a problem with a customer or something like that of that nature. I can't remember her exact words.**
**Q    Did she provide any specific details?**
**A    To the manager?**
**Q    When she called the manager to come in.**
**A    She was saying I don't want to pay the two days, and something of that nature. Like I said, it was probably more said; but I**

wasn't paying attention.  By that time those guys in there was talking too, among themselves.

Q    Okay.  What happened when Matt entered the room?  What did he do or say?

A    He said, well, we got your information.  We're going to bill your -- the card.  I said, no, you're not billing the card because I don't have the van.  Give me the van back.  I said, well, I'm not going with that. He asked me to sign a paper.  That's what it was.  And I refused to sign the paper.  And then he said, well -- Like I said, we were all getting loud.  He said, well, I'm going to call the police.  I said, call them.  And I waited and the police never showed, so I left.

Q    Why was Matt calling the police?

A    He said, I'll get the police here to alleviate the situation.  I said, no problem.

Q    Did he then go call the police?

A    I believe he did dial the police, and -- He dialed the police, and then I waited.

Q    Were you all inside the rental area at that point?

A    Yeah.

Q    When did the others that were in the van leave Apple's premises?

A    Well, he was locking up -- While this was going on, he continued to lock up.  So basically, we all left out the building. Everybody left together.

Q    And when you say everybody, do you mean everyone from the van, or --

A    Everyone from the van, even the lady behind the desk, she was walking out.  We all was walking out, because he was locking the building.  Okay?  And she was leaving.  We all walked out that front door, whatever, side door.  We stood outside.

Q    Okay.

A    And I was just waiting for the police to be called.

Q    Okay.  Did you and all the others that were in the van leave Apple at the same time?

A    No.

Q    Okay.  Did they leave before or after you?

A    Before me.

Q    Okay.  When did they leave?

A    When you say when, do you mean time wise, or --

Q    Yes.

A    Prior to me, probably, maybe 15 minutes.

Q    How did they leave?

A    That's when my brother-in-law, he

23

1    getting more like aggressive or mad, and she

2    was like I don't need this bull shit.  And, you

3    know, just like cussing and fuck this job and

4    this and that, and that's all.

5        Q    Okay.  Then what happened?

6        A    Basically getting mad.  And then we

7    started walking -- **Oh, and then this other guy**

8    **came in**.  That was the guy that was -- when we

9    first came, the employee, he came in, and he

10   started saying -- you know, putting his part in

11   the conversation.  Started saying, well, if you

12   don't want to pay two days get a lawyer, get a

13   lawyer.  It was like, you know, and after he

14   said get a lawyer, I guess I walked outside

15   with, I think it was three or four other

16   gentlemen, we walked outside.  And then he was,

17   **that same guy was saying about calling the**

18   **police because of the argument**, because of the

19   lady.

20       Q    Now, had that guy walked outside with

21   you?

22       A    No.  He was inside there.  When that

23   lady started, you know, like, tripping out like

24   yelling and stuff, he came -- he was in the

25   room there, and that's when he was like just

15

1    like, you say, in between the door.  He came

2    over, conversation started out.  **Once it**

3    **started getting like loud, I started to walk**

4    **closer.  And as I started to walk closer,**

5    **that's when everything erupted.  It was started**

6    **to erupt.  By the time I got there, both**

7    **tempers flared up, and a few choice words were**

8    **being said.**

9        Q    What was being said?

10       A    Well, actually **what I heard was**

11   **basically -- When he came back to return the**

12   **van, the lady mentioned, I waited on your black**

13   **and she said -- I started to move a little**

14   **closer.  He said, what do you mean?  You waited**

15   **on my black what?  Finish what you were saying.**

16   **Did you wait on my black ass?  I'm like whoa.**

17            **And at that point in time the manager**

18   **came out, and he threatened about notifying the**

19   **police and everything.  It was settled, and**

20   **eventually we ended up -- everybody ended up**

21   **leaving.**  She came out.  When I was walking out

22   the door, we waited on our car for about 20

23   minutes, she came out right in back of us.  And

24   then when the car was pulling up, she came out

25   and sped right off.  She was like right beside

agreed to do this and that.

Q    So he was upset about the monetary dealings?

A    I don't know if he was upset about it.  I think he was trying to explain to her what they had talked about on the phone.

Q    So this was the same conversation that had started before that comment was supposedly made?

A    Yeah.  And from what I understand, he thought it was all settled.

Q    Did it get resolved there in the rental office?

A    I would say no.

Q    Why do you say that?

A    Because she walked out.  She was angry.  **The manager came in.**  And for the most part, **he seemed like he was trying to get to the bottom of what was going on.  I guess he had to call the police, so, you know, I guess things really didn't get out of hand.**

Q    Were you there when the police were called?

A    I think we tried to wait around for a while, and I think they -- I can't remember if they did show up or if we just left after a while, so I really can't recall that.

Q    Okay.  You were there when the manager came in?

A    Yeah.

Q    And you said this was a male, correct?

A    Right.

Q    Okay.  What was his tone and behavior like?

A    He was just trying to get to the bottom of it.  He really -- I didn't think he was really all that upset.  I mean, obviously, he is concerned.  You know, I guess, you know, he wants to try to resolve the situation the

12

1    Hanes knew each other at all?

2         A    No, no.  I believe he was, like, sort

3    of like an Apple employee because he came from

4    out through the back area like.

5         Q    Okay.  And then **what happened after**

6    **that gentleman came out?**

7         A    Well, **he wanted to know what was**

8    **going on**, and he was -- Jeff was like talking

9    to her -- talking to him about, you know, what

10   she had just said, and that's when **she came out**

11   and said I don't need this shit, and was

12   gathering her stuff -- **gathering her stuff**

13   **together and took off.**

14        Q    Okay.

15        A    Went outside and took off.

16        Q    And then what happened to you guys?

17   **Were you all still inside then?**

18        A    We were -- No, I was walking.

19   **Everybody was walking out because actually when**

20   **she left, we were sort of congregating around**

21   **there, like somebody -- Either her or the man**

22   **said something about calling the police or**

23   **something.**

24        Q    Why?  Do you know why?

25        A    And Jeff was like -- I don't know

13

1   why, but Jeff was basically, call them.  You

2   know what I mean?  Because -- I didn't see him

3   do anything wrong, and I didn't see anybody

4   else do anything wrong.  So call them.

5        Q    Okay.  And **do you know if the police**

6   **were called or not?**

7        A    **I had left.  I don't know if the**

8   **police were called or anything.**

9        Q    Okay.

10        A    I gathered everybody together and

11   just left.  I don't know what the deal was with

12   that.

13        Q    And **did everyone leave with you?**

14        A    **That I was supposed to take, yeah;**

15   **Lionel, Jimmy, Jeff.  I guess the other guys**

16   **went with somebody else.**

17        Q    Okay.  **So who was in your car?**

18        A    **Lionel, I don't know his last name,**

19   **jeff, and --**

20        Q    **Jeff Hanes?**

21        A    **Jeff Hanes.**

22        Q    **Okay.**

23        A    **-- and Jimmy.  I don't know Jimmy's**

24   real name.

25        Q    Okay.  Those three went with you?

49

10

```
1        A    Yes.

2        Q    Okay.  So what happened when you approached

3   your car?

4        A    I got in my car, started it up, and cracked

5   the window and asked him to move out of my way.

6        Q    Okay.  So you were able to get into your car

7   with no problem?

8        A    Yes.

9        Q    Was anything being said to you at that time?

10       A    There was things being said, but I can't

11  recall what it was, because I was more or less blocking

12  things out at that point.

13       Q    What were you saying?

14       A    I asked them to move.

15       Q    Anything else?

16       A    No.

17       Q    And how did you -- what was your tone of voice

18  or whatever when you said that?

19       A    It wasn't a normal tone.  I would say it would

20  have to be on the loud side.  I just cracked the window.

21       Q    Now, when you left, were the police called

22  already?

23       A    Yes, Matt called them from the service

24  department I think.

25       Q    Okay.  And he called the police when you were
```

50

still there?

    A    I was up getting my things ready to walk out the door.

    Q    So you knew the police were coming?

    A    Yes.

    Q    Did you expect the police to come?

    A    Yes.

    Q    But you left?

    A    I left.

    Q    Why?

    A    I just wanted to get out of there.

    Q    Okay.  But you knew the police were coming to a situation you were involved in, so why would you leave?

    A    They were coming to remove them from the property.

    Q    This is based on contact with you.  Isn't that correct?

    A    Yes.

    Q    So why would you leave?

    A    I can't answer that.  I don't know.  I can't answer that.

    Q    When did you first have contact with police officers?

    A    They called me from the dealership at home.

    Q    That same day?

34

7

1    you did on November 14th of '98.

2         A    Because my attempt to make the situation less

3    hostile was not successful, and therefore I felt that a

4    third party would be able to do so much better than I,

5    being the police.

6         Q    And that's the first time you have ever

7    thought that?

8         A    I don't recollect.

9         Q    But you don't recall ever feeling that way

10   before?

11        A    Yes, I do actually.

12        Q    When?

13        A    When my first wife and I were getting

14   divorced.

15        Q    Actually, if you can keep it in context, we

16   are talking about Apple Chevrolet and your employment

17   there.

18        A    Okay.

19        Q    So you are talking about when you dealt with a

20   divorce situation?

21        A    Yeah.

22        Q    Okay.  But now if we can keep it in context

23   with dealing with Apple Chevrolet.

24        A    Okay.

25        Q    Do you ever recall feeling that way before?

make sure that you understood?

    A    That originally it was a two-day charge and then when the scuttle broke out, we told Mr. Hanes that we would get with Mr. Pollack on Monday and reduce it to a one-day charge.

    Q    Who told him that?

    A    Who told who that?

    Q    Who told Mr. Hanes that?

    A    I guess Joann.

    Q    You guess.  You don't know?

    A    I wasn't present.

    Q    Okay.  So what actual knowledge do you have?

    A    Just phone conversations.  I was at home.

    Q    Could you hear anything in the background? Could you hear voices or just Joann's?

    A    Just Joann's.  But when Matt called me, I could hear voices in the background.

    Q    So the conversation that you had with Joann, when you told her just allow the one-day charge and you will talk with Mr. Pollack on another day?

    A    Yes.

    Q    And so you could not hear any other voices at that last conversation you remember having with Joann?

    A    Not the last, no.

    Q    Okay.  So then to your knowledge then, Mr.

8

1    Hanes was not present?

2         A    I don't know.

3         Q    So then when you said you would get with Mr.

4    Pollack about the charges, then that had to be before any

5    scuttle that you claim?

6         A    No, it was after the scuttle that we said we

7    would talk to Mr. Pollack on Monday about the charges.

8         Q    Okay.  But you couldn't -- you heard nothing

9    in the background when you last spoke with Joann?

10        A    Not with Joann, no.

11        Q    And when did you make that statement about Mr.

12   Pollack?  With Joann or Kugle?

13        A    I don't remember.

14        Q    Now, you said when the scuttle broke out.

15   What scuttle was described to you?  What does that refer

16   to?

17        A    Matt Kugle called me at home.  He was checking

18   in the van.  There was some damage on the van.  The van

19   was not -- the damage was not caused by Mr. Hanes.  It

20   was prior damage.  But he was just verifying that it was

21   prior damage.  And I could hear loud voices in the

22   background.

23        Q    How many loud voices?

24        A    One.

25        Q    Then just voice, not voices?

37

1       A    A voice.

2       Q    And could you determine what was being said?

3       A    No.

4       Q    Did you also hear Joann Hall's voice?

5       A    No.

6       Q    And what was the scuttle that was described to

7   you?

8       A    It was just a heated conversation.  I couldn't

9   pick out words.  And Matt had told somebody, and that was

10  Mr. Hanes, to calm down.

11      Q    Was it actually described to you or was it

12  just what you could overhear?

13      A    Just what I could overhear.

14      Q    So then when you use that word scuttle, then

15  you are just referring to some loud voices you heard in

16  the background?

17      A    Right.

18      Q    Okay.  No fighting or anything like that?

19      A    Right.

20      Q    Just loud voices?

21      A    Yes.

22      Q    Did you hear any threats or anything like that

23  being made?

24      A    No.

25      Q    How did Matt sound when he spoke with you?

38

8

```
 1        A     Calm, just verifying that the damage wasn't
 2   done by Mr. Hanes.
 3        Q     What action did you take after that
 4   conversation?
 5        A     Considering the circumstances, it seemed like
 6   he might be in trouble.  And I called my husband at that
 7   point.
 8        Q     What circumstances led you to believe that he
 9   was in trouble?
10        A     Matt had said that, you know, he was just
11   checking the van to see if there was damages, you know,
12   that it was a pretty heated moment there with some
13   argument.  And I called my husband at that point.
14        Q     You said he was calm?
15        A     He was calm to me, but you could hear, you
16   know, that there was some problems going on in the
17   background.
18        Q     What type of problems did you hear?
19        A     Just loud noises.  Somebody was angry.  You
20   could tell that there was a conflict going on in the
21   background.
22        Q     In your experience, have you ever dealt with
23   an angry customer?
24        A     No.
25        Q     You never had a customer being in a loud voice
```

23

27

the parties involved not to worry about the charges, that
we would square them away later, because obviously it was
a tension-filled situation in my opinion and I felt it in
the best interest of all involved to just handle it in
that way.

Q    Now, you said that Joann called you?

A    Yes, ma'am.

Q    Do you recall around about the time of her
first call to you in reference to any rental action?

A    No, ma'am.

Q    Do you remember the number of times she called
you?

A    No, ma'am.

Q    Do you know if she just called you the one
time when Mr. Hanes was present?

A    I honestly don't remember the number.

Q    Any specific reason why you don't remember
that but you remember all other details?

A    I am sure I don't remember all other details.
I am sure there is a lot of them I left out.  I am sorry.
It has been so long.  I just don't remember.

Q    Now, you said that she called you and told you
that Mr. Hanes was present and upset?

A    She didn't name him, no, that's not correct.

Q    I didn't say that she named him.  But she told

24

wasn't paying attention.  By that time those guys in there was talking too, among themselves.

Q   Okay.  What happened when Matt entered the room?  What did he do or say?

A   He said, well, we got your information.  We're going to bill your -- the card.  I said, no, you're not billing the card because I don't have the van.  Give me the van back.  I said, well, I'm not going with that. He asked me to sign a paper.  That's what it was.  And I refused to sign the paper.  And then he said, well -- Like I said, we were all getting loud.  He said, well, I'm going to call the police.  I said, call them.  And I waited and the police never showed, so I left.

Q   Why was Matt calling the police?

A   He said, I'll get the police here to alleviate the situation.  I said, no problem.

Q   Did he then go call the police?

A   I believe he did dial the police, and -- He dialed the police, and then I waited.

Q   Were you all inside the rental area at that point?

A   Yeah.

Q   When did the others that were in the van leave Apple's premises?

A   Well, he was locking up -- While this was going on, he continued to lock up.  So basically, we all left out the building. Everybody left together.

Q   And when you say everybody, do you mean everyone from the van, or --

A   Everyone from the van, even the lady behind the desk, she was walking out.  We all was walking out, because he was locking the building.  Okay?  And she was leaving.  We all walked out that front door, whatever, side door.  We stood outside.

Q   Okay.

A   And I was just waiting for the police to be called.

Q   Okay.  Did you and all the others that were in the van leave Apple at the same time?

A   No.

Q   Okay.  Did they leave before or after you?

A   Before me.

Q   Okay.  When did they leave?

A   When you say when, do you mean time wise, or --

Q   Yes.

A   Prior to me, probably, maybe 15 minutes.

Q   How did they leave?

A   That's when my brother-in-law, he

23

1   getting more like aggressive or mad, and she

2   was like I don't need this bull shit.  And, you

3   know, just like cussing and fuck this job and

4   this and that, and that's all.

5        Q    Okay.  Then what happened?

6        A    Basically getting mad.  And then we

7   started walking -- **Oh, and then this other guy**

8   **came in.**  That was the guy that was -- when we

9   first came, the employee, he came in, and he

10  started saying -- you know, putting his part in

11  the conversation.  Started saying, well, if you

12  don't want to pay two days get a lawyer, get a

13  lawyer.  It was like, you know, and after he

14  said get a lawyer, I guess I walked outside

15  with, I think it was three or four other

16  gentlemen, we walked outside.  And then he was,

17  **that same guy was saying about calling the**

18  **police because of the argument,** because of the

19  lady.

20       Q    Now, had that guy walked outside with

21  you?

22       A    No.  He was inside there.  When that

23  lady started, you know, like, tripping out like

24  yelling and stuff, he came -- he was in the

25  room there, and that's when he was like just

24

1    call the police, call the police.  They don't

2    want to pay the second day call the police.

3        Q    Okay.

4        A    And that was like his part mostly to

5    say get a lawyer and call the police.  That's

6    it.

7        Q    Did anyone either encourage or

8    discourage him from calling the police?

9        A    No, no.  I mean, he was behind the

10    counter.

11        Q    Okay.

12        A    You can't discourage him.  I mean,

13    you can't grab him.

14        Q    No one said don't do it, or go ahead

15    and do it?

16        A    No.  **Jeff was saying call the police,**

17    and they can hear my side of what happened.

18        Q    Okay.  And do you know if the police

19    were called or not?

20        A    **I know that his brother-in-law showed**

21    **up.  This is outside after everything happened,**

22    and that lady left when we were outside in the

23    parking lot.  She got in the car and even

24    though my statement that I wrote back then, it

25    seemed like she was trying to hit his

15

1    like, you say, in between the door.  He came

2    over, conversation started out.  **Once it**

3    **started getting like loud, I started to walk**

4    **closer.  And as I started to walk closer,**

5    **that's when everything erupted.  It was started**

6    **to erupt.  By the time I got there, both**

7    **tempers flared up, and a few choice words were**

8    **being said.**

9        Q    What was being said?

10       A    Well, actually **what I heard was**

11   **basically -- When he came back to return the**

12   **van, the lady mentioned, I waited on your black**

13   **and she said -- I started to move a little**

14   **closer.  He said, what do you mean?  You waited**

15   **on my black what?  Finish what you were saying.**

16   **Did you wait on my black ass?  I'm like whoa.**

17            **And at that point in time the manager**

18   **came out, and he threatened about notifying the**

19   **police and everything.  It was settled, and**

20   **eventually we ended up -- everybody ended up**

21   **leaving.**  She came out.  When I was walking out

22   the door, we waited on our car for about 20

23   minutes, she came out right in back of us.  And

24   then when the car was pulling up, she came out

25   and sped right off.  She was like right beside

agreed to do this and that.

Q    So he was upset about the monetary dealings?

A    I don't know if he was upset about it.  I think he was trying to explain to her what they had talked about on the phone.

Q    So this was the same conversation that had started before that comment was supposedly made?

A    Yeah.  And from what I understand, he thought it was all settled.

Q    Did it get resolved there in the rental office?

A    I would say no.

Q    Why do you say that?

A    Because she walked out.  She was angry.  **The manager came in.**  And for the most part, **he seemed like he was trying to get to the bottom of what was going on.  I guess he had to call the police, so, you know, I guess things really didn't get out of hand.**

Q    Were you there when the police were called?

A    I think we tried to wait around for a while, and I think they -- I can't remember if they did show up or if we just left after a while, so I really can't recall that.

Q    Okay.  You were there when the manager came in?

A    Yeah.

Q    And you said this was a male, correct?

A    Right.

Q    Okay.  What was his tone and behavior like?

A    He was just trying to get to the bottom of it.  He really -- I didn't think he was really all that upset.  I mean, obviously, he is concerned.  You know, I guess, you know, he wants to try to resolve the situation the

15

A     Right.

Q     **Did Mr. Hanes try and talk the manager out of calling the police?**

A     **No.  I believe he encouraged him to.**

Q     Do you know why he encouraged that?

A     I guess because -- Again, can I guess in this case?

Q     No.  If you know.

A     (No audible response).

Q     Okay.  When did you leave the rental premises?

A     I would say, you know, 15, 20 minutes after the incident.

Q     Okay.  Now, when you say incident, to what are you referring?

A     The conversation, the argument between the sales lady and Mr. Hanes.

Q     And were you inside the building that whole 15 to 20 minutes?

A     No, I was not.  For the first part, after the initial argument, we were inside. Then we went outside after the manager said I'm going to call the police or whatever.  She came out a little bit later on, yelled some more things, or whatever like that, got in the car, and we were in the parking lot and then we left.

Q     Okay.  Did all of you leave together?

A     I believe so.

Q     Okay.  Mr. Hanes included?

A     It seems to me I thought he said he wanted to stay behind for some reason and talk to the police.

Q     Okay.  Have you ever been discriminated against based on your race, in your opinion?

A     I think so.

12

1    Hanes knew each other at all?

2        A    No, no.  I believe he was, like, sort

3    of like an Apple employee because he came from

4    out through the back area like.

5        Q    Okay.  And then **what happened after**

6    **that gentleman came out?**

7        A    Well, **he wanted to know what was**

8    **going on,** and he was -- Jeff was like talking

9    to her -- talking to him about, you know, what

10   she had just said, and that's when **she came out**

11   and said I don't need this shit, and was

12   gathering her stuff -- **gathering her stuff**

13   **together and took off.**

14       Q    Okay.

15       A    Went outside and took off.

16       Q    And then what happened to you guys?

17   **Were you all still inside then?**

18       A    We were -- No, I was walking.

19   **Everybody was walking out because actually when**

20   **she left, we were sort of congregating around**

21   **there, like somebody -- Either her or the man**

22   **said something about calling the police or**

23   **something.**

24       Q    Why?  Do you know why?

25       A    And Jeff was like -- I don't know

13

1       why, but Jeff was basically, call them.  You

2       know what I mean?  Because -- I didn't see him

3       do anything wrong, and I didn't see anybody

4       else do anything wrong.  So call them.

5            Q    Okay.  And **do you know if the police**

6       **were called or not?**

7            A    **I had left.  I don't know if the**

8       **police were called or anything.**

9            Q    Okay.

10           A    I gathered everybody together and

11      just left.  I don't know what the deal was with

12      that.

13           Q    And **did everyone leave with you?**

14           A    **That I was supposed to take, yeah;**

15      **Lionel, Jimmy, Jeff.  I guess the other guys**

16      **went with somebody else.**

17           Q    Okay.  **So who was in your car?**

18           A    **Lionel, I don't know his last name,**

19      **jeff, and --**

20           Q    **Jeff Hanes?**

21           A    **Jeff Hanes.**

22           Q    **Okay.**

23           A    **-- and Jimmy.**  I don't know Jimmy's

24      real name.

25           Q    Okay.  Those three went with you?

36

know if that was a response.

A    No, I am thinking.

Q    Okay.

A    I can't say that I know that Joann was threatened.  I can say that I called the police because as I mentioned earlier, that was what I thought I should do and that's what -- when I informed Jeffrey Hanes that that's what I was going to do, he was in agreement.

Q    So why is it that you felt that that's what you should do?

A    As I stated earlier.

Q    What was that?

A    That a third party would be able to mediate or relieve the situation a little better than obviously I could.

Q    So you didn't think that maybe someone above you within your organization could be the mediator?

A    There was no one else there, ma'am.

Q    At that time.  Is that right?

A    That's correct.

Q    Are there persons that you could reach at any other day that could possibly mediate?

A    There are other people that I could call, but under the circumstances that I recall there being, that was what I felt I should do at the time.  It was also

37

1    what -- when I had mentioned this, it was also what

2    Jeffrey Hanes told me I should do as well.

3        Q    Actually, I was trying to figure out why would

4    you mention it in the first place.  So who are the people

5    that you could call?

6        A    At the time, probably the general manager,

7    which I believe was John Franklin would have been the

8    other person to call.

9        Q    Have you ever had to make contacts like to

10   someone above you to mediate customer complaints before?

11       A    Yes.

12       Q    And have you ever -- if you didn't make the

13   contact yourself, have you ever gave information to the

14   customer who would not accept your rendition to contact

15   someone above you?

16       A    I am sorry.  Repeat the question.

17       Q    Okay, sure.  If you did not contact someone

18   above you yourself, have you ever advised the customer in

19   a dispute that you could not settle that they could

20   contact someone in a higher position than you?

21       A    Yes.

22       Q    Now, from your recollection, I believe you

23   stated that the dispute that you saw you referred to was

24   between Mr. Hanes and Joann Hall.  Was that correct?

25       A    There is a dispute over a rental bill.  I

25

33

have to leave at that point, or were you
walking?  Were you --

    A    I was walking.  I was walking.

    Q    Okay.  So after you had waited for
the police on that road off of Roosevelt, for
however long, then you just started walking?

    A    That's correct.

    Q    And to where did you walk?

    A    I walked down to Roosevelt Avenue,
and I got picked up.

    Q    Okay.  Who came and picked you up?

    A    Dimitrios picked me up.

    Q    And how did he know to come pick you
up?

    A    Because he knew I didn't have no car.

    Q    Okay.  Had you previously arranged
for him to come back and get you?

    A    He left with the guys.  They all knew
I didn't have no car.  No, I didn't.

    Q    Okay.  So you didn't know if anyone
was coming back or not?

    A    No.

    **Q    Okay.  So he just happened to come
back?**

    **A    Yep.**

    **Q    Had the police arrived at that time?**

    **A    No.**

    **Q    So why did you leave?**

    **A    Because I didn't think they were
coming.  It was like 20 minutes went by, 15, 20
minutes.  I said, well, I ain't standing out
here waiting on them.**

    **Q    At some point the police cited you
based on that day, didn't they?**

    **A    That's correct.**

    **Q    And did you receive that cite in
person or through the mail?**

    **A    Through the mail.**

    **Q    Okay.**

    (Hanes Deposition Exhibit Number 4

was marked for identification).

BY MS. AUSTIN:

    Q    I'm showing you what's been marked as

Exhibit 4.  Is that a copy of the citation that

you received?

    A    Yes.

    Q    Okay.  And that was from the police,
correct?

    A    That's correct.

    **Q    Okay.  Was there ever a hearing held
as a result of that citation?**



20

33

have to leave at that point, or were you
walking?  Were you --
    A    I was walking.  I was walking.
    Q    Okay.  So after you had waited for
the police on that road off of Roosevelt, for
however long, then you just started walking?
    A    That's correct.
    Q    And to where did you walk?
    A    I walked down to Roosevelt Avenue,
and I got picked up.
    Q    Okay.  Who came and picked you up?
    A    Dimitrios picked me up.
    Q    And how did he know to come pick you
up?
    A    Because he knew I didn't have no car.
    Q    Okay.  Had you previously arranged
for him to come back and get you?
    A    He left with the guys.  They all knew
I didn't have no car.  No, I didn't.
    Q    Okay.  So you didn't know if anyone
was coming back or not?
    A    No.
    **Q    Okay.  So he just happened to come
back?**
    **A    Yep.**
    **Q    Had the police arrived at that time?**
    **A    No.**
    **Q    So why did you leave?**
    **A    Because I didn't think they were
coming.  It was like 20 minutes went by, 15, 20
minutes.  I said, well, I ain't standing out
here waiting on them.**
    **Q    At some point the police cited you
based on that day, didn't they?**
    **A    That's correct.**
    **Q    And did you receive that cite in
person or through the mail?**
    **A    Through the mail.**
    **Q    Okay.**
    (Hanes Deposition Exhibit Number 4

was marked for identification).

BY MS. AUSTIN:

    Q    I'm showing you what's been marked as

Exhibit 4.  Is that a copy of the citation that

you received?

    A    Yes.
    Q    Okay.  And that was from the police,
correct?
    A    That's correct.
    **Q    Okay.  Was there ever a hearing held
as a result of that citation?**

COMMONWEALTH OF PENNSYLVANIA **CITATION NO.**
**NON-TRAFFIC SUMMONS** P1177542-2

| 1. Magisterial District Number | 2. Docket Number | 3. Social Security Number |
|---|---|---|
| 19-1-02 | NT-0822-98 | 209154 3 5151 |

| 4. Address of Magisterial District Office | 5. Driver's Number | 6. State |
|---|---|---|
| 515 Maryland Ave. Suite 2 York PA | 21 285 216 | ☒ PA |

7. Defendant's Name - First: Jeffery   Middle: Lynn   Last: Nanes

8. Defendant's Address (Street-City-State-Zip Code): 516 W King St. York PA 17404

| 9. Race/Ethnicity | 10. Sex | 11. Date of Birth (MM/DD/YY) | 12. Resident Status | 13. Type of Arrest |
|---|---|---|---|---|
| (W) ☐ White  (A) ☐ Asian | (M) ☒ Male | | (R) ☒ Resident | (O) ☐ On-View |
| (B) ☒ Black  (H) ☐ Hispanic | (F) ☐ Female | 06/04/67 | (N) ☐ Non-Resident | (S) ☒ Summoned/Cited |
| (I) ☐ Native-American (U) ☐ Unknown | | | (U) ☐ Unknown | |

| 14. JUVENILE | 15. Parents Notified | 16. Parent's Name | 17. Date Notified | 18. Time |
|---|---|---|---|---|
| ☐ Yes | ☐ Yes | | | |

19. Charge
☒ Disorderly Conduct  ☐ Criminal Trespass  ☐ Theft of Services  ☐ Criminal Mischief
☐ Harassment  ☐ Public Drunkenness  ☐ Scattering Rubbish
☐ Retail Theft  ☐ Purchase, Consumption, Possession or Transportation of Liquor or Malt or Brewed Beverages
☐ Other

| 20. Nature of Offense | 21. Pa. Code | 22. ☒ CRIMES CODE TITLE 18 |
|---|---|---|
| DEF. did w/ the intent to | | |
| | | 23. SECTION / 24. SUB SEC |
| cause public inconvenience, annoyance | | 5503 (a)(3) |
| | | 25. FINE |
| or alarm, continually curse at (2) | | 150.00 |
| | | 26. COSTS |
| employees at a public business. | | 76.00 |
| | | 27. J.C.P. 1.50 |
| | 29. ☐ Lab Services Requested | 28. TOTAL DUE $227.50 |

| 30. Date | 31. Time | 32. Day | 33. City/Twp/Boro | 34. Code | 35. Zone |
|---|---|---|---|---|---|
| 11/14/98 | 1725 | SAT | York | 301 | W |

| 36. Location | 37. County | 38. County Code |
|---|---|---|
| Apple Chevrolet | York | 67 |

| 39. Defendant's Signature - Acknowledges Receipt of Citation | 40. Date | 41. |
|---|---|---|
| X  — FILED — | 11/14/98 | ☐ Issued  ☒ Filed  ☐ Filed on info. received |

42. I verify that the facts set forth in this citation are true to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa. C.S.A. § 4904) relating to unsworn falsification to authorities.

| OFFICER'S SIGNATURE | BADGE NUMBER | ORI NUMBER |
|---|---|---|
| Dwight D. Hensel | 179 | PA0670200 |

43. Station Address: 50 W. King St. York PA 17401

| 44. Offense Code | 45. Property Record No. | 46. Systems Code | 47. | |
|---|---|---|---|---|

60

13

1      Q    And what was the substance of your
2  involvement?
3      A    I think someone told me what had happened.
4      Q    And who was that?
5      A    I can't remember.
6      Q    And what did they tell you?
7      A    They told me there was an incident at the
8  dealership.
9      Q    What type of incident?
10      A    Do you want to know verbatim from what I
11  remember?
12      Q    Sure.
13      A    Okay.  They told me that -- well, they told me
14  a gentleman had come in and made a scene at the
15  dealership, that my operator quit, my best operator ever
16  quit because of the scene, and that they arrested the
17  gentleman for disturbing the peace.
18      Q    Did you also pursue charges of theft of
19  services or any type of theft charges?
20      A    No, not to my knowledge.  No, not to my
21  knowledge.  I don't know.
22      Q    What type of investigation did you do into
23  that matter?
24      A    The only thing that I can recall that I did is
25  they told me that the police came and they charged a

61

13

1    gentleman with disturbing my business, disturbing the

2    peace I guess, and the only thing I told them was to call

3    the police to see if the police would drop the charges.

4        Q    And who did you tell that?

5        A    I can't remember.

6        Q    And why did you say that?

7        A    Because just from my business experience, it

8    just doesn't pay to get involved in arguments with

9    people.  It is not worth it.  It might have been a

10   disturbance, but it's just not worth pursuing it.  And

11   that's just the way I do business.

12       Q    And how many times have police been called on

13   customers disturbing the peace?

14       A    The only time that I can remember is this is

15   the only time that I can remember, that I remember.

16       Q    Do customers ever make complaints about

17   service or fees or anything like that?

18       A    I didn't hear the second part of your

19   question.

20       Q    Do customers ever make complaints about

21   service or fees or anything like that?

22       A    Yes.

23       Q    To your knowledge, the police have never been

24   called on them?

25       A    To my knowledge, no.

14

28

have to leave at that point, or were you
walking?  Were you --

    A    I was walking.  I was walking.

    Q    Okay.  So after you had waited for
the police on that road off of Roosevelt, for
however long, then you just started walking?

    A    That's correct.

    Q    And to where did you walk?

    A    I walked down to Roosevelt Avenue,
and I got picked up.

    Q    Okay.  Who came and picked you up?

    A    Dimitrios picked me up.

    Q    And how did he know to come pick you
up?

    A    Because he knew I didn't have no car.

    Q    Okay.  Had you previously arranged
for him to come back and get you?

    A    He left with the guys.  They all knew
I didn't have no car.  No, I didn't.

    Q    Okay.  So you didn't know if anyone
was coming back or not?

    A    No.

    **Q    Okay.  So he just happened to come
back?**

    **A    Yep.**

    **Q    Had the police arrived at that time?**

    **A    No.**

    **Q    So why did you leave?**

    **A    Because I didn't think they were
coming.  It was like 20 minutes went by, 15, 20
minutes.  I said, well, I ain't standing out
here waiting on them.**

    **Q    At some point the police cited you
based on that day, didn't they?**

    **A    That's correct.**

    **Q    And did you receive that cite in
person or through the mail?**

    **A    Through the mail.**

    **Q    Okay.**

    (Hanes Deposition Exhibit Number 4

was marked for identification).

BY MS. AUSTIN:

    Q    I'm showing you what's been marked as

Exhibit 4.  Is that a copy of the citation that

you received?

    A    Yes.

    Q    Okay.  And that was from the police,
correct?

    A    That's correct.

    **Q    Okay.  Was there ever a hearing held
as a result of that citation?**

A    Yes.

Q    Do you recall where that hearing was held?

A    Maryland Avenue.

Q    Okay.  Was it in a district justice office?

A    Yes.

Q    Who was present that day?

A    Myself, Dimitrios Tomboris, Joanne Hall, (phonetic) the district magistrate, and the police officer.

Q    Okay.  Did all of those people that you mentioned, other than the district justice, testify at the hearing?

A    Yes.

Q    Okay.  And you testified?

A    Yes.

Q    Dimitrios testified?

A    Yes.

Q    Joanne testified?

A    Yes.

Q    And the police officer testified?

A    Yes.

MS. AUSTIN:  Just to note for the record, Attorney Thompson has entered the room.

Do you need to take a break for any reason?

MS. THOMPSON:  No.  Do you need to?

THE WITNESS:  No, I'm fine.

BY MS. AUSTIN:

Q    Do you recall what was the police officer's testimony?

A    Not right offhand, no.

Q    Okay.  How about Dimitrios?

A    No.

Q    How about Joanne?

A    Everything was in reference to what happened.  Word for word, no, I can't give you that.  As with Dimitrios and the officer, it was everything about the incident that happened.  But I can't give you word for word what they said.

Q    Do you recall your testimony that day?

A    Basically, just explaining what happened, about the disagreement that happened; stated that I did get loud and pretty much, basically, she said the same thing, she -- I got loud, too.  And that's pretty much what it was.

Q    This citation that was issued to you, that's been marked as Exhibit 4, do you know if that's a criminal or civil citation?

A    I don't.

Q    Okay.  Who was prosecuting this charge against you?

A    The police officer was the one that

29

was doing the talking.

Q    Okay.  Do you know if Apple at any time had asked the police officer to drop the charge?

A    I'm not sure.

Q    Do you recall at that D.J. hearing, the district justice asking you if you heard Joanne Hall make the statement, I was waiting on your black ass?

A    I may have made the statement.  I don't recall him saying that.  He may have said that.  I don't recall him actually saying that.  I did make the statement though.  Like I said, I don't actually remember.

Q    Okay.  You just said but you made the statement, what statement?

A    When I presented my case, it was in -- when I was giving him the information that was presented.  I did inform him that she made the statement.

Q    Now, at some point during that hearing you said to the D.J., no, I didn't really hear that; but she wanted to say that, didn't you?

A    Say what?

Q    At some point you told the D.J., you did not hear Joanne say, I was waiting on your black ass; but that you knew she wanted to make that statement.

A    Black ass, yeah.

Q    What was the result of that D.J. hearing?

A    He found me guilty.

Q    Okay.  On October 1st, 1999, you visited a doctor about headaches; is that correct?

A    That's correct.

Q    Okay.  This is about a year after this November 14th incident, right?

A    That's correct.

Q    Okay.  Had you just started having the headaches at that point?

A    No.

Q    Okay.  When did they begin?

A    Well, actually, probably, prior to that.  I can't really put my finger on the date when they started occurring.

Q    Why did you wait until October 1999 to go to a doctor?

A    Because at that point, I felt it was necessary at that time.

Q    Were you taking any type of medication or anything to alleviate the headaches?

A    Prior to going to the doctor?

Q    Correct.

30

was doing the talking.

Q    Okay.  Do you know if Apple at any time had asked the police officer to drop the charge?

A    I'm not sure.

Q    Do you recall at that D.J. hearing, the district justice asking you if you heard Joanne Hall make the statement, I was waiting on your black ass?

A    I may have made the statement.  I don't recall him saying that.  He may have said that.  I don't recall him actually saying that. I did make the statement though.  Like I said, I don't actually remember.

Q    Okay.  You just said but you made the statement, what statement?

A    When I presented my case, it was in -- when I was giving him the information that was presented.  I did inform him that she made the statement.

Q    Now, at some point during that hearing you said to the D.J., no, I didn't really hear that; but she wanted to say that, didn't you?

A    Say what?

Q    At some point you told the D.J., you did not hear Joanne say, I was waiting on your black ass; but that you knew she wanted to make that statement.

A    Black ass, yeah.

Q    What was the result of that D.J. hearing?

A    He found me guilty.

Q    Okay.  On October 1st, 1999, you visited a doctor about headaches; is that correct?

A    That's correct.

Q    Okay.  This is about a year after this November 14th incident, right?

A    That's correct.

Q    Okay.  Had you just started having the headaches at that point?

A    No.

Q    Okay.  When did they begin?

A    Well, actually, probably, prior to that.  I can't really put my finger on the date when they started occurring.

Q    Why did you wait until October 1999 to go to a doctor?

A    Because at that point, I felt it was necessary at that time.

Q    Were you taking any type of medication or anything to alleviate the headaches?

A    Prior to going to the doctor?

Q    Correct.

31

11

1    Q    Okay.  And what was your role in that
2    specific seminar?  Were you a speaker?  Were
3    you attending?  Did you organize it?  Something
4    else?

5    A    No.  I was just attending so I could
6    learn.

7    Q    Okay.  And how about Mr. Hanes?

8    A    Same thing.

9    Q    Okay.  And how did you travel to and
10   from that seminar?

11   A    We rented a van.

12   Q    Okay.  **Who rented the van?**

13   **A    Jeff Hanes did all the renting, but**
14   **it was Metro that was going to pay for it.**

15   Q    Why was that?

16   A    It was through this gentleman that
17   was -- I guess you could call him, like, our
18   supervisor or our leader.  Him name was Jesse
19   Pohlig, something like that.

20   Q    Okay.

21   A    And he said that he was going to pay
22   because it was going to be a couple of us going
23   up there.

24   Q    Okay.  Who drove the van?

25   A    Jeff.

34

7

1       Q    So how many times did you instruct her to

2    charge for two days?

3       A    Once.

4       Q    Okay.  And that would have been the first time

5    she told you he was running late?

6       A    Correct.

7       Q    So your statement is you had no knowledge

8    until you are saying he arrived that she authorized a

9    one-day charge?

10       A    Correct.

11       Q    Now, had you known that Joann Hall authorized

12    a one-day charge, would you expect that authorization to

13    be upheld?

14       A    Considering the circumstances.

15       Q    What?

16       A    That I would get with Mr. Pollack on Monday in

17    regards to the charges.

18       Q    When you made that statement, did you know at

19    that time that you made that statement you would get with

20    Mr. Pollack, did you know what Joann Hall had said to Mr.

21    Hanes, that she would only charge for one day?

22       A    Yes.

23       Q    You did know that?

24       A    Yes.  I think I understand your question.

25       Q    Can you explain what you are saying yes to to

32

came and picked them up in a car.

Q    And who is your brother-in-law?

A    Steve Jones.

Q    Okay.  And when did Mr. Jones arrive at Apple?

A    He was actually there before I got there because I had called him to meet us there for a ride from the place.

Q    Okay.  And where were you after the others left in Mr. Jones' car?

A    There's a little road at the back coming off Roosevelt Avenue.  I walked down there, and I was just standing there.

Q    Okay.  So you left Apple's lot at that point?

A    Yeah, I was down there.  I thought the police might come in that way, so I just stood down at the end of the road.

Q    As of this time, had anything been resolved about the charges for the van based on its late return?

A    When you say at this time anything has been resolved, I'm not sure what you actually mean.

Q    You had been telling the people from Apple that you weren't going to pay extra.  Had they agreed to that?  Had anything been resolved?

A    They actually called Jesse, and Jesse told me I didn't have to pay my part.  He talked with the manager, and -- maybe once or twice, and me and Jesse never really talked no more, because after what happened he was like, I'll take care of it, I believe, or I don't know exactly the conversation he had with the manager or whoever contacted him.

Q    When was that?  That day?

A    I'm not even sure.  I think that Monday or something like that.  I'm not even sure exactly when they discussed it.  It might have been the following week.  He gave me some details about -- I think it may be a day or something like that.  And then at that point, he said I didn't even have to pay my share of the van so --

Q    I'm sorry.  He told you what?

A    I didn't have to pay my share of that van -- renting that van.

Q    What do you mean you didn't have to pay your share?

A    He used his credit card because I didn't have a credit card.

Q    Right.

A    So, basically, we were splitting the fee on the van --

Q    Okay.

A    -- me and him.  I didn't have a

32

credit card to rent it myself, so I told him to use his.  So he said don't worry about it.  He was going to take care of it.

Q     Okay.  Was the lady who had been behind the counter still there while you were waiting off of that side road for the police?

A     No.

Q     When had she left?

A     She left before us, if I'm not mistaken.

Q     Before the others also left?

A     Yes.

Q     Okay.  Did you see her get into her car?

A     Yes.

Q     Where was her car parked?

A     Not too far from the door, right out front, I guess.  I don't know whether it's called front or whatever outside.  I don't know.  Not too far from the door.  I could see the car when we were standing out there.

Q     And where were you standing in relation to her car?

A     We were standing -- There was a curb there.  We were standing probably right there.  A little street and some of them was standing on the curb, on the sidewalk or whatever, and there was a little road; might've been just standing off to the side there.  I can't -- I can't actually put everybody in place, but we were standing out front there.

Q     And why were you standing there?

A     Because we just came out the building and was -- I guess, we -- Basically, I was waiting for the police.  And I guess we all were waiting to tell the story to the police officer, and that's why we were just standing there.

Q     Did you have to move at all for her to get her car out of the way?

A     I wasn't standing near the car, me.

Q     Okay.  I thought you just said you were all at the curb, right next to her car.

A     I wasn't at the car.  I was standing -- I said, we were -- some were standing in the front door, some were standing out in the lower road there.  I didn't have to move, no.

Q     Okay.  Did anyone else?

A     I think when she backed out, the way she cut her wheels, somebody had to jump out the way or something.  I can't remember exactly.

Q     Do you recall what time it was when you finally left that day?

A     Not -- Not actually, no.  I don't know the exact time, no.

Q     Okay.  What transportation did you

33

was doing the talking.

Q    Okay.  Do you know if Apple at any time had asked the police officer to drop the charge?

A    I'm not sure.

Q    Do you recall at that D.J. hearing, the district justice asking you if you heard Joanne Hall make the statement, I was waiting on your black ass?

A    I may have made the statement.  I don't recall him saying that.  He may have said that.  I don't recall him actually saying that. I did make the statement though.  Like I said, I don't actually remember.

Q    Okay.  You just said but you made the statement, what statement?

A    When I presented my case, it was in -- when I was giving him the information that was presented.  I did inform him that she made the statement.

Q    Now, at some point during that hearing you said to the D.J., no, I didn't really hear that; but she wanted to say that, didn't you?

A    Say what?

Q    At some point you told the D.J., you did not hear Joanne say, I was waiting on your black ass; but that you knew she wanted to make that statement.

A    Black ass, yeah.

Q    What was the result of that D.J. hearing?

A    He found me guilty.

Q    Okay.  On October 1st, 1999, you visited a doctor about headaches; is that correct?

A    That's correct.

Q    Okay.  This is about a year after this November 14th incident, right?

A    That's correct.

Q    Okay.  Had you just started having the headaches at that point?

A    No.

Q    Okay.  When did they begin?

A    Well, actually, probably, prior to that.  I can't really put my finger on the date when they started occurring.

Q    Why did you wait until October 1999 to go to a doctor?

A    Because at that point, I felt it was necessary at that time.

Q    Were you taking any type of medication or anything to alleviate the headaches?

A    Prior to going to the doctor?

Q    Correct.

18. Any and all documents evidencing any medical consultations, treatment, diagnoses, or prescriptions arising out of or resulting from the incident alleged in Plaintiff's Complaint.

A copy of said document, which is confidential and not to be used for any other purpose apart from this litigation, is attached and incorporated herein.

19. Any and all documents identified in your Response to Defendant's First Set of Interrogatories to Plaintiff, if not already produced in response to a prior request herein.

A copy of "Receipt of Payment" given to Plaintiff on or around March 10, 1999, and "Detail of Usage charges" is attached and incorporated herein.

**CGA Law Firm**
Countess Gilbert Andrews P.C.

By: _____
Sara A. Austin, Esquire
I.D. # 59052
29 North Duke Street
York, PA 17401
(717) 848-4900

Attorney for Defendants

DATED: July 11th, 2001



Confidential

This information is furnished on the condition that it will be used only for the purpose for which it was requested. Any other use or disclosure of this information requires the express authorization of the YORK HEALTH CORPORATION.

**Jeffrey Hanes  10/01/99**

**S:**   Comes in for headache. He reports an incident eight months ago. Apparently what happened he went to Apple Chevrolet and there was a dispute about payment. He returned the van slightly late and according to him tried to contact the company know that he was going to be late and they were going to charge him an extra day which he agreed to pay however he stated that he wanted to keep the van an extra day and they had the van reserved for another customer. Apparently according to him the person assisting them at Apple Chevrolet became belligerent and began making racial remarks to him. At that point he became upset and a police officer was called. He waited for the police officer to arrive and he never arrived and he was to appear in court and apparently was given a citation for disorderly contact. According to him his side of the story never was heard. Since this episode he reports that he has been getting headaches. He has no history of headache previous to this. He says that the headaches have been on the top of his head and they are a tight sharp sensation. He gets occasionally light-headed with them. He gets no photophobia, no nausea or vomiting although once he did have some episodes of shortness of breath. He says that this has effected his work and that he missed some work with this and that the headaches are only relieved with lying down.

**O:**   Head, eyes, ears, nose and throat examination; normal cephalic, atraumatic. Neck - no jugular venous distention, no carotid bruits. Lungs are clear to auscultation. Heart regular rate and rhythm. Abdominal exam - non tender to palpation. Neurologically cranial nerves II - XII intact, motor strength - 5/5, sensory intact to light touch. Extremities - non cyanosis, clubbing. Reflexes are 2+. Funduscopic exam - optic disc margins are sharp.

**A:**   Headaches, tension.

**P:**   Will give him a trial of nonsteroidals. Will give Relafen for him to take. Also he is suppose to be on Elavil and I told him to go ahead and take that at night. I told him to take the Relafen 250 mg po bid. Warned of potential side effects. Risks, benefits, treatment options and consequences of treatment and non-treatment were discussed with patient. Patient voiced understanding and agreement with this treatment plan. Patient was made aware of potential side effects of medicines prescribed. He has no sign of intracranial process with this as they appear to be tension headaches exacerbated by stress. If these headaches change in character I am going to go ahead and get an MRI to rule out any intracranial process.

N. NAIR, M.D./TK:t

34

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY L. HANES,                          :    CIVIL ACTION NO.
    Plaintiff                          :

                          :
                          :
    V.                                     :    Jury Trial Demanded
                          :
APPLE CHEVROLET, INC. and                  :
TERRY STEWART, President/Owner             :
    Jointly and Severally                  :
    Defendants                             :

FILED

NOV 1 4 2000

PER _____
HARRISBURG, PA.    DEPUTY CLERK

1 : CV-00-2003

## COMPLAINT

1.    Plaintiff, Jeffrey L. Hanes, is an African American male who resides at 455 South Duke Street, York, Pennsylvania.

2.    Defendant, Apple Chevrolet, is a corporation that is wholly or partially owned by Terry Stewart. Its principal place of business is located at 1200 Loucks Road, York, Pennsylvania.

3.    Defendant, Terry Stewart, is a Caucasian male who is the legal record owner and President of Apple Chevrolet.

4.    Defendants employ 100 employees.

### COUNT I – 42 U.S.C.S. § 2000a

5.    Paragraphs 1 through 4 of this Complaint are incorporated herein by reference as though set forth in full.

6.    Apple Chevrolet provides a public service of vehicle rentals and this activity affects interstate commerce.

1

35

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY L. HANES,                     :  CIVIL ACTION NO.
    Plaintiff                         :
                                      :
                                      :
                                      :
    V.                                :
                                      :  Jury Trial Demanded
APPLE CHEVROLET, INC. and             :
TERRY STEWART, President/Owner        :
    Jointly and Severally             :
    Defendants                        :

FILED
NOV 1 4 2000
PER _____
HARRISBURG, PA.    DEPUTY CLERK

1:CV-00-2003

## COMPLAINT

1.  Plaintiff, Jeffrey L. Hanes, is an African American male who resides at 455 South Duke Street, York, Pennsylvania.

2.  Defendant, Apple Chevrolet, is a corporation that is wholly or partially owned by Terry Stewart.  Its principal place of business is located at 1200 Loucks Road, York, Pennsylvania.

3.  Defendant, Terry Stewart, is a Caucasian male who is the legal record owner and President of Apple Chevrolet.

4.  Defendants employ 100 employees.

## COUNT I – 42 U.S.C.S. § 2000a

5.  Paragraphs 1 through 4 of this Complaint are incorporated herein by reference as though set forth in full.

6.  Apple Chevrolet provides a public service of vehicle rentals and this activity affects interstate commerce.

1

4

of discovery; that sealing, certification and filing are waived; that all objections, except as to the form of the question, are reserved to the time of trial.

* * * * *

JEFFREY HANES,

called upon by Defendants to give testimony, being duly sworn by me, testified as follows:

EXAMINATION

BY MS. AUSTIN:

Q    Mr. Hanes, I've already identified myself of record.  I'm going to be asking you some different questions today.  I would ask that you answer clearly so that the reporter can correctly take down your responses.

If you don't understand a question that I have asked you, please say that you don't understand the question.  If you don't know the answer, do not guess.  I am not looking for any guesses only what you know.

If you don't hear me, ask me to repeat the question.  We only want your firsthand knowledge.  If you need a break, let me know.  If you need to talk to your attorney, let me know.

Are you on any type of drugs, medication, or anything similar that would hinder your ability to hear, understand, and answer my questions today?

A    No, I'm not.

Q    Okay.  Are you ill or suffering any other type of physical condition that would hinder your ability to hear, understand, and answer my questions today?

A    No.

Q    Okay.  Do you understand all of these instructions that I've given you?

A    Yes.

Q    Okay.  Please state your full name, address, and telephone number.

A    Jeffrey L. Hanes, 316 Reinecke Place, 578-2762.

Q    And the address you gave is in York City?

A    That's correct.

**Q    Okay.  And what is your race?**

**A    I'm African American.**

Q    Did you grow up here in York?

A    Yes.

Q    Okay.  Where did you go to elementary school?

A    Devers.

Q    Do you recall what years you were there?

A    In the '70s.

Q    Where did you go after Devers Elementary?

36

16

incident happened.

Q    Okay.  You mentioned Mark Green was also in the van that day?

A    That's correct.

Q    Okay.  And what was Mark Green there for?

A    He was going for information like I was.

Q    Okay.  Do you recall what his occupation was?

A    He's a CBS news reporter.

Q    Was he associated with Metro?

A    He was taking classes at that time.

Q    Had you known him prior to that day?

A    Yes.

Q    How long did you know him?

A    Since high school.

Q    Was he in your class then?

A    No.

Q    Had you kept in touch with him since high school?

A    Yeah.

Q    Okay.  Would you say you had a social relationship, business relationship, both?

A    Well, we had a social relationship, then business relationship as far as the Metro thing, other than that --

Q    Okay.  And where was Mr. Green sitting in the van on the way to and from Philadelphia?

A    I don't know exactly.  He was in the back.  I know that for sure.

Q    So he was somewhere behind you with Mr. Weathers.?

A    I don't know where he was.

Q    Okay.  What is his race?

A    Black, African American.

Q    Okay.  And there was also a Dave someone in the vehicle, right?

A    Yeah.

Q    What was he there for that day?

A    He came with Jim -- well, Dimitrios.

Q    Okay.

A    And I don't know -- I don't even know his last name.  I don't know -- I never seen him no more.

Q    Had you met him prior to that day?

A    Yeah.

Q    Do you know what his occupation was at the time?

A    Not -- not right offhand, no.

Q    And you said you've had no contact with Dave since that day?

A    No.

Q    And what is Dave's race?

A    He's white.

Q    **Okay.  Where did you pick up the van?**

17

```
A    Apple Chevrolet.
Q    What day?
A    The 13th, I guess, the day before
Saturday.
Q    Friday, November 13th?
A    Yeah, I picked it up Friday.
Q    What time?
A    It was in the afternoon.
Q    Do you recall when?
A    Yeah, it was about noon.
Q    Did Mr. Pohlig go with you?
A    No.
Q    Okay.  Who else was present when you
picked up the van?
A    Present?  Nobody was present.
Somebody took me to go get the van, but they
weren't in the building.  I was on my lunch
break, actually.
Q    Okay.  I assume there were one or
more Apple employees there when you picked it
up?
A    In the building?
Q    There when you picked up the van.
A    There was employees in the building
if that's what you mean.
Q    How did you get the van?  Was it just
there and you got into it and drove away?  What
did you do to get this van?
A    I signed a paper for it.
Q    Okay.  How did you get the papers?
A    From the lady that was there.
Q    Okay.  So there was someone behind
the counter?
A    Yes.
Q    Okay.  Do you recall what this person
looked like?
A    She was a white lady.
Q    Do you recall her hair color?
A    Light brown, brown.  I don't know.
Q    Okay.  Now, are you guessing, or
you're sure of that?
A    I don't know, you know, different
colors of hair.  It looks brown to me.
Q    Okay.  Do you recall her name?
A    No.
Q    Okay.  Did you have any type of
discussions with her when you got there about
what time the van was to be returned and on
what day?
A    Yeah.  Yes, I did.
Q    Okay.  Tell me about that
conversation.
A    Well, she told me, have the van back
at four o'clock.  Then I said, well, I'm going
to Philadelphia.  I'll do my best.  I said, you
know traffic can be hectic.  I don't know what
to predict what the traffic is going to be
```

A      I don't know.  I guess somewhere in the neighborhood of -- after 3:30 or something like that.

Q      How often did you make these calls to Apple?

A      I might have made two or three calls, maybe.  I would say two to three calls, easily.

Q      And what did you say during these calls?

A      I said, I'm running late.  I'm in traffic.  Traffic's backed up, and we're not -- I don't think I'm going to make it back by the time.

Q      Do you recall when you made your last call to Apple prior to actually getting back to Apple?

A      When you say do I remember --

Q      Do you remember what time you made that last call prior to actually getting back to Apple?

A      Maybe a quarter of five, somewhere in that area.

Q      Where were you at that time?

A      We were on our way in, maybe Columbia, Lancaster County, somewhere in that neighborhood.

Q      **What time did you actually arrive back at Apple?**

A      I think 5:10, 5:15.

        (Hanes Deposition Exhibit Number 2 was marked for identification).

BY MS. AUSTIN:

Q      **I'm showing you a two-page document that has been marked as Exhibit 2.  This document was received by you, through your counsel, as part of the discovery process.**

A      Um-hum.

Q      **Can you look at this and tell me if you recognize it?**

A      Yep.

Q      **What is that?**

A      It's a copy of my prior phone bill.

Q      **Okay.  If you'll look on page 2, I've highlighted one of the items.  Can you tell me the phone number that you called in that highlighted call?**

A      That was Apple Chevrolet.

Q      **Okay.  And what time was that call?**

A      It says 5:13 p.m.

Q      **Okay.  Do you know why you would have -- And is that on November 14th?**

A      That's correct.

Q      **Do you know why you would have been calling Apple at 5:13 p.m. on that day?**

A      Yes.

37

38

1    A    Calm, just verifying that the damage wasn't

2    done by Mr. Hanes.

3    Q    What action did you take after that

4    conversation?

5    A    Considering the circumstances, it seemed like

6    he might be in trouble.  And I called my husband at that

7    point.

8    Q    What circumstances led you to believe that he

9    was in trouble?

10   A    Matt had said that, you know, he was just

11   checking the van to see if there was damages, you know,

12   that it was a pretty heated moment there with some

13   argument.  And I called my husband at that point.

14   Q    You said he was calm?

15   A    He was calm to me, but you could hear, you

16   know, that there was some problems going on in the

17   background.

18   Q    What type of problems did you hear?

19   A    Just loud noises.  Somebody was angry.  You

20   could tell that there was a conflict going on in the

21   background.

22   Q    In your experience, have you ever dealt with

23   an angry customer?

24   A    No.

25   Q    You never had a customer being in a loud voice

disputing a bill?

    A    No.

    Q    Have you ever had a customer in loud voice or -- strike that. Have you ever had a customer who would not listen to you explain the charges in the bill?

    A    No.

    Q    How many complaints have you dealt with from customers?

    A    None.

    Q    You have never dealt with any customer complaints?

    A    (Shakes head)

    Q    Was that a no to that?

    A    Yes.

    Q    So you have never had a customer complain to you about a rental contract, condition of the vehicle, billing, or anything like that?

    A    No.

    Q    And you were in that position for eight years?

    A    Yes.

    Q    Working Monday through Friday?

    A    Yes.

    Q    Have you ever seen anyone else dealing with a customer who disputed bills or anything else?

    A    Our service area.

38

32

7

1          A     To prices, yes.

2          Q     Were there situations where you kept telling

3     them what the price or so was and they kept asking for

4     something else?

5          A     Yes.

6          Q     Was there a time that you ever felt other than

7     this claim on November 14th of '98 that a customer might

8     have been threatening in any way in reference to

9     handling, dealing with the complaints?

10          A     I honestly don't recollect.

11          Q     Okay.  But there could have been?

12          A     Sure.

13          Q     What are the number of times that you called

14     the police to respond to Apple Chevrolet?

15          A     I don't recollect any exact number.  I am

16     sorry.

17          Q     More than one?

18          A     Yes.

19          Q     More than two?

20          A     Yes.

21          Q     More than three?

22          A     Is the question since I have started at Apple

23     Chevrolet, since my employment started?

24          Q     First my question is the number of times you

25     called police to respond.  That's where it is first.

39

32

A    To prices, yes.

Q    Were there situations where you kept telling them what the price or so was and they kept asking for something else?

A    Yes.

Q    Was there a time that you ever felt other than this claim on November 14th of '98 that a customer might have been threatening in any way in reference to handling, dealing with the complaints?

A    I honestly don't recollect.

Q    Okay.  But there could have been?

A    Sure.

Q    What are the number of times that you called the police to respond to Apple Chevrolet?

A    I don't recollect any exact number.  I am sorry.

Q    More than one?

A    Yes.

Q    More than two?

A    Yes.

Q    More than three?

A    Is the question since I have started at Apple Chevrolet, since my employment started?

Q    First my question is the number of times you called police to respond.  That's where it is first.

33

1      A    I understand.  But I mean, do you mean since I

2  have worked for Apple?

3      Q    Exactly.

4      A    Yes, it has been more than three.

5      Q    What are the reasons why you would call the

6  police?

7      A    For vandalism, for theft.  I don't recollect

8  all the reasons.

9      Q    Besides November 14th of 1998, have you ever

10 called the police for a customer complaint?

11     A    I don't recollect.

12     Q    So according to your recollection, you have

13 never called the police to mediate a customer complaint?

14     A    I don't recollect.

15     Q    That was my question to you.  According to

16 your recollection, you don't recall ever calling the

17 police --

18     A    Correct.

19     Q    -- to mediate a customer complaint?

20     A    Right.

21     Q    Okay.  Now, are there any reasons or

22 justifications or defenses that you have to explain your

23 actions on November 14th of '98?

24     A    I don't understand your question.

25     Q    I am asking you basically why did you do what

40

36

A    Yeah, I was taking some over-the-counter medicine, just Tylenol and stuff like that.

Q    Do you have any type of medical evidence that connects your headaches to the incident on November 14, 1998?

A    As far as evidence, visiting a doctor; talking with the doctor; asking me do I have any on-going problems.  They asked me, in general, was I known for having headaches.  I told them no.  Other than that, no evidence.

Q    Do you have any type of medical training yourself?

A    Yes.

Q    What?

A    CPR.

Q    When?

A    When I --

Q    When did you receive that training?

A    Five years, six years ago, if not more.

Q    Five to six years prior to today?

A    The first time.  I think I had it a couple times.

Q    Any other medical training other than that?

A    Medical training, not -- no.

Q    Okay.  Describe for me the cause or causes of these seizures you've experienced over the past ten to 15 years.

A    I don't know the actual cause of it. To describe -- I can't see myself when I'm having them.  Based on what people told me, epilepsy-type seizures, trembling.  That's about it.

Q    Have they been diagnosed as epileptic?

A    Not necessarily.  They treat them like they're epilepsy, because I don't have a -- I may have a seizure, maybe once every five years or whatever.  That's how it's been. But I do take medication for it, so --

Q    And when did you begin taking that medication?

A    Several years ago, maybe seven, eight, maybe more.  I can't really recall the actual first time.

Q    Was it prior to November 14, 1998?

A    Yes.

Q    Do you have any indication when a seizure is going to begin, onset?

A    No.  No.  No.

Q    About how long do the seizures last?

A    I have no idea.

Q    Okay.  Are there any side effects of the medication you're taking to control the seizures?

41

37

A    No.
Q    Describe for me any monetary damage
-- damages that you say you have incurred as a
result of this incident on November 14th, 1998?
A    Can you define the word monetary?
Q    Having to do with money, lost money?
A    Okay.  Well, the time I took off
work, the fines -- You're talking about out-of-
pocket expenses; is that correct?
Q    Damages -- Any monetary, money
damages that you allege that you have incurred
as a result of the incident on November 14th,
1998?
A    I mean, those were my doctor bills,
doctor visits, medication, time off of work,
fines -- the fine, excuse me.
Q    Okay.  Now, you said doctor bills.
Did you visit a doctor other than this one on
October 1st, 1999?
A    I went back to it.  That's the doctor
office that I go to.
Q    Okay.  How often have you been back
for this same thing?
A    I've been back maybe two or three
times.  Other than that --
Q    Do you have copies of those bills?
A    I'm pretty sure I can -- have them at
home or I can get a copy.  I just -- not with
me today, I don't, no.
Q    Do you recall what those bills were,
the amount?
A    Not right offhand.
Q    And you said there's also medication.
What type of medication?
A    It's called -- If I can pronounce it
right -- Neosporin -- not Neosporin.
Neoproxin (phonetic), something of that nature.
I just can't pronounce it correctly.
Q    And who prescribed that for you?
A    The doctor at the health center.
Q    And when was that prescribed?
A    I had several prescriptions at
different times.
Q    Before or after November 14, 1998?
A    That was after.
Q    Do you recall the cost of those?
A    I have what is called a ten dollar
co-payment, if I'm not mistaken.
Q    As part of your insurance?
A    That's correct.
Q    Okay.  So you paid $10 for how
many -- for each of how many ever prescriptions
you got?
A    That's correct.
Q    And do you have copies of any checks
that you might have used to make that
co-payment?

38

A    I probably -- For that, I probably paid cash, since it was so small.  Probably cash.  I don't have a copy of a check, no.

Q    Do you have copies of any receipts you would have gotten for those prescriptions?

A    I may have.

Q    Okay.  Now, you mentioned, also, you believe that part of the damages were a fine. Are you talking about that D.J. fine?

A    That's correct.

Q    Okay.  You also said you have -- you had time off work for which you've incurred damages.  Can you describe these in more detail for me?

A    Well, I have to use my vacation time. On several times I had to use vacation time.

Q    When?  For what?

A    To show up to the district magistrate's office, any other events such as, up to this point -- Today I had a subpoena, so I had talked to my supervisor and he wanted the subpoena, so I don't know how -- what he's going to -- how he's working that as far as time off.

Q    Okay.  So how many times have you had to use vacation?

A    I'm not sure right offhand.

Q    Okay.  So -- and this was paid vacation?

A    That's correct.

Q    So you weren't out of pocket anything.  You still got paid for those days, correct?

A    But it still was my time.

Q    You still got paid for those days?

A    That's correct.

Q    Other that the alleged incident on November 14th, 1998, have you ever been discriminated against based on your race?

A    Yes.

Q    When?

A    Several times.  I worked at Cable TV, Cable TV.

Q    Okay.  When was this discrimination that you believe you experienced there?

A    When I worked there about in the '80s.

Q    Okay.  What happened?

A    As far as, when you say what happened, what did I do, or --

Q    Well, tell me what you believe you experienced as far as the discrimination.

A    Well, I bidded on a particular job, and everybody who had got the job prior to me didn't have to take tests.  They made me take all types of tests.  I was the only one that had to take this test.  And they were actually