2 TO G      (71)

6-18-02
Sc

# ORIGINAL

## In The Matter Of:

*Jeffrey L. Hanes v.*

*Apple Chevolet, Inc.*

FILED
HARRISBURG, PA

JUN 17 2002

MARY E. D'ANDREA CLERK
Per _____
    Deputy Clerk

*Jeffrey L. Hanes*

*May 24, 2002*

1:00-CV-2003

*Key Reporters*

*1300 Garrison Drive*

*York, PA 17404*

*(717) 764-7801    FAX: (717) 764-6367*

*Original File A24MAY02.PRN, 104 Pages*
*Min-U-Script® File ID: 3206827488*

## Word Index available for this Min-U-Script®

COPY



EXHIBIT "1"

Jeffrey L. Hanes
May 24, 2002

   

Jeffrey L. Hanes   v.
Apple Chevolet, Inc.

Page 7

[1] can correctly take down your responses.
[2]     If you don't understand a question
[3] that I have asked you, please say that you
[4] don't understand the question. If you don't
[5] know the answer, do not guess. I am not
[6] looking for any guesses only what you know.
[7]     If you don't hear me, ask me to
[8] repeat the question. We only want your
[9] firsthand knowledge. If you need a break, let
[10] me know. If you need to talk to your attorney,
[11] let me know.
[12]     Are you on any type of drugs,
[13] medication, or anything similar that would
[14] hinder your ability to hear, understand, and
[15] answer my questions today?
[16]     **A:** No, I'm not.
[17]     **Q:** Okay. Are you ill or suffering any
[18] other type of physical condition that would
[19] hinder your ability to hear, understand, and
[20] answer my questions today?
[21]     **A:** No.
[22]     **Q:** Okay. Do you understand all of these
[23] instructions that I've given you?
[24]     **A:** Yes.
[25]     **Q:** Okay. Please state your full name,

Page 8

[1] address, and telephone number.
[2]     **A:** Jeffrey L. Hanes, 316 Reinecke Place,
[3] 578-2762.
[4]     **Q:** And the address you gave is in York
[5] City?
[6]     **A:** That's correct.
[7]     **Q:** Okay. And what is your race?
[8]     **A:** I'm African American.
[9]     **Q:** Did you grow up here in York?
[10]     **A:** Yes.
[11]     **Q:** Okay. Where did you go to elementary
[12] school?
[13]     **A:** Devers.
[14]     **Q:** Do you recall what years you were
[15] there?
[16]     **A:** In the '70s.
[17]     **Q:** Where did you go after Devers
[18] Elementary?
[19]     **A:** Edgar Fahs Smith.
[20]     **Q:** That's a middle school?
[21]     **A:** That's correct.
[22]     **Q:** Okay. And do you recall when you
[23] were there?
[24]     **A:** I guess in the '80s. I'm not sure
[25] exactly what year.

 

**Lawyer's Notes**

Page 23

[1] attending a seminar in Philadelphia, correct?
[2]    **A:** That's correct.
[3]    **Q:** What seminar were you attending?
[4]    **A:** It was a Metro — for the insurance
[5] — Metro.
[6]    **Q:** Okay. Metro was sponsoring it?
[7]    **A:** That's correct.
[8]    **Q:** Do you recall the name?
[9]    **A:** When you're saying the name —
[10]    **Q:** The name of the seminar.
[11]    **A:** (No audible response).
[12]    **Q:** Was it titled the ABC's of Public
[13] Adjusting? What was it called?
[14]    **A:** What was it called?
[15]    **Q:** Yes. What was the title of the
[16] seminar?
[17]    **A:** I'm trying to think. I can't even
[18] remember if it was called — no, I don't
[19] remember what it was called.
[20]    **Q:** Okay. What was it about?
[21]    **A:** It was just about how to do the
[22] business and give me information on the
[23] business of writing insurance claims, showing
[24] people how to do the business, basically.
[25]    **Q:** Would you say this was a basic

Page 24

[1] seminar, intermediate, advanced? How would you
[2] classify it?
[3]    **A:** It was open to everybody. I just —
[4] general, I guess.
[5]    **Q:** Okay. All right. So it was — It
[6] was a — for people with some experience in the
[7] field, no experience?
[8]    **A:** For everybody, exactly.
[9]    **Q:** Okay. Was it only for people
[10] associated with Metro?
[11]    **A:** I wouldn't say just associated with
[12] Metro. I would say probably anybody who was
[13] interested in being a part of Metro.
[14]    **Q:** Why were you attending this seminar?
[15]    **A:** To get further training and
[16] information.
[17]    **Q:** Was it — Was this seminar after you
[18] already had your license?
[19]    **A:** Yes.
[20]    **Q:** So you were already working under
[21] Metro at this point?
[22]    **A:** Yeah. I believe I was. Yeah, that's
[23] correct.
[24]    **Q:** Okay. What was your role in the
[25] seminar?

Jeffrey L. Hanes   v.
Apple Chevrolet, Inc.

Jeffrey L. Hanes

Jeffrey L. Hanes
May 24, 2002

*Lawyer's Notes*

Page 25

[1]   **A:** My role? I had no role in the
[2]  seminar.
[3]   **Q:** You were just attending?
[4]   **A:** That's correct.
[5]   **Q:** Is this just a one-day seminar?
[6]   **A:** Yes.
[7]   **Q:** How did you travel to and from
[8]  Philadelphia to attend that seminar?
[9]   **A:** I drove.
[10]   **Q:** What did you drive?
[11]   **A:** A van.
[12]   **Q:** Was that your van?
[13]   **A:** No.
[14]   **Q:** Okay. Whose van was it?
[15]   **A:** I rented it.
[16]   **Q:** Okay. From whom?
[17]   **A:** Apple Chevrolet.
[18]   **Q:** Were you the person who made the
[19]  rental reservation?
[20]   **A:** No.
[21]   **Q:** Who did?
[22]   **A:** Jesse Pohlig.
[23]   **Q:** Who was Jesse Pohlig?
[24]   **A:** He was considered a regional manager.
[25]   **Q:** For whom?

Page 26

[1]   **A:** Metro.
[2]   **Q:** Okay. Why did Jesse rent the van?
[3]   **A:** So we could have a way to go to
[4]  Philly. He asked me to rent it. I didn't have
[5]  a credit card at the time so he used his.
[6]   **Q:** How did you become acquainted with
[7]  Mr. Pohlig?
[8]   **A:** Through Metro.
[9]   **Q:** How long had you known him?
[10]   **A:** Probably a year or so.
[11]   **Q:** Did Mr. Pohlig also live here in
[12]  York?
[13]   **A:** No.
[14]   **Q:** Do you know where he lived?
[15]   **A:** He lived in New Jersey.
[16]   **Q:** Okay. What was Mr. Pohlig's role in
[17]  this seminar?
[18]   **A:** Attending.
[19]   **Q:** Okay. Was he in the van with you?
[20]   **A:** No.
[21]   **Q:** Okay. Who drove the van?
[22]   **A:** Me.
[23]   **Q:** Both ways?
[24]   **A:** Correct.
[25]   **Q:** Who else was in the vehicle besides

Jeffrey L. Hanes
May 24, 2002



Jeffrey L. Hanes   v.
Apple Chevolet, Inc.

*Lawyer's Notes*

Page 35

[1] back. I know that for sure.

[2]     **Q:** So he was somewhere behind you with

[3] Mr. Weathers.?

[4]     **A:** I don't know where he was.

[5]     **Q:** Okay. What is his race?

[6]     **A:** Black, African American.

[7]     **Q:** Okay. And there was also a Dave

[8] someone in the vehicle, right?

[9]     **A:** Yeah.

[10]     **Q:** What was he there for that day?

[11]     **A:** He came with Jim — well, Dimitrios.

[12]     **Q:** Okay.

[13]     **A:** And I don't know — I don't even know

[14] his last name. I don't know — I never seen

[15] him no more.

[16]     **Q:** Had you met him prior to that day?

[17]     **A:** Yeah.

[18]     **Q:** Do you know what his occupation was

[19] at the time?

[20]     **A:** Not — not right offhand, no.

[21]     **Q:** And you said you've had no contact

[22] with Dave since that day?

[23]     **A:** No.

[24]     **Q:** And what is Dave's race?

[25]     **A:** He's white.

Page 36

[1]     **Q:** Okay. Where did you pick up the van?

[2]     **A:** Apple Chevrolet.

[3]     **Q:** What day?

[4]     **A:** The 13th, I guess, the day before

[5] Saturday.

[6]     **Q:** Friday, November 13th?

[7]     **A:** Yeah, I picked it up Friday.

[8]     **Q:** What time?

[9]     **A:** It was in the afternoon.

[10]     **Q:** Do you recall when?

[11]     **A:** Yeah, it was about noon.

[12]     **Q:** Did Mr. Pohlig go with you?

[13]     **A:** No.

[14]     **Q:** Okay. Who else was present when you

[15] picked up the van?

[16]     **A:** Present? Nobody was present.

[17] Somebody took me to go get the van, but they

[18] weren't in the building. I was on my lunch

[19] break, actually.

[20]     **Q:** Okay. I assume there were one or

[21] more Apple employees there when you picked it

[22] up?

[23]     **A:** In the building?

[24]     **Q:** There when you picked up the van.

[25]     **A:** There was employees in the building

---

**Page 35 - Page 36  (20)**             **Min-U-Script®**             **Key Reporters**  (717) 764-7



***Lawyer's Notes***

Page 37

[1] if that's what you mean.
[2]  **Q:** How did you get the van? Was it just
[3] there and you got into it and drove away? What
[4] did you do to get this van?
[5]  **A:** I signed a paper for it.
[6]  **Q:** Okay. How did you get the papers?
[7]  **A:** From the lady that was there.
[8]  **Q:** Okay. So there was someone behind
[9] the counter?
[10]  **A:** Yes.
[11]  **Q:** Okay. Do you recall what this person
[12] looked like?
[13]  **A:** She was a white lady.
[14]  **Q:** Do you recall her hair color?
[15]  **A:** Light brown, brown. I don't know.
[16]  **Q:** Okay. Now, are you guessing, or
[17] you're sure of that?
[18]  **A:** I don't know, you know, different
[19] colors of hair. It looks brown to me.
[20]  **Q:** Okay. Do you recall her name?
[21]  **A:** No.
[22]  **Q:** Okay. Did you have any type of
[23] discussions with her when you got there about
[24] what time the van was to be returned and on
[25] what day?

Page 38

[1]  **A:** Yeah. Yes, I did.
[2]  **Q:** Okay. Tell me about that
[3] conversation.
[4]  **A:** Well, she told me, have the van back
[5] at four o'clock. Then I said, well, I'm going
[6] to Philadelphia. I'll do my best. I said, you
[7] know traffic can be hectic. I don't know what
[8] to predict what the traffic is going to be
[9] like.
[10]  **Q:** Now, this was four p.m. the next day,
[11] Saturday, November 14th; correct?
[12]  **A:** That's correct.
[13]  **Q:** Okay. And after this discussion you
[14] signed the rental agreement?
[15]  **A:** That's correct.
[16]  **Q:** Okay. Did you have any questions
[17] about the rental agreement before you signed
[18] it?
[19]  **A:** Not that I really recall. I can't
[20] recall. We just talked general.
[21]  **Q:** If you had any questions at that
[22] time, would you have asked them?
[23]  **A:** I guess, if I'd had them.
[24]  **Q:** Okay. I'm showing you a two-page,
[25] double-sided document. Do you recall seeing

Jeffrey L. Hanes  v.
Apple Chevolet, Inc.                    Jeffrey L. Hanes                    Jeffrey L. Hanes
May 24, 2002

**Lawyer's Notes**

Page 45

[1] **Q:** It was when you got there?
[2] **A:** I think you could register prior to
[3] there — or arriving there, or you could — It
[4] didn't matter. I think — I don't know how
[5] everybody in the van registered. But I can't
[6] recall the actual —
[7] **Q:** Do you recall if you pre-registered
[8] or if you registered that morning?
[9] **A:** I may have pre-registered.
[10] **Q:** Okay. What types of topics were
[11] covered at the seminar?
[12] **A:** How to write insurance claims; how
[13] the business worked; just general information
[14] on public adjusting.
[15] **Q:** Was it all one long seminar, or were
[16] there different little subtopics, subsections?
[17] **A:** I would say it was one continuous
[18] with different speakers, presenters.
[19] **Q:** Was everyone all in one big room?
[20] **A:** That's correct.
[21] **Q:** Did you receive any written materials
[22] at the seminar?
[23] **A:** Yeah, they hand out booklets and
[24] information.
[25] **Q:** Would that have covered the topics

Page 46

[1] that were being discussed at the seminar?
[2] **A:** Yeah.
[3] **Q:** Do you still have those booklets and
[4] information?
[5] **A:** Probably not.
[6] **Q:** Why not?
[7] **A:** I moved several times probably since
[8] that date, and stuff — it might be packed
[9] away.
[10] **Q:** Okay. So you don't know; you may,
[11] you may not?
[12] **A:** I don't know.
[13] **Q:** Okay. What time was the seminar
[14] scheduled to end on November 14th?
[15] **A:** I believe two o'clock.
[16] **Q:** And did you stay until the end?
[17] **A:** No.
[18] **Q:** What time did you leave the seminar?
[19] **A:** Close to two. Somewhere around two,
[20] somewhere in that neighborhood.
[21] **Q:** So it was around two, the seminar
[22] just had not ended yet?
[23] **A:** Somewhere in that neighborhood,
[24] correct.
[25] **Q:** Okay. And all of you, I assume, left

**Jeffrey L. Hanes**
**May 24, 2002**

 

Jeffrey L. Hanes v.
Apple Chevolet, Inc.

Page 47

[1] together?
[2]    **A:** Yes.
[3]    **Q:** The same people that rode to the
[4] seminar were the only ones in the van on the
[5] way back?
[6]    **A:** Yes.
[7]    **Q:** Okay. What route did you take on
[8] your way back to York?
[9]    **A:** I took the opposite way. I went
[10] pretty much the same, turnpike down to 30.
[11]    **Q:** What time was it when you realized
[12] that you would be late returning the van to
[13] Apple?
[14]    **A:** Well, I guess when she called me or
[15] something. I didn't realize I was going to be
[16] late.
[17]    **Q:** So it wasn't until you got a call
[18] from Apple?
[19]    **A:** I was in traffic, and I didn't know
[20] how long the traffic was going to move or
[21] whatever. So I didn't know if I was going to
[22] be late.
[23]    **Q:** Okay. But you said someone from
[24] Apple called you?
[25]    **A:** That's correct.

Page 48

[1]    **Q:** When was that?
[2]    **A:** Maybe four, 3:50, something — 3:30
[3] on, something like that.
[4]    **Q:** Okay. So you don't know exactly
[5] when. You know it was sometime after 3:30?
[6]    **A:** Not right off the top of my head.
[7] But I do have it written down somewhere, but,
[8] no. As of right now, no, I don't.
[9]    **Q:** Okay. Now, did you have a cell phone
[10] with you that — that the person from Apple was
[11] able to call you?
[12]    **A:** That's correct.
[13]    **Q:** Okay. Where were you when you
[14] received that phone call, that first phone call
[15] from the person at Apple?
[16]    **A:** In traffic.
[17]    **Q:** Do you remember where on the way
[18] back? Were you in Bensalem? Were you in —
[19] obviously, you were somewhere between the
[20] seminar and York. Do you recall where you
[21] were?
[22]    **A:** Out on the other side of Lancaster,
[23] somewhere between Philly and Lancaster. I
[24] don't know exactly.
[25]    **Q:** On the far side of Lancaster?

**Jeffrey L. Hanes    v.**
**Apple Chevrolet, Inc.**

● **Jeffrey L. Hanes** ●

**Jeffrey L. Hanes**
**May 24, 2002**

*Lawyer's Notes*

[1]    **A:** That's correct.

[2]    **Q:** Okay. What happened after the person

[3] from Apple called you? Were there any further

[4] contacts between you and Apple?

[5]    **A:** Did I talk to her anymore?

[6]    **Q:** Yes.

[7]    **A:** Yes.

[8]    **Q:** Okay. Who made — Who initiated the

[9] next contact, you or Apple?

[10]    **A:** I called — I called several times,

[11] and I would get, like, the voice message and

[12] then I did get to her to call her and let her

[13] know how I was making out in traffic and

[14] everything.

[15]    **Q:** Do you recall when you made those

[16] calls?

[17]    **A:** I don't know. I guess somewhere in

[18] the neighborhood of — after 3:30 or something

[19] like that.

[20]    **Q:** How often did you make these calls to

[21] Apple?

[22]    **A:** I might have made two or three calls,

[23] maybe. I would say two to three calls, easily.

[24]    **Q:** And what did you say during these

[25] calls?

[1]    **A:** I said, I'm running late. I'm in

[2] traffic. Traffic's backed up, and we're not —

[3] I don't think I'm going to make it back by the

[4] time.

[5]    **Q:** Do you recall when you made your last

[6] call to Apple prior to actually getting back to

[7] Apple?

[8]    **A:** When you say do I remember —

[9]    **Q:** Do you remember what time you made

[10] that last call prior to actually getting back

[11] to Apple?

[12]    **A:** Maybe a quarter of five, somewhere in

[13] that area.

[14]    **Q:** Where were you at that time?

[15]    **A:** We were on our way in, maybe

[16] Columbia, Lancaster County, somewhere in that

[17] neighborhood.

[18]    **Q:** What time did you actually arrive

[19] back at Apple?

[20]    **A:** I think 5:10, 5:15.

[21]    (Hanes Deposition Exhibit Number 2

[22] was marked for identification).

[23]                **BY MS. AUSTIN:**

[24]    **Q:** I'm showing you a two-page document

[25] that has been marked as Exhibit 2. This

**Jeffrey L. Hanes**
May 24, 2002

 

**Jeffrey L. Hanes  v.**
**Apple Chevolet, Inc.**

Page 51

[1]  document was received by you, through your
[2]  counsel, as part of the discovery process.
[3]    **A:** Um-hum.
[4]    **Q:** Can you look at this and tell me if
[5]  you recognize it?
[6]    **A:** Yep.
[7]    **Q:** What is that?
[8]    **A:** It's a copy of my prior phone bill.
[9]    **Q:** Okay. If you'll look on page 2, I've
[10]  highlighted one of the items. Can you tell me
[11]  the phone number that you called in that
[12]  highlighted call?
[13]    **A:** That was Apple Chevrolet.
[14]    **Q:** Okay. And what time was that call?
[15]    **A:** It says 5:13 p.m.
[16]    **Q:** Okay. Do you know why you would have
[17]  — And is that on November 14th?
[18]    **A:** That's correct.
[19]    **Q:** Do you know why you would have been
[20]  calling Apple at 5:13 p.m. on that day?
[21]    **A:** Yes.
[22]    **Q:** Why?
[23]    **A:** Because I was letting her know I was
[24]  putting gas in it, and I was right on 30,
[25]  coming down the highway. I just got done

Page 52

[1]  putting gas in, filling it up, and I was
[2]  actually, right on 30, to let her know I was
[3]  coming right there.
[4]    **Q:** Okay. So as of the time of that
[5]  phone call, 5:13 p.m., you were not yet back at
[6]  Apple?
[7]    **A:** That's a possibility, yes.
[8]    **Q:** Okay. What did you do when you got
[9]  back to Apple?
[10]    **A:** What did I do? What do you mean?
[11]    **Q:** You arrived at Apple's business
[12]  premises.
[13]    **A:** Right.
[14]    **Q:** I assume you turned the van into the
[15]  parking lot?
[16]    **A:** That's correct.
[17]    **Q:** What did you do?
[18]    **A:** Well, I — When I got out, I seen the
[19]  manager locking the gates. I asked him did he
[20]  want the van; he said hold on. Then I went
[21]  inside.
[22]    **Q:** Do you know who that manager was?
[23]    **A:** That was Matt.
[24]    **Q:** When you say Matt, you mean Matt
[25]  Kugel?

Jeffrey L. Hanes   v.
Apple Chevrolet, Inc.

Jeffrey L. Hanes

Jeffrey L. Hanes
May 24, 2002

**Lawyer's Notes**

Page 53

[1]    **A:** That's correct.
[2]    **Q:** Okay. Had you seen him prior to that
[3] date?
[4]    **A:** Never. No, no.
[5]    **Q:** Did Matt take over the van from you
[6] after he was locking the gates?
[7]    **A:** Like I said, I went inside to turn
[8] the keys in. He just told me to hold up, as
[9] far as that. He just continued to do what he
[10] was doing as far as locking some gates or
[11] doors. He was locking up, doing some things.
[12]    **Q:** Where was the van at that time?
[13]    **A:** I pulled it out front.
[14]    **Q:** So the van was still in the lot
[15] there?
[16]    **A:** Yeah.
[17]    **Q:** Okay. And you said you went inside
[18] the building?
[19]    **A:** That's correct.
[20]    **Q:** Okay. Who else was inside the
[21] building there when you went in?
[22]    **A:** As far as employees?
[23]    **Q:** Anyone.
[24]    **A:** There was another customer waiting,
[25] and the lady behind the counter.

Page 54

[1]    **Q:** Okay. Did you go in alone, or did
[2] anyone else from the van come in with you?
[3]    **A:** Everybody came in.
[4]    **Q:** Okay. The other customer that was
[5] waiting, had you ever seen that person prior to
[6] that day?
[7]    **A:** No.
[8]    **Q:** Have you ever seen that person since
[9] that day?
[10]    **A:** No.
[11]    **Q:** Was it a male or a female?
[12]    **A:** It was a male.
[13]    **Q:** Okay. And what was his race?
[14]    **A:** White, I guess.
[15]    **Q:** Well, now are you guessing or do you
[16] know?
[17]    **A:** He looked white.
[18]    **Q:** Okay. And you said there was a lady
[19] behind the counter.
[20]    **A:** Yes.
[21]    **Q:** Had you seen her prior to that day?
[22]    **A:** No.
[23]    **Q:** And what was her race?
[24]    **A:** Appearance, white.
[25]    **Q:** Anyone else other than the customer,

Jeffrey L. Hanes
May 24, 2002

Page 59

[1]    A: She was behind the counter.
[2]    Q: Were there any other doors into or
[3] out of that area?
[4]    A: There might have been another door.
[5]    Q: Do you recall where it was?
[6]    A: No.
[7]    Q: So after you came in and went to the
[8] counter, then what did you do?
[9]    A: I turned the keys in.
[10]    Q: Okay. Did you then leave?
[11]    A: No.
[12]    Q: What happened?
[13]    A: We had some discrepancy about the
[14] bill.
[15]    Q: Okay. Who's we?
[16]    A: Me and the lady behind the counter.
[17]    Q: Okay. What discussion did you have?
[18]    A: About her charging me for two days.
[19] When we talked on the phone previously, she
[20] said she was going to charge me two days. So I
[21] said, well, no use in me trying to fight this
[22] traffic and get back, and I said just go ahead
[23] and charge it, and I'll just keep the van for
[24] two days.
[25]    Q: And what was her response then?

Page 60

[1]    A: We had a couple conversations. I
[2] think she said let me call you back, or — I
[3] knew the customer was there. I think she said,
[4] well, let me call you back. I think she had to
[5] make a phone call or something. I'm not sure.
[6]    Q: So this was while you were still on
[7] your way back to Apple?
[8]    A: Yeah.
[9]    Q: Okay.
[10]    A: You're asking me about the
[11] conversation, but it was about the conversation
[12] that we had on the phone.
[13]    Q: Okay.
[14]    A: Then we had the discussion when I got
[15] back about the bill.
[16]    Q: Okay. And was this a discussion in
[17] normal tones of voice? Did it get heated?
[18] Tell me about it.
[19]    A: It was in normal tones of voice, and
[20] then after, you know, I was going to be charged
[21] two days and the van was gone, you know, I was
[22] upset about that, because I wasn't going to pay
[23] for something I didn't use. Because she
[24] originally told me she was charging me one day
[25] when I brought the van back. And I was upset

**Min-U-Script®**

Jeffrey L. Hanes   v.
Apple Chevolet, Inc.                    Jeffrey L. Hanes

Jeffrey L. Hanes
May 24, 2002

*Lawyer's Notes*

[1] because she lied to me in order to get me to
[2] bring the van back. That's the way I took it.
[3]    Because we had several conversations,
[4] and then when I got there, then she said she
[5] was going to charge me, so I got upset about
[6] being charged for something that I'm not using.
[7]    **Q:** Now, you said at that point the van
[8] was already gone?
[9]    **A:** I don't know if it was actually gone.
[10] I did turn the keys in, and I said, well, just
[11] give me the keys back and then you can charge
[12] me two days. I have no problem with that.
[13]    Then I think the customer that was
[14] there had left the room with the manager to go
[15] out to the van, and — prior.
[16]    **Q:** Okay. Now, was it just you and the
[17] lady behind the counter that were involved in
[18] this discussion, or were there other people
[19] involved?
[20]    **A:** Me and her was doing the discussing.
[21]    **Q:** Okay. Now, you said some point you
[22] got angry because you had been told you were
[23] going to be charged two days, and the keys or
[24] the van were no longer available to you.
[25]    What happened at that point after you

[1] got angry?
[2]    **A:** I told her I'm not being charged for
[3] two days because I didn't use the van for two
[4] days, and I'm not paying for two days.
[5]    **Q:** At this point were you still speaking
[6] in a calm tone?
[7]    **A:** I might have been getting loud,
[8] probably then.
[9]    **Q:** How about the lady behind the
[10] counter, was she still speaking in a calm tone?
[11]    **A:** I guess it started getting loud for
[12] both of us because I didn't want to be billed,
[13] and she seemed like she was upset for waiting
[14] on me being late.
[15]    **Q:** Okay. Were you both talking slowly
[16] to be understood? Were you both talking
[17] quickly? How was that conversation or
[18] discussion proceeding?
[19]    **A:** I guess just general talking. I
[20] didn't look at it as fast or slow.
[21]    **Q:** Okay. How did you know that she was
[22] upset waiting for you? I think those were your
[23] words.
[24]    **A:** Well, after we got into the
[25] disagreement of me paying, I said, I'm not

**Jeffrey L. Hanes**
**May 24, 2002**

**Jeffrey L. Hanes    v.**
**Apple Chevrolet, Inc.**

Page 63

[1] paying. I was consistently saying, I'm not
[2] paying. I said — You know, I said, I'm not
[3] paying until you give me the keys back. I
[4] said, you're going to have to bill my — the
[5] credit card is not my credit card, but I said
[6] I'm not paying. And she — She said, you're
[7] paying. She stated that I was going to pay for
[8] the two days. I said, well, you told me this,
[9] and I said that's what I'm going by.
[10]     I said, basically, you told me — You
[11] tricked me into getting here. She said, I
[12] didn't trick you into bringing the van back,
[13] which I know she did and felt she did. And
[14] then she went into, I waited on your black —
[15] and then she didn't finish her sentence. I
[16] stated — I said, you want me to finish it? My
[17] black ass. That's all I said. And then she
[18] said, I didn't say that. I said, you didn't
[19] say black ass, but you said black.
[20]     **Q:** What was her response, if any?
[21]     **A:** When I said that?
[22]     **Q:** Yes.
[23]     **A:** She said, she didn't say black
[24] ass. And then I don't know if Matt came in,
[25] Kugel, the manager came in at that time. She

Page 64

[1] was upset because I was telling him what she
[2] said. I said, I know you said it. And, bottom
[3] line, I clarified what she said to her, and she
[4] had a disagreement. And she said, eff this
[5] place. I don't need this. She kept going on
[6] and on using profanity. And like I said, Matt
[7] came in the room. I don't know if she was
[8] cussing at that particular time, when he walked
[9] in.
[10]     And I told him, I said, I'm not
[11] paying. I said the same thing to him. I'm not
[12] paying two days. And, basically, he said, well
[13] — and then — I'm trying to think. He came
[14] in. I don't know if he — She made a call,
[15] like I said, to him. He came in, and he came
[16] in like he was already under the — whatever
[17] she told him, he came in like with a attitude,
[18] so I said to him, once again. I'm not paying.
[19] I don't care. And then —
[20]     **Q:** Where did she make the call from to
[21] him?
[22]     **A:** I think there's a phone right there
[23] at the desk. There's a phone on that desk, I
[24] believe.
[25]     **Q:** So you knew she was calling someone?



Page 65

[1]    **A:** Yeah.

[2]    **Q:** Did you hear her — what she said?

[3]    **A:** Not exactly. I think she said just
[4]  come over here. I'm having a problem with a
[5]  customer or something like that of that nature.
[6]  I can't remember her exact words.

[7]    **Q:** Did she provide any specific details?

[8]    **A:** To the manager?

[9]    **Q:** When she called the manager to come
[10]  in.

[11]    **A:** She was saying I don't want to pay
[12]  the two days, and something of that nature.
[13]  Like I said, it was probably more said; but I
[14]  wasn't paying attention. By that time those
[15]  guys in there was talking too, among
[16]  themselves.

[17]    **Q:** Okay. What happened when Matt
[18]  entered the room? What did he do or say?

[19]    **A:** He said, well, we got your
[20]  information. We're going to bill your — the
[21]  card. I said, no, you're not billing the card
[22]  because I don't have the van. Give me the van
[23]  back. I said, well, I'm not going with that.
[24]  He asked me to sign a paper. That's what it
[25]  was. And I refused to sign the paper. And

Page 66

[1]  then he said, well — Like I said, we were all
[2]  getting loud. He said, well, I'm going to call
[3]  the police. I said, call them. And I waited
[4]  and the police never showed, so I left.

[5]    **Q:** Why was Matt calling the police?

[6]    **A:** He said, I'll get the police here to
[7]  alleviate the situation. I said, no problem.

[8]    **Q:** Did he then go call the police?

[9]    **A:** I believe he did dial the police,
[10]  and — He dialed the police, and then I waited.

[11]    **Q:** Were you all inside the rental area
[12]  at that point?

[13]    **A:** Yeah.

[14]    **Q:** When did the others that were in the
[15]  van leave Apple's premises?

[16]    **A:** Well, he was locking up — While this
[17]  was going on, he continued to lock up. So
[18]  basically, we all left out the building.
[19]  Everybody left together.

[20]    **Q:** And when you say everybody, do you
[21]  mean everyone from the van, or —

[22]    **A:** Everyone from the van, even the lady
[23]  behind the desk, she was walking out. We all
[24]  was walking out, because he was locking the
[25]  building. Okay? And she was leaving. We all



*Lawyer's Notes*

Page 67

[1] walked out that front door, whatever, side
[2] door. We stood outside.
[3]    **Q:** Okay.
[4]    **A:** And I was just waiting for the police
[5] to be called.
[6]    **Q:** Okay. Did you and all the others
[7] that were in the van leave Apple at the same
[8] time?
[9]    **A:** No.
[10]    **Q:** Okay. Did they leave before or after
[11] you?
[12]    **A:** Before me.
[13]    **Q:** Okay. When did they leave?
[14]    **A:** When you say when, do you mean time
[15] wise, or —
[16]    **Q:** Yes.
[17]    **A:** Prior to me, probably, maybe 15
[18] minutes.
[19]    **Q:** How did they leave?
[20]    **A:** That's when my brother-in-law, he
[21] came and picked them up in a car.
[22]    **Q:** And who is your brother-in-law?
[23]    **A:** Steve Jones.
[24]    **Q:** Okay. And when did Mr. Jones arrive
[25] at Apple?

Page 68

[1]    **A:** He was actually there before I got
[2] there because I had called him to meet us there
[3] for a ride from the place.
[4]    **Q:** Okay. And where were you after the
[5] others left in Mr. Jones' car?
[6]    **A:** There's a little road at the back
[7] coming off Roosevelt Avenue. I walked down
[8] there, and I was just standing there.
[9]    **Q:** Okay. So you left Apple's lot at
[10] that point?
[11]    **A:** Yeah, I was down there. I thought
[12] the police might come in that way, so I just
[13] stood down at the end of the road.
[14]    **Q:** As of this time, had anything been
[15] resolved about the charges for the van based on
[16] its late return?
[17]    **A:** When you say at this time anything
[18] has been resolved, I'm not sure what you
[19] actually mean.
[20]    **Q:** You had been telling the people from
[21] Apple that you weren't going to pay extra. Had
[22] they agreed to that? Had anything been
[23] resolved?
[24]    **A:** They actually called Jesse, and
[25] Jesse told me I didn't have to pay my part. He

Jeffrey L. Hanes    v.
Apple Chevolet, Inc.



Jeffrey L. Hanes

Jeffrey L. Hanes
May 24, 2002

[1] talked with the manager, and — maybe once or
[2] twice, and me and Jesse never really talked no
[3] more, because after what happened he was like,
[4] I'll take care of it, I believe, or I don't
[5] know exactly the conversation he had with the
[6] manager or whoever contacted him.
[7]    **Q:** When was that? That day?
[8]    **A:** I'm not even sure. I think that
[9] Monday or something like that. I'm not even
[10] sure exactly when they discussed it. It might
[11] have been the following week. He gave me some
[12] details about — I think it may be a day or
[13] something like that. And then at that point,
[14] he said I didn't even have to pay my share of
[15] the van so —
[16]    **Q:** I'm sorry. He told you what?
[17]    **A:** I didn't have to pay my share of that
[18] van — renting that van.
[19]    **Q:** What do you mean you didn't have to
[20] pay your share?
[21]    **A:** He used his credit card because I
[22] didn't have a credit card.
[23]    **Q:** Right.
[24]    **A:** So, basically, we were splitting the
[25] fee on the van —

[1]    **Q:** Okay.
[2]    **A:** — me and him. I didn't have a
[3] credit card to rent it myself, so I told him to
[4] use his. So he said don't worry about it. He
[5] was going to take care of it.
[6]    **Q:** Okay. Was the lady who had been
[7] behind the counter still there while you were
[8] waiting off of that side road for the police?
[9]    **A:** No.
[10]    **Q:** When had she left?
[11]    **A:** She left before us, if I'm not
[12] mistaken.
[13]    **Q:** Before the others also left?
[14]    **A:** Yes.
[15]    **Q:** Okay. Did you see her get into her
[16] car?
[17]    **A:** Yes.
[18]    **Q:** Where was her car parked?
[19]    **A:** Not too far from the door, right out
[20] front, I guess. I don't know whether it's
[21] called front or whatever outside. I don't
[22] know. Not too far from the door. I could see
[23] the car when we were standing out there.
[24]    **Q:** And where were you standing in
[25] relation to her car?



*Lawyer's Notes*

Page 73

[1] for him to come back and get you?
[2]   **A:** He left with the guys. They all knew
[3] I didn't have no car. No, I didn't.
[4]   **Q:** Okay. So you didn't know if anyone
[5] was coming back or not?
[6]   **A:** No.
[7]   **Q:** Okay. So he just happened to come
[8] back?
[9]   **A:** Yep.
[10]   **Q:** Had the police arrived at that time?
[11]   **A:** No.
[12]   **Q:** So why did you leave?
[13]   **A:** Because I didn't think they were
[14] coming. It was like 20 minutes went by, 15, 20
[15] minutes. I said, well, I ain't standing out
[16] here waiting on them.
[17]   **Q:** At some point the police cited you
[18] based on that day, didn't they?
[19]   **A:** That's correct.
[20]   **Q:** And did you receive that cite in
[21] person or through the mail?
[22]   **A:** Through the mail.
[23]   **Q:** Okay.
[24]   (Hanes Deposition Exhibit Number 4
[25] was marked for identification).

Page 74

[1]             **BY MS. AUSTIN:**
[2]   **Q:** I'm showing you what's been marked as
[3] Exhibit 4. Is that a copy of the citation that
[4] you received?
[5]   **A:** Yes.
[6]   **Q:** Okay. And that was from the police,
[7] correct?
[8]   **A:** That's correct.
[9]   **Q:** Okay. Was there ever a hearing held
[10] as a result of that citation?
[11]   **A:** Yes.
[12]   **Q:** Do you recall where that hearing was
[13] held?
[14]   **A:** Maryland Avenue.
[15]   **Q:** Okay. Was it in a district justice
[16] office?
[17]   **A:** Yes.
[18]   **Q:** Who was present that day?
[19]   **A:** Myself, Dimitrios Tomboris, Joanne
[20] Hall, (phonetic) the district magistrate, and
[21] the police officer.
[22]   **Q:** Okay. Did all of those people that
[23] you mentioned, other than the district justice,
[24] testify at the hearing?
[25]   **A:** Yes.



**Lawyer's Notes**

Page 77

[1] on your black ass?
[2]   **A:** I may have made the statement. I
[3] don't recall him saying that. He may have said
[4] that. I don't recall him actually saying that.
[5] I did make the statement though. Like I said,
[6] I don't actually remember.
[7]   **Q:** Okay. You just said but you made the
[8] statement, what statement?
[9]   **A:** When I presented my case, it was
[10] in — when I was giving him the information
[11] that was presented. I did inform him that she
[12] made the statement.
[13]   **Q:** Now, at some point during that
[14] hearing you said to the D.J., no, I didn't
[15] really hear that; but she wanted to say that,
[16] didn't you?
[17]   **A:** Say what?
[18]   **Q:** At some point you told the D.J., you
[19] did not hear Joanne say, I was waiting on your
[20] black ass; but that you knew she wanted to make
[21] that statement.
[22]   **A:** Black ass, yeah.
[23]   **Q:** What was the result of that D.J.
[24] hearing?
[25]   **A:** He found me guilty.

Page 78

[1]   **Q:** Okay. On October 1st, 1999, you
[2] visited a doctor about headaches; is that
[3] correct?
[4]   **A:** That's correct.
[5]   **Q:** Okay. This is about a year after
[6] this November 14th incident, right?
[7]   **A:** That's correct.
[8]   **Q:** Okay. Had you just started having
[9] the headaches at that point?
[10]   **A:** No.
[11]   **Q:** Okay. When did they begin?
[12]   **A:** Well, actually, probably, prior to
[13] that. I can't really put my finger on the date
[14] when they started occurring.
[15]   **Q:** Why did you wait until October 1999
[16] to go to a doctor?
[17]   **A:** Because at that point, I felt it was
[18] necessary at that time.
[19]   **Q:** Were you taking any type of
[20] medication or anything to alleviate the
[21] headaches?
[22]   **A:** Prior to going to the doctor?
[23]   **Q:** Correct.
[24]   **A:** Yeah, I was taking some
[25] over-the-counter medicine, just Tylenol and



*Lawyer's Notes*

Page 79

[1] stuff like that.
[2]     **Q:** Do you have any type of medical
[3] evidence that connects your headaches to the
[4] incident on November 14, 1998?
[5]     **A:** As far as evidence, visiting a
[6] doctor; talking with the doctor; asking me do I
[7] have any on-going problems. They asked me, in
[8] general, was I known for having headaches. I
[9] told them no. Other than that, no evidence.
[10]     **Q:** Do you have any type of medical
[11] training yourself?
[12]     **A:** Yes.
[13]     **Q:** What?
[14]     **A:** CPR.
[15]     **Q:** When?
[16]     **A:** When I —
[17]     **Q:** When did you receive that training?
[18]     **A:** Five years, six years ago, if not
[19] more.
[20]     **Q:** Five to six years prior to today?
[21]     **A:** The first time. I think I had it a
[22] couple times.
[23]     **Q:** Any other medical training other than
[24] that?
[25]     **A:** Medical training, not — no.

Page 80

[1]     **Q:** Okay. Describe for me the cause or
[2] causes of these seizures you've experienced
[3] over the past ten to 15 years.
[4]     **A:** I don't know the actual cause of it.
[5] To describe — I can't see myself when I'm
[6] having them. Based on what people told me,
[7] epilepsy-type seizures, trembling. That's
[8] about it.
[9]     **Q:** Have they been diagnosed as
[10] epileptic?
[11]     **A:** Not necessarily. They treat them
[12] like they're epilepsy, because I don't have
[13] a — I may have a seizure, maybe once every
[14] five years or whatever. That's how it's been.
[15] But I do take medication for it, so —
[16]     **Q:** And when did you begin taking that
[17] medication?
[18]     **A:** Several years ago, maybe seven,
[19] eight, maybe more. I can't really recall the
[20] actual first time.
[21]     **Q:** Was it prior to November 14, 1998?
[22]     **A:** Yes.
[23]     **Q:** Do you have any indication when a
[24] seizure is going to begin, onset?
[25]     **A:** No. No. No.



Page 81

[1]  **Q:** About how long do the seizures last?

[2]  **A:** I have no idea.

[3]  **Q:** Okay. Are there any side effects of

[4]  the medication you're taking to control the

[5]  seizures?

[6]  **A:** No.

[7]  **Q:** Describe for me any monetary damage

[8]  — damages that you say you have incurred as a

[9]  result of this incident on November 14th, 1998?

[10]  **A:** Can you define the word monetary?

[11]  **Q:** Having to do with money, lost money?

[12]  **A:** Okay. Well, the time I took off

[13]  work, the fines — You're talking about out-of-

[14]  pocket expenses; is that correct?

[15]  **Q:** Damages — Any monetary, money

[16]  damages that you allege that you have incurred

[17]  as a result of the incident on November 14th,

[18]  1998?

[19]  **A:** I mean, those were my doctor bills,

[20]  doctor visits, medication, time off of work,

[21]  fines — the fine, excuse me.

[22]  **Q:** Okay. Now, you said doctor bills.

[23]  Did you visit a doctor other than this one on

[24]  October 1st, 1999?

[25]  **A:** I went back to it. That's the doctor

Page 82

[1]  office that I go to.

[2]  **Q:** Okay. How often have you been back

[3]  for this same thing?

[4]  **A:** I've been back maybe two or three

[5]  times. Other than that —

[6]  **Q:** Do you have copies of those bills?

[7]  **A:** I'm pretty sure I can — have them at

[8]  home or I can get a copy. I just — not with

[9]  me today, I don't, no.

[10]  **Q:** Do you recall what those bills were,

[11]  the amount?

[12]  **A:** Not right offhand.

[13]  **Q:** And you said there's also medication.

[14]  What type of medication?

[15]  **A:** It's called — If I can pronounce it

[16]  right — Neosporin — not Neosporin.

[17]  Neoproxin (phonetic), something of that nature.

[18]  I just can't pronounce it correctly.

[19]  **Q:** And who prescribed that for you?

[20]  **A:** The doctor at the health center.

[21]  **Q:** And when was that prescribed?

[22]  **A:** I had several prescriptions at

[23]  different times.

[24]  **Q:** Before or after November 14, 1998?

[25]  **A:** That was after.

Exh 2

Kathy Sargen-Rental Department Manager

On Friday Jeffrey Hanes came in to my office around noon to pick up the van that his boss, Jesse Pohlig, had reserved earlier that morning. Jesse had been advised that when he reserved the van that the only way I could rent him the van was that it had to be back on Saturday, no later than 4 PM due to a prior reservation.

When Jeffrey came in, we did the paperwork and I advised him the same conditions (van due back by 4 PM Saturday). He had an attitude from the get go and he said back to me smartly, " Well what if I run into traffic?" I remembered thinking to myself that I wouldn't have rented him the van if he was the one renting it, because of his smart attitude.

On Saturday around 4:30PM I got a phone call from Joann Hall at my home telling me that the van wasn't back yet, my 4:00PM appointment was there to pick it up and what should she do? I advised her to call him and find out where he was and to tell him there would be a 2 day charge instead of 1 for not returning the van on time.

Joann called me back and told me that he would be back in 20 minutes and that he wasn't happy about the 2 day charge. The next call I recieved was from Matt Kugle whenthe van was finally returned. He was checking in the van for mileage and gas and he noticed some damage to the van and wanted to check with me to make sure it was prior damage(as it was) and not damage caused by Jeffrey. I could hear Jeffrey in the background "mouthing off" to Matt and it got so bad that Matt had to tell him to "calm down", that he was just checking in the van. It was at this point that I thought Matt and Joann might be in some trouble so I called my husband, Used Car Manager, Rick Sargen and told him what was going on.

*Exh 3*

9.    Identify any and all information supporting the allegations in Paragraph 7 of the Complaint.


See Answer to number 8.

10.    Identify any and all information supporting the allegations in Paragraph 8 of the Complaint.

Paragraph 8 of the complaint is amended to state the van was to be returned by 5:00pm on November 14, 1998, not November 14, 2000.


In answering considering such amendment: See rental agreement in possession of Defendant. Also, Plaintiff held conversation with Defendants' clerk on November 13, 1998 at approximately 12:00pm. Defendant has information to the identity of said female clerk.

11.    Identify any and all information supporting the allegations in Paragraph 12 of the Complaint.


See answer number 2.


12.    Identify any and all information supporting the allegations in Paragraph 13 of the Complaint.

See answer to number 2.

Exh 4

e.      When good faith requires the Plaintiff qualify an Answer or denial, only a part of the matter to which an admission is requested, the Plaintiff shall specify so much of the requested admission as is true, and qualify or deny the remainder.

f.      Plaintiff may not give lack of knowledge or information as a reason for failure to admit or deny, unless Plaintiff states that reasonable inquiry has been made and that the information known or readily obtainable to the Plaintiff is insufficient to enable the Plaintiff to admit or deny.

g.      Plaintiff may not object to a requested admission on the grounds that the request presents a genuine issue for trial.

## REQUESTED ADMISSIONS

1.      Admit that Exhibit "A" attached to this Request is a true and correct copy of the two-page rental agreement;   **Deny. No exhibit was so attached.**

2.      Admit that the credit card provided to Defendant Apple upon which to place charges for the rental van belonged to the co-driver, Jesse Pohlig;   **Admit.**

3.      Admit that the co-driver, Jesse Pohlig, agreed to return the van on or before 4:00 **Deny Jesse Pohlig was a driver.** p.m. on November 14, 1998;   **Lack of knowledge of Mr. Pohligs. agreement, since the contract is not readily obtainable.**

4.      Admit that, upon pick-up of the van on November 13, 1998, Defendant again **Admit clerk asked Plaintiff** reminded Plaintiff of the 4:00 p.m. return time; **to try to have vehicle back by 4pm, but no later than 5pm.**

5.      Admit that the van was returned at approximately 5:30 p.m. on November 14, 1998;   **Deny. Van was returned between 10=15 minutes after 5pm.**

*Exh 5*

5/3/02

Sandra Thompson, Attorney at Law
P.O.Box 2361
York, Pennsylvania 17405

**RE: Hanes v. Apple Chevrolet, et al**

Dear Ms. Thompson:

The following is my account of the events that occurred on November 14,1998, at Apple Chevrolet, Inc. This account is to the best of my knowledge, after all, it has been 4 (four) years.

I arrived at Apple Chevrolet, Inc. at 5:00 pm. or a little before on Nov. 14, 1998 to pick up a van that I had rented for that evening, to transport some friends to a Bull & Oyster Roast that we were going to attend in Baltimore, Maryland.

Upon arrival, the lady behind the counter of the rental facility had informed me that the van that I was renting was not back yet and if I minded waiting. I told her no I did not mind and that I would wait out side.

After about a half an hour, I went back in to inquire about the van. She told me it was still not back but that she had the persons phone number who had rented the van earlier and that she would call him and find out how much longer he would be.

After the phone call, she had informed me that he was on his way and if I would mind waiting a little longer, again, I said I would wait.

Once the van arrived, the man who rented the van, Mr. Jeffrey Hanes, went to the rental counter, I suppose, to turn in the keys. The next thing I remember was some arguing and then Mr. Hanes saying that "If you are going to charge me for another day, then I'll just take the van and bring it back tomorrow.

A little time went by and then the General Manager came over to me and handed me the keys and said that he was sorry for the mix-up and that I could go.

When I returned the van the next day, the General Manager asked me, that if anything was to come about, would I help them out in the matter, and I said "yes I would".
He had also informed me that the lady behind the counter was so upset that she quit.

As I mentioned at the top of this letter, it has been 4 years, and to the best of my knowledge, this is how I remember the events of that day.

If you have any questions, please feel free to contact me. Although I will be out of the state from May 10, 2002 thru May 18, 2002.

Sincerely,

John M. Shriver

cc.    Sara A. Austin
    BLAKEY, YOST, BUPP & RAUSCH,LLP

*Elaine Mosby*    5/3/02
ELAINE MOSBY
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires February 28, 2006

**APPLE CHEVROLET / GEO**
200 Loucks Road    (717) 848-1300
YORK PA 17404

NO CARS WILL BE CHECKED IN AFTER 8:30 P.M.

Stock No.

MAKE: 95 CHEVROLET
MODEL: 15 PASS (TEAL)    VIN. NO.
LICENSE NO.: BNX-9176
DATE AND TIME OUT: 11-13-98    DATE AND TIME DUE IN: 11-14-98

LESSEE (PRINT): 1202 LOUCKS RD
P.O. BOX 7326
ADDRESS: YORK PA 17404
CITY:    STATE:    ZIP: 843-9853

FIRM NAME: JEFF HAYNES    PHONE
DRIVER: 516 W KING ST    (PA-PA 757-1374)
HOME ADDRESS: YORK    PA    PHONE: 7404
CITY: 21285 216    STATE: PA    ZIP: 630-99

DRIVER'S LICENSE NO.    STATE    DATE EXPIRES

By: X _____ Lessee    By: X _____ Lessee
THE OPERATION OF THE VEHICLE BY ANY DRIVER UNDER 21 YEARS OF AGE IS PROHIBITED.

| OUT | IN — SUBJECT TO CHARGE |
|---|---|
| BODY | |
| INTERIOR | |
| RADIO | Charge - Visa    Auth #464090 |
| HEATER-A/C | |
| GLASS | |
| TIRES | |
| GRILL | |
| GAS | FULL |

GAS: FULL
PLEASE REPLACE GAS USED / THANK YOU

No Smoking!    X _____ CUSTOMER SIGNATURE

DEPT.
RO #    AUTH #    PO #

LESSEE AGREES TO RENT THE ABOVE CAR SUBJECT TO THE TERMS AND CONDITIONS STATED ABOVE AND ON REVERSE SIDE.

**IMPORTANT - READ BEFORE SIGNING**
In consideration of the mutual promises and covenants herein contained, the undersigned, customer rents from the owner the automobile de agrees, by his signature hereon, to rent the automobile subject to the terms and conditions on the reverse side hereof, which the customer which provisions, by reference hereto, are incorporated into this agreement.

REPAIR ORDER NO.    SERVICE ADVISOR    RENTER'S SIGNATURE X

ADAMS IX ● (717) 467-4727

CLEAN UP CHARGE OF $75.00 TO BE ADDED IF VEHICLE NOT RETU

RATE PER DAY: 59.00    DAYS: 1    $ 59.0
DAILY RATES BASED ON 24 HOURS FROM DEPARTURE OR ANY PART THEREOF
ODOMETER READING IN: 32080
ODOMETER READING OUT: 21855
RATE: 20    PER MILE: 325
FREE/DAY: 15    1125
TOTAL MILEAGE: 1125    $
DAY RATE PLUS MILEAGE    $ 81.5
SALES TAX: 8%    $ 6.5
GAS CHARGES: $12/4 TANK    $
INSURANCE: $10/DAY WAIVER    $ 10.
$2/DAY STATE RENTAL TAX    $ 2.0

TOTAL CHARGES    $ 100.0

DEPOSIT    $
TOTAL CHARGES LESS DEPOSIT    $
REFUND    $

| | INVOICE | UNIT | CUST |
|---|---|---|---|
| ACCOUNT TITLE | ACCT. NO. | AMOUNT | |
| BASIC INCOME RENTAL CARS | | | |
| MILEAGE INCOME RENTAL CARS | | | |
| CUSTOMER PURCHASED GAS | | | |
| OTHER CUSTOMER CREDITS | | | |
| TAX | | | |
| SOURCE 300 | CHARGE SALES | | |
| SOURCE 300 | CASH SALES | | |

HANES BILL
- Explain chang

2/25 Franklin

Case 1:20-cv-02800-CCC    Document 71    Filed 06/11/2002    Page 27 of 98




**CUSTOMER RENTAL AGREEMENT**

ACE OF HEARTS
1200 Loucks Road
YORK, PA

18370

NO CASE WILL BE CHECKED IN AFTER 8:30 P.M.

In consideration and upon covenants, terms and conditions herein contained, the permissive user, as a service customer, hereinafter referred to as "the Customer," rents a temporary substitute automobile that is described in this agreement, hereinafter referred to as "the Automobile," from the owner of the automobile, hereinafter referred to as "the Owner."

1. The Customer acknowledges that said Automobile is the property of the Owner, although the registered title may be in some third party name, and that the Customer has received the Automobile in good operating and mechanical condition and that the Customer will cause the Automobile to be used only in a normal and prudent manner.

2. It is expressly agreed that the Customer is not the agent, servant or employee of the Owner in any manner whatsoever.

3. The Customer warrants that he, and any other person operating the Automobile has a current and valid driver's license in his possession issued by a competent authority of any one of the United States or the District of Columbia, and the Customer's use, or any other driver's use of the Automobile will not, or is not in violation of any section of the Motor Vehicle Code of the state in which the Automobile is operated.

4. The Customer agrees that he will return the Automobile to Owner's premises from which it was rented, or to such other place as hereon designated for return in the same condition as the Customer received it, ordinary wear and tear excepted, on this return date stated herein, or sooner, upon demand of the Owner.

5. The Customer agrees that said Automobile shall not be used or operated:

 a. In violation of any of the terms and conditions of this agreement.

 b. By any person in violation of law as to age or by the Customer or by a driver who has given a fictitious name or false age or address.

 c. For any illegal purpose.

 d. In any race, speed test, contest, or any preparation thereof.

 e. To propel or to tow any automobile or trailer.

 f. By any person while under the influence of intoxicants or narcotics or drugs.

 g. By any person other than the Customer who signed this agreement unless the written consent of the Owner is endorsed hereon.

 h. By any person not in possession of a valid driver's license.

 i. To carry passengers or property for compensation, express or implied.

 j. To carry passengers other than in the passenger compartment.

 k. In violation of any federal, state, or municipal law, ordinance, rule or regulation governing the use, operation or return thereof.

 l. Outside the scope of permission granted by this agreement as to mileage, distance or other restriction as contained in this agreement without the prior written consent of the Owner.

 m. Farther than 250 air miles from the Owner's business premises without the written permission of the Owner. In no case will this distance include Mexico.

6. The Customer agrees to pay the Owner on demand:

 a. A mileage charge and service and time charges computed at the rate specified hereon until the Automobile is returned to the Owner's premises.

 b. The amount of any fines for parking, traffic or legal violation as assessed against the Automobile, driver or Owner until the Automobile is returned the Owner.

7. The Customer agrees that he will, at his sole risk and expense, maintain Bodily Injury and Property Damage Insurance covering the use of the Automobile during the time it is in his possession or used with his permission, and at his direction, until it is returned to the Owner with limits at least equal to or greater than the statutory requirements of the state in which the Automobile is rented.

8. The Customer agrees that he will, at his sole risk and expense, maintain Physical Damage Insurance covering the Automobile during the time it is in his possession, used at his direction or with his permission, until it is returned to Owner. The Customer accepts responsibility for loss of or damage to the Automobile, tires, tools, accessories, and other equipment, from any cause, and shall reimburse the Owner at full market value for any loss, loss of use, and physical damage of or to the Automobile.

9. The Customer shall lock the Automobile and remove the key therefrom at all times when the Automobile is not being operated.

10. The Customer shall not disconnect or tamper with the odometer or speedometer and if there is evidence that the same has been tampered with or disconnected, or for any reason shall be inoperative, the Customer agrees that, at the option of the Owner, the Customer shall pay, in addition to all other charges specified in this agreement, $5.00

(Five Dollars) for each hour while the Automobile is rented under this agreement.

11. The Customer agrees to indemnify and hold the Owner harmless of, from and against any and all loss, claims, damages, attorney's fees, expenses, and liability in connection with, growing out of, or resulting from this agreement or the use of the Automobile by the Customer or other. If suit is instituted by the Owner to recover possession of the Automobile or to enforce any of the terms of this agreement, or to collect any sums of money, damages or costs from the Customer hereunder, the Customer shall pay all costs and reasonable attorneys' fees and reasonable collection costs incurred by the Owner in such suit or action.

12. If there is any violation of any of the terms, conditions, covenants or restrictions of this agreement by the Customer or by any other driver to whom the Customer has granted permission to operate the Automobile, the rights of the Customer and such other driver to use or operate the Automobile shall terminate immediately, and such violation shall constitute an absolute defense against any claim filed against the Owner or its insurance carrier, and the Customer and such other driver, hereby agree, jointly and severally, to indemnify and save harmless the Owner and its insurance carrier of and from any and all damages, loss, cost and expense that the Owner or its insurance carrier of both, shall sustain including, but not limited to, court costs and counsel fees by reason of any claim for personal injury or property damage.

13. Upon termination of the rights of the Customer and such other driver to use or operate the Automobile due to a violation as provided in paragraph 12, the Customer and such other driver agree to cease using or operating the Automobile immediately, to notify the Owner of said cessation and to pay all expenses incurred by the Owner in returning the Automobile to the Owner's premises, and the Customer and such other driver further agree that any continued operation or use of the Automobile after such a violation, is an operation or use without the knowledge, consent, and permission of the Owner, and the Owner may notify the police or other authorities that the Automobile has been stolen and the Customer and such other driver hereby release and discharge the Owner from any and all claims of whatever nature arising therefrom.

14. The Customer and any other person authorized to drive the Automobile, hereby agree with the Owner and its insurance carrier, that all provisions covering bodily injury caused by the Owner or operator of an uninsured motor vehicle under the Owner's policy and any subsequent renewal thereof, are hereby deleted and shall be of no force or effect with respect to any person or insured named or otherwise, Customer or other driver.

15. If the Customer has directed the billing for charges, in connection with this agreement, to be transmitted to another person, firm or organization which, upon being so billed has failed to make payment, then the Customer shall, upon being billed, properly pay said charges.

16. The Customer shall not permit any repairs or alterations to be made to the Automobile or to permit any lien to be placed upon the Automobile without the Owner's prior written consent. The Customer shall pay all unauthorized charges in connection with the use or safekeeping of the Automobile.

17. The Customer warrants that he has now, and will maintain in full force and effect, a policy of insurance for Bodily Injury and Property Damage Liability equal to or greater than the statutory limits required by any state or province in which the Automobile may be operated and that in the event of any lapse or cancellation of the Customer's insurance policies, the Customer will immediately cease to operate the Automobile or to permit its further use or operation by any other person than the Owner. The Customer further warrants that he will maintain Physical Damage Insurance that will provide full replacement or repair of any damage that may occur, from any cause, to the Automobile, and that in the event such insurance is cancelled or lapses, the Customer will immediately cease to operate the Automobile or allow to be operated by any other person than the named insured.

18. The Customer agrees to report all accidents, damages or loss of any nature to the Owner as soon as practical and to further assist the Owner in all negotiations for repair, replacement and loss of use of the Automobile with the Customer's Insurance carrier.

19. This agreement constitutes the entire agreement between the Owner and the Customer. No changes in this agreement shall be valid unless written hereon and signed by both the Owner and the Customer. The Customer warrants that all information stated to the Owner is true, full and correct.

*(NOTE: Page 1 and page 2 of this Agreement together constitute one Agreement)*

SRA-3

# RENTAL AGREEMENT

In this Agreement, the words "you" and "your" refer to the customer signing this Agreement. The word Lessor refers to the corporation or person providing the vehicle. This Agreement covers your rental of the vehicle(s) described below. When you sign this Agreement, you agree to all the conditions on both sides of this Agreement. This Agreement will not exceed two (2) months.

| CUSTOMER: FIRST  JEFF   INITIAL   LAST  HAYNES | OTHER DRIVER(S) 1. NAME  JESSE POHLIG |
|---|---|
| LOCAL ADDRESS  516 W. KING ST  CITY/TOWN YORK  STATE  ZIP | ADDRESS  754 ADAMS AVE MAYS LAND |
| TEL. #    ☐ RENT  HOW LONG  ☐ OWN | DATE OF BIRTH 10-31-46  LICENSE NO. P6166400671042  STATE  EXPIRES 4-30-0 |
| PERMANENT ADDRESS:  NO. STREET  CITY/TOWN  STATE  ZIP | 2. NAME |
| TEL. #    ☐ RENT  HOW LONG  ☐ OWN | ADDRESS |
| SOCIAL SECURITY NO. | DATE OF BIRTH  LICENSE NO.  STATE  EXPIRES |

DRIVERS LICENSE NO.  21 215 216  STATE  PA
DATE ISSUED  EXPIRES 6-30-99  DATE OF BIRTH 6.4.67
EMPLOYER NAME  METRO  HOW LONG
ADDRESS  TELEPHONE NO.
CREDIT REFERENCE: MAJOR CREDIT CARD NAME  646  NUMBER 9107 9033 0969  EXPIRES x5/0

VEHICLE: 98 CHRY 15  98071
YEAR MAKE MODEL COLOR STOCK NUMBER
VIN  LICENSE PLATE NO.
EXTERIOR: OUT BODY—FENDERS—TIRES #
         IN
         OUT WHEELCOVERS—LIGHTS
         IN
INTERIOR: OUT UPHOLSTERY—RADIO—MATS
         IN
         OUT ACCESSORIES
         IN
ODOMETER: OUT 21855  FUEL: ☐ F ☐ ¾ ☐ ½ ☐ E
         IN  FUEL: ☐ F ☐ ¾ ☐ ½ ☐ E
MILEAGE DRIVEN:

## PHYSICAL DAMAGE INSURANCE DEDUCTIBLES

You will be responsible for insurance deductibles if you do not purchase a Collision Damage Waiver (CDW). These deductibles are:

Collision          $
Comprehensive      $

**NOTICE: PURCHASE OF THE COLLISION DAMAGE WAIVER IS NOT REQUIRED. AUTO INSURANCE YOU HAVE IN EFFECT MAY COVER THE SAME LOSSES AS THE COLLISION DAMAGE WAIVER. BY SIGNING THIS RENTAL AGREEMENT, YOU MAY BECOME RESPONSIBLE FOR ANY DAMAGE TO THE VEHICLE EVEN IF YOU ARE NOT AT FAULT.**

I have read and understand the above notice and I ☒ do ☐ do not desire to purchase a CDW.

CUSTOMER INITIALS     DATE

CHECK TYPE OF RENTAL IF
OPERATOR AGED 21 THROUGH 24
SERVICE RENTAL ☐
INSURANCE REFERRAL ☐

BUSINESS USE WITH
MAJOR CREDIT CARD ☐
VEHICLE PROVIDED IN ACCORDANCE
WITH GMPP PROVISIONS ☐

UNDER NO CIRCUMSTANCES SHALL ANYONE UNDER 21 YEARS OF AGE OPERATE THIS VEHICLE.

YOU ARE LIABLE FOR ALL PARKING AND DRIVING VIOLATIONS AND MUST TURN IN ALL PARKING SUMMONSES WITH PAYMENT UPON "CHECK-IN."

ALL DRIVERS MUST POSSESS A VALID OPERATOR'S LICENSE. The rental of the vehicle to any person under 25 years of age is strictly prohibited, unless specifically authorized by the Lessor.

By your signature, you warrant that the information on vehicle use and other drivers is accurate and complete. Further, you represent that you have read, understand and agree with the terms and conditions stated on this Agreement.

X _____  CUSTOMER SIGNATURE     DATE 11-13-98

LESSOR HAS AUTHORIZED CUSTOMER
AGE 21 THROUGH 24?     ☐ YES  ☐ NO

LESSOR SIGNATURE

VEHICLE
DATE AND TIME OUT  11-13-98
DATE AND TIME IN
TOTAL RENTAL TIME
DATE DUE—EXPIRATION OF CONTRACT  11-14-98

| RENTAL RATES | | CHARGES |
|---|---|---|
| HOURLY | @ $ | $ |
| DAY | @ $ | $ |
| WEEK | @ $ | $ |
| MONTH | @ $ | $ |
| SPECIAL | @ $ | $ |
| MILES | @ ¢ PER MI. | $ |
| SALES TAX | % | $ |
| CDW: DAY @ $ | | $ |
| GAS CHGS. | | $ |
| MISC. CHGS. | | $ |
| DISCOUNT | % | $ ( ) |
| TOTAL MILEAGE & RENTAL CHARGES | | $ |
| SUB TOTAL | | $ |
| LESS CREDITS (REPAIRS, ETC.) | | $ ( ) |
| | | $ |
| TOTAL | | $ |

LESS CASH DEPOSITS
DATE REC'D.     AMT.
/      $
/      $
( )

| INSURANCE PAYMENT DUE | $ |
|---|---|
| BALANCE DUE OR REFUND DUE | $ |

| PAID BY (✓) | CASH | CHECK | CHARGE |
|---|---|---|---|

1. **Payment of Charges:** You agree to pay all you owe under this agreement including time, mileage, fuel and insurance charges. You are personally responsible for these charges as long as you have the vehicle. Any other person, firm or organization which you direct be billed may also be responsible for these charges.

2. **Application of Security Deposit:** The Lessor may retain any amount held as a security deposit until you pay all you owe. If you do not pay promptly, the Lessor may apply the security deposit to what you owe.

3. **Use:**
   (a) You agree that the vehicle will NOT be used by any person except you and persons who are at least 25 years of age and are:
      (i) members of your immediate family who permanently reside in your household; or
      (ii) your employer, partner, executive officer or regular employe of your employer; or
      (iii) listed as the other driver on this agreement.
   (b) You also agree that the vehicle will not be used:
      (i) in any illegal manner;
      (ii) for hire;
      (iii) to push or pull any other vehicle;
      (iv) outside the United States or Canada without permission of the Lessor.

4. **Title:** Title to this vehicle will never transfer to you. You agree not to assign this Agreement, give up the vehicle, or to do any act to encumber, convert, pledge, assign, conceal, abandon or destroy the vehicle.

5. **Liability Insurance:** A Bodily Injury and Property Damage Policy covers you as an additional insured while using the vehicle. Limits of liability are $100,000 for injury to or death of any one person, up to a maximum of $300,000 per occurrence, and $50,000 for property damage in any one accident. This coverage will conform to the "No Fault" law of any state.

6. **Physical Damage Insurance:** A policy of physical damage insurance provides for a collision deductible in the amount shown on the reverse on each collision (with another object) or upset (roll-over) loss. This policy also provides for a comprehensive deductible in the amount shown on the reverse for any other loss. You are liable for the deductible amounts unless you elect to pay an additional charge.

7. **Exclusions from Insurance Coverage:** The insurance coverages described in Items 5 and 6 do not apply:
   (a) while the vehicle is being used for hire, to push or pull any other vehicle, or outside the U.S. or Canada without the Lessor's permission;
   (b) to injury or damage caused intentionally by the persons using the vehicle;
   (c) to the loss of or damage to property in the possession of anyone using the vehicle; or
   (d) to bodily injury suffered by any employe of any person using the vehicle in the course of his or her employment.

   **Exclusions from Collision Damage Waiver:** Any Collision Damage Waiver does not apply:
   (a) while the vehicle is used in any manner prohibited by this Agreement;
   (b) to injury or damage caused intentionally by the persons using the vehicle;
   (c) to the loss of or damage to property in the possession of anyone using the vehicle;
   (d) to bodily injury suffered by any employe of any person using the vehicle in the course of his employment; or

   (e) to loss or damage caused by conversion, embezzlement or conversion by you or anyone else using the vehicle under your permission.

8. **Accidents, Thefts, Claims and Suits:** You must report any accident or theft of the vehicle to the Lessor at once. You agree to cooperate with the Lessor in any claim or suit.

9. **Traffic Summonses, Penalties and Fines:** You will pay at once all traffic fines that you or the vehicle get until you return the vehicle to the Lessor.

10. **Indemnification:** You agree to reimburse the Lessor for any damages, liabilities, or costs caused by your use of the vehicle which are not covered by insurance.

11. **Mileage:** The odometer installed in the vehicle will determine the number of miles you have driven the vehicle. If the odometer has been tampered with, you agree to pay a mileage charge based on the Lessor's experience with similar rentals. You will also pay the cost to repair or replace the odometer.

12. **Repairs:** The Lessor must approve any repairs to the vehicle. You will pay for any unauthorized repairs.

13. **Return of Vehicle:** You agree to return the vehicle to the Lessor on the agreed date or sooner if the Lessor tells you to. If you do not return the vehicle to the Lessor's address, you will pay return mileage at the stated rate. The vehicle must be returned in the same condition in which you received it except for reasonable wear.

14. **Default:** If you do not keep any of these promises or if any of the statements you have made are not true, the Lessor may end this Agreement and take the vehicle back. The Lessor may also sue you for damages. If the Lessor hires an attorney to collect what you owe, you will pay his reasonable fee as permitted by law plus court costs.

15. **Personal Property:** The Lessor is not responsible for any personal property left in the vehicle when you return the vehicle other than to use reasonable care in holding the property for you.

16. **Miscellaneous:** This Agreement may not be changed in any way except in writing. If any provision of this Agreement is not enforceable, the rest of the Agreement will be valid. The law at the Lessor's place of business will govern this Agreement.

---

Lessor warrants that to the best of his knowledge all representations made by the Customer are accurately recorded and that Customer has made no representations that the vehicle will be used or operated contrary to the terms and conditions of this Rental Agreement. Further, that Customer and all other drivers conform to the current eligibility requirements.



GMAC

**Rental Plan**



*Exh 1*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
. . . . . . . . . . . . . . . . .
JEFFREY L. HANES,                .
              Plaintiff          .
                                 .
                                 .
         vs.                     .   Civil No. 1:CV-00-2003
                                 .
                                 .
APPLE CHEVROLET, INC. and        .
TERRY STEWART, PRESIDENT/        .
OWNER,                           .
              Defendants         .
. . . . . . . . . . . . . . . . .
```

| | | |
|---|---|---|
| Deposition of: | | JOANN M. HALL |
| Taken by | : | Plaintiff |
| Date | : | May 10, 2002, 11:41 a.m. |
| Place | : | Mt. Moriah Baptist Church<br>1165 East Prospect Street<br>York, Pennsylvania |
| Before | : | Donna S. Elicker, RMR<br>Reporter - Notary Public |

APPEARANCES:

    SONDRA THOMPSON, ESQ.
        For - Plaintiff

    BLAKEY, YOST, BUPP & RAUSCH
    By:  SARA A. AUSTIN, ESQ.
        For - Defendants

ALSO PRESENT:
    JEFFREY L. HANES
    TERRENCE S. STEWART

*EXHIBIT "7"*

11

2

1  don't know or I can't answer by anyone?

2      A    No.

3      Q    But you do recall that you went back to work

4  for Apple Chevrolet right before the district court

5  hearing?

6      A    I can't say yes or no to that question.  I

7  don't know.  I don't know if I was back at Apple

8  Chevrolet at that point yet or not.

9      Q    You went to the district court hearing as

10  their agent.  Is that right?

11      A    For the York City Police I believe that was.

12      Q    You went to the district court hearing as

13  Apple Chevrolet's agent.  Is that correct?

14      A    Yes, for Apple Chevrolet, yes.

15      Q    But you do not remember if you were working

16  for Apple Chevrolet at that time?

17      A    No, I don't.

18      Q    Who advised you to go to that district court

19  hearing?

20      A    I was subpoenaed.

21      Q    By who?

22      A    York City Police I believe it was.

23      Q    Did you have any contact with anyone at Apple

24  Chevrolet before that district court hearing?

25      A    Did I have -- I don't understand that.

5

1        Q   Are you involved as far as -- or was part of

2 your duties to also issue to the customer who wants to

3 rent a vehicle the contract?  Are you involved in the

4 signing of the contract and preparation of the contract?

5        A   Sometimes.

6        Q   Were you involved in the signing or

7 preparation of the contract between Apple Chevrolet and

8 the rental to Jeffrey Hanes?

9        A   No.

10        Q   The person who is renting the vehicle, must

11 they sign a contract?

12        A   Yes, when they pick the vehicle up.

13        Q   And the signature on that contract, does that

14 make them responsible for the terms in that contract?

15        A   Yes.

16        Q   And that would also be for returning the

17 vehicle and for paying the fees?  So when they sign that

18 contract, their signature as customer makes them

19 responsible for paying the fees or returning the vehicle?

20        A   It all depends on how she has it set up.

21 Sometimes they bill them; they don't actually pay that

22 day.

23        Q   But I am saying, the signature though makes

24 them responsible for paying, even if it's another day?

25        A   Yes, yes.

29

1    A    I just call the manager and let them handle

2  it.

3    Q    Now, in the time that you were employed with

4  Apple Chevrolet, did a customer besides Jeffrey Hanes

5  ever raise their voice in disputing a complaint?

6    A    Yes, I have had some service customers.

7    Q    You had service customers that would race

8  their voice?

9    A    (Nods head)

10    Q    How often would you say that you had service

11  customers that would do that?

12    A    Probably, approximately one maybe every week

13  or every other week.

14    Q    Okay.  Did you ever call the police on them?

15    A    No.

16    Q    What is typically their race, those service

17  customers that would raise their voice?

18    A    I can't recall that.

19    Q    Now, is there any reason or justification that

20  you are stating for your actions on November 14th of

21  1998?

22    A    Is there any reason?

23    Q    Um-hum.  Why did you do what you did on

24  November 14th of 1998?

25    A    As far as what?  I don't understand what you

7    1    and the return of the rental vehicle.

2        A    I contacted him first.

3        Q    And when was that?

4        A    It was a little after 4 o'clock.

5        Q    So the first time you called was after 4:00?

6        A    (Nods head)

7        Q    Who was present when you called?

8        A    The other customer waiting on the van.

9        Q    Do you have any knowledge of the changes that

10    were made on the rental contract to Jeffrey L. Hanes?

11        A    Yes.

12        Q    And explain those changes.

13        A    The rental manager called me that morning

14    stating that that van had to be back by 4:00 p.m. and I

15    had to record the mileage and the gas on the next rental

16    agreement for the next customer.

17        Q    Who was that that contacted you?

18        A    Kathy Sargen.

19        Q    Now, how was that a change?

20        A    I am not sure what time they picked it up that

21    morning the previous day.  They picked it up that

22    afternoon, which it would usually be returned the

23    following afternoon at the same time, but this one had to

24    be returned earlier.

25        Q    And when was that change communicated?

7

1  A  To me?

2  Q  Yes.

3  A  That Saturday morning.

4  Q  And where were you when that was communicated?

5  A  At the cashier's desk.

6  Q  And do you have access to the rental

7 agreements for you to look at it and see what the person

8 was supposed to do or not do?

9  A  Yes.

10  Q  So that was within your control?

11  A  Yes.

12  Q  And did you see that rental agreement?

13  A  Yes.

14  Q  And is that what it said?

15  A  Must be returned by 4:00 p.m., yes.

16  Q  When was that written on there?

17  A  When the customer picked the rental up.

18  Q  How do you know?

19  A  This was a carbon copy that I had.

20  Q  So you don't have the original?

21  A  It is a four-piece contract.  There is two

22 pieces.

23  Q  And who gets the original?

24  A  I guess the original is there along with a

25 carbon copy.  And then two other copies are given to the

7   1   customer.

2        Q    Do you have knowledge of the terms that were

3   whited out on the contract?

4        A    No.

5        Q    Even subsequent to November 14th of '98, do

6   you have any knowledge of any terms that were whited out

7   on that contract?

8        A    No.

9        Q    So when Jeffrey Hanes came and disputed --

10  well, you said -- first of all, I am sorry, let me back

11  up.  You said you first contacted him after 4 o'clock.

12  Is that right?

13       A    A little after 4:00.

14       Q    But the time -- could you be mistaken about

15  the time?

16       A    No.

17       Q    But you know that this was after John Schriver

18  appeared?

19       A    Yes.

20       Q    So you didn't call Jeffrey Hanes for the first

21  time until after John Schriver appeared?

22       A    Right.

23       Q    Okay.  And you are sure about that?

24       A    Yes.

25       Q    And do you recall the substance of that

1    something else I could give the other customer instead of

2    that van.

3         Q    And then did you call Kathy before or after

4    you called Rick and Matt?

5         A    Before.

6         Q    So then after you spoke with Kathy, she told

7    you to charge him for two days, then you spoke with Rick

8    and Matt Kugle?

9         A    Yes.

10        Q    Now, after that initial conversation, did you

11   have another conversation with Mr. Hanes?

12        A    Yes, he called back.

13        Q    And what was the substance of that

14   conversation?

15        A    He said if he was going to be charged for two

16   days, he was going to keep the van for two days.

17        Q    Okay.  Then what action did you take?

18        A    I asked him to return the van.  And if he

19   would just return the van today, I would only charge him

20   for one day.

21        Q    Did you tell him you don't have any authority,

22   but I am just going to do this anyway?

23        A    Yes.

24        Q    When did you tell him that?

25        A    During the conversation.  I said I was advised

6

1    are asking.  As far as what?  What did I do?

2        Q    Any action that you took, what was your

3    reasons for it?

4        A    I was doing my job.  I don't understand what

5    you are asking.

6        Q    When you stormed out of the office and you

7    quit, why did you do that?

8        A    I was not going to be put through something

9    like that again.

10        Q    What were you put through?

11        A    Very, very -- with a very upset customer.  And

12   I was put in a position where I was back there alone

13   dealing with really just one person, but there was four

14   other ones there.

15        Q    When you say really one person, but four

16   others there, you were dealing with who?

17        A    Mr. Hanes.

18        Q    Did the other four get involved?

19        A    No.

20        Q    Did they say anything to you?

21        A    No.

22        Q    Did they threaten you in any way?

23        A    No.

24        Q    Did they look at you in any way?

25        A    They were looking at me.

31

Q      Okay.  So was that threatening to you?

A      Yes, it was.

Q      And they said nothing to you at all?

A      They said nothing.

Q      Can you describe these four persons?

A      No.  It has been three and a half years or so.
I can't describe them.

Q      Can you describe their race?

A      No.

Q      You didn't see them at any time since then?

A      No.

Q      Not at a Human Relations Commission or
anywhere?

A      Yes, at the Human Relations Commission, and I
am sorry, the district court hearing.

Q      And what was their race?

A      I am not sure.  I am not sure of the other guy
that was there.  But Jeffrey Hanes is black.

Q      At the Human Relations Commission, did you see
any of the other four that you said were just around
looking at you?

A      There was one guy there.

Q      What was his race?

A      I am not sure.

Q      Okay.  Did he have white skin?  Did he have

9

1  Hanes was questioning you about the bill?

2      A    It was a lot of other things besides just

3  being questioned about the bill.

4      Q    And what was that?

5      A    Well, he was very upset, and just being

6  accused of different things.

7      Q    And what actual statements were you making

8  during that time?

9      A    I tried to explain the bill to him, what was

10  told to me that I had to do for the rental contract, for

11  the billing.  I explained to him -- I also explained to

12  him that the other customer was waiting at the dealership

13  since like quarter of -- between quarter of and 4 o'clock

14  to pick up his rental, this same van that Jeffrey had.

15          It was just everybody was very upset and I was

16  being accused of treating the other person better than

17  what I was treating Jeffrey Hanes.

10

18      Q    When you say everybody was very upset, who is

19  that?  Who was everybody?

20      A    Jeffrey Hanes, myself, Matt.

21      Q    And when you were describing yourself as being

22  upset, describe what occurred.  How was your voice?  How

23  did you look?  What was going on?

24      A    It was very loud.  I can't explain how I

25  looked.  I don't know how.

1  Hanes was questioning you about the bill?

2       A    It was a lot of other things besides just

3  being questioned about the bill.

4       Q    And what was that?

5       A    Well, he was very upset, and just being

6  accused of different things.

7       Q    And what actual statements were you making

8  during that time?

9       A    I tried to explain the bill to him, what was

10  told to me that I had to do for the rental contract, for

11  the billing.  I explained to him -- I also explained to

12  him that the other customer was waiting at the dealership

13  since like quarter of -- between quarter of and 4 o'clock

14  to pick up his rental, this same van that Jeffrey had.

15       It was just everybody was very upset and I was

16  being accused of treating the other person better than

17  what I was treating Jeffrey Hanes.

18       Q    When you say everybody was very upset, who is

19  that?  Who was everybody?

20       A    Jeffrey Hanes, myself, Matt.

21       Q    And when you were describing yourself as being

22  upset, describe what occurred.  How was your voice?  How

23  did you look?  What was going on?

24       A    It was very loud.  I can't explain how I

25  looked.  I don't know how.

10

1    Q    When you say it was very loud, are you saying

2    I was very loud?

3    A    All three of us were very loud.

4    Q    Okay.

5    A    It's like I would start to explain things, I

6    couldn't even finish my sentences.  It just got to a

7    point where it kept going on and on and on and on, that I

8    just wanted to leave.

9         I mean, there was no exchange.  All I had to

10   do was take the keys and the paperwork.  That's all we

11   needed to do.  The rental department was going to bill

12   whoever was assigned to this rental.  But it just got

13   into a big mess and it just kept going on and on and on

14   and on.

15   Q    So did you at any time tell Mr. Hanes, well,

16   come back at another time and speak to another manager or

17   anything like that?

18   A    Matt did.

19   Q    And what was his words?

20   A    That he will talk to Kathy about this and they

21   will contact him Monday.

22   Q    Did Matt make any other statements?

23   A    He also tried to calm Jeffrey Hanes down.

24   Q    And what did he say?

25   A    That he would just take the rental agreement

10

1    and that we would have someone contact them or his

2    company, whoever rented the van on Monday to go over the

3    billing.

4        Q    You are saying that he said that in a loud

5    mannerism?

6        A    I would say it was in a louder than what a

7    normal tone would be because we couldn't finish anything

8    we started to say.

9        Q    So what, you became frustrated because you

10   couldn't finish what you wanted to say?

11       A    Yes.

12       Q    So you became loud?

13       A    Yes.

14       Q    Did Matt at that time make any statements as

15   to knowing Mr. Hanes from school or anywhere else?

16       A    I did hear him say, yes, he knows him from

17   school.

18       Q    When did he say that?

19       A    That was probably once he came back to the

20   service department when he walked in and they were

21   speaking.  I can't explain it.  I don't know what they

22   were speaking about.  But he says, yes, I do know you, I

23   went to school with you.

24       Q    And what was the context of that statement?

25       A    I don't understand.

48

10

1    Q    What was he saying that to explain?  What was

2    going on that that came out?

3    A    I don't know.

4    Q    You don't -- you were there?

5    A    I was there.  I don't know.  I don't remember

6    what brought that on.

7    Q    And he also said that in a loud tone?

8    A    Yes.

9    Q    And when you left, where was Mr. Hanes?

10    A    Out front on the side of the dealership where

11    the customers park.

12    Q    Now, is that the same place where you park?

13    A    Yes.

14    Q    And where was he in relation to your vehicle?

15    A    In front of it.  If you are looking at the

16    vehicle, he was in the left -- I mean, the right front of

17    it.

18    Q    When you first went out the building, where

19    was he?  When you first went to walk out the door, where

20    was he?

21    A    Right at the front of my car.

22    Q    Did he have any reason to know that that was

23    your car?

24    A    No.

25    Q    So he was just standing there basically?

42

walked into the cashier area, yes.

    Q    Did you understand -- could you make out the words?

    A    Oh, yes.

    Q    What was being said?

    A    I don't recall.

    Q    Then how do you know you can make out the words?

    A    Because I was standing very close to everybody that was -- I walked in through the door.

    Q    So are you just saying, I was close enough that I should have heard but I don't know if I really heard?

    A    No, I am sure I heard what was going on.  I just don't recollect what was being said verbatim.

    Q    Do you recollect generally what was being said?

    A    Yes, I recollect there being a dispute over a rental bill.

    Q    Do you recollect any accusations as to how Ms. Hall responded to Mr. Hanes in reference to using any race or anything like that?

    A    No, ma'am.

    Q    So you don't recall that discussion at all?

    A    No, ma'am.

10

1     A    Yes.

2     Q    Okay.  So what happened when you approached

3 your car?

4     A    I got in my car, started it up, and cracked

5 the window and asked him to move out of my way.

6     Q    Okay.  So you were able to get into your car

7 with no problem?

8     A    Yes.

9     Q    Was anything being said to you at that time?

10     A    There was things being said, but I can't

11 recall what it was, because I was more or less blocking

12 things out at that point.

13     Q    What were you saying?

14     A    I asked them to move.

15     Q    Anything else?

16     A    No.

17     Q    And how did you -- what was your tone of voice

18 or whatever when you said that?

19     A    It wasn't a normal tone.  I would say it would

20 have to be on the loud side.  I just cracked the window.

21     Q    Now, when you left, were the police called

22 already?

23     A    Yes, Matt called them from the service

24 department I think.

25     Q    Okay.  And he called the police when you were

50

still there?

A    I was up getting my things ready to walk out the door.

Q    So you knew the police were coming?

A    Yes.

Q    Did you expect the police to come?

A    Yes.

Q    But you left?

A    I left.

Q    Why?

A    I just wanted to get out of there.

Q    Okay.  But you knew the police were coming to a situation you were involved in, so why would you leave?

A    They were coming to remove them from the property.

Q    This is based on contact with you.  Isn't that correct?

A    Yes.

Q    So why would you leave?

A    I can't answer that.  I don't know.  I can't answer that.

Q    When did you first have contact with police officers?

A    They called me from the dealership at home.

Q    That same day?

51

11      1          A     That evening.

        2          Q     Do you recall how long you had been home

        3    before you received the call?

        4          A     Probably a half hour, 45 minutes.

        5          Q     Okay.  Do you recall the conversation, what

        6    you told the officer?

        7          A     No, I don't.

        8          Q     Okay.  Who was it that called you?  Was it the

        9    officer or somebody else?

       10          A     It was an officer, a police officer.

       11          Q     And when was the next time you had any contact

       12    with an officer?

       13          A     At the district court hearing.

       14          Q     So in between that time, you had no contact

       15    with him?

       16          A     No.

       17          Q     In between that time, you had no contact with

       18    Apple Chevrolet, anyone from there?

       19          A     Matt Kugle called me that same evening to see

       20    if I was okay, and also Kathy Sargen.

       21          Q     And what was the context of their conversation

       22    to you?

       23          A     Asked me if I was okay.

       24          Q     Anything else?

       25          A     No.

11

1  Q They didn't ask you if you would be available

2 to testify or anything like that?

3  A No.

4  Q Or give a statement or anything like that?

5  A Just the police asked me a couple things, but

6 I couldn't tell you what they were right now.

7  Q Now, during this time, this exchange within

8 Apple Chevrolet between all the parties, you, Matt, and

9 Mr. Hanes, was Mr. Hanes or anybody told to leave the

10 premises or anything like that?

11  A Yes.

12  Q Okay.  When?

13  A When Matt came back -- oh, I told him -- first

14 I probably told him that I was finished, I didn't need

15 anything else from him.  Then when Matt came back to the

16 service department, he also told him that they would just

17 take care of it Monday.  And that's all I recall.

18  Q So he didn't say leave, I want you to leave

19 now and get out.  He just said, I'll take care of it

20 Monday?

21  A I can't recall those exact words, just leave,

22 no.

23  Q So to your knowledge, it was the implication

24 by I'll take care of it Monday?

25  A Yeah, we would have someone call him Monday.

11

1    Q    So you thought that implied, okay, I am done

2    with you now, I have everything I need from you now, so

3    you can leave?

4    A    Yes.

5    Q    Now, as far as John Schriver, the other person

6    to rent that vehicle, how long was he present?

7    A    He came to the dealership about ten of 4:00.

8    Q    No, I am asking actually so I can direct you,

9    once Jeffrey Hanes arrived, how long was John Schriver

10   present?

11   A    I would say not even five minutes.

12   Q    Okay.  So basically, Jeffrey Hanes handed you

13   the keys and you handed the keys to John Schriver and he

14   left, or somebody handed the keys to John Schriver?

15   A    I handed the keys to John Schriver, yes.

16   Q    And then he left?

17   A    Yes.

18   Q    Once he had the keys?

19   A    Yes.

20   Q    So was he a party to this conversation between

21   you?

22   A    Yes.

23   Q    John Schriver could hear the conversation

24   between you?

25   A    Yes.

54

11

1    Q    So he heard what you said?

2    A    Yes.

3    Q    And he heard what Jeffrey Hanes said?

4    A    Yes.

5    Q    And could he hear if anybody else was

6    involved?

7    A    The only other person that was involved was

8    Matt.  And he was out checking the van in, so there was

9    really no conversation at that point with Matt.

10   Q    Okay.  And then you said from the time Jeffrey

11   Hanes entered the building, John Schriver left five

12   minutes later?

13   A    Approximately five minutes.

14   Q    Do you have any knowledge as to someone from

15   Apple Chevrolet contacting John Schriver to write a

16   statement?

17   A    I knew they were going to try.

18   Q    And what was the context of that conversation

19   that they were going to try to get him to write a

20   statement?

21   A    Just that he was the other person standing

22   there with me.

23   Q    Why did they believe they needed him to write

24   a statement?

25   A    Because as upset as what everybody was and

55

12

1   then it went to district court and then it just came to

2   this point.

3       Q    Have you been instructed by anyone to not

4   follow through with the charges?

5       A    To not follow through with the charges?

6       Q    Right, to just let it go.

7       A    No.

8       Q    Okay.  So from your information, Apple

9   Chevrolet did want to pursue the criminal charges against

10  Mr. Hanes?

11      A    I don't know.

12      Q    I am asking based on your knowledge.  I am

13  asking, what do you know.  From what you know, Apple

14  Chevrolet, as far as the people involved, did want to

15  pursue the charges against Mr. Hanes?

16      A    I don't see how I can answer that.  I was not

17  there when the police came.  I don't know if there was

18  charges pressed.  All I know is that I was served with

19  papers after that by the City Police.

20      Q    And you also stated that you were party to

21  information that they wanted John Schriver to write a

22  statement because of charges being filed.

23      A    I think that was for the Human Relations.

24      Q    So you are changing your answer?  It wasn't

25  for the district court?

12

1      A     No, I was the only one at the district court.

2      Q     My original question to you was, did you know

3  why they wanted John Schriver to write a statement.  Now,

4  can you answer that?

5      A     It would be for that Human Relations.

6      Q     So they wanted -- if John Schriver was

7  contacted two days after November 14th of 1998, what

8  would that be for?

9      A     I have no idea.

10      Q     Did you know about John Schriver being

11  contacted to give information as to what he saw?

12      A     No, I don't know.

13      Q     Now, have you ever been involved in a

14  conversation with a customer who was loud or disputed a

15  bill?

16      A     Yes.

17      Q     But you didn't quit?

18      A     No.

19      Q     You say you didn't call the police?

20      A     No.

21      Q     Okay.  You say you don't remember their race?

22      A     No.

23      Q     Do you recall how long that exchange took

24  place between the time Jeffrey Hanes came into Apple

25  Chevrolet and you left?

58

12

1  that you believed John Schriver arrived if John Schriver

2  says he didn't arrive until ten of 5:00?

3       A    That's not correct.  I would not be --

4       Q    So he would be mistaken?

5       A    Yes.

6       Q    So if he said he was not supposed to pick up

7  the vehicle until 5 o'clock, then he is mistaken?

8       A    Yes.

9       Q    Not you?

10       A    Not me.

11       Q    Okay.  Now, was there any type of body

12  language between any of the parties involved that you

13  recall?

14       A    Body language?

15       Q    Um-hum.  Was anything done with hands or legs

16  or expressions or anything like that?

17       A    No.

18       Q    Okay.  So even when the four other persons

19  were standing there, they weren't doing anything with

20  their body or anything?  They were just looking at you?

21       A    Standing there, yes.

22       Q    Just standing there looking at you?

23       A    (Nods head)

24       Q    And then Jeffrey Hanes, he was disputing the

25  bill?

12

1     A    Yes.

2     Q    Or however?

3     A    Yes.

4     Q    But nothing with the body language or

5  anything?

6     A    No.

7     Q    His body, okay.  So nothing you found by body

8  language to be threatening?

9     A    No.

10    Q    Did Matt Kugle go into any more detail about

11  his previous knowledge of Jeffrey Hanes?

12    A    Not with me.

13    Q    He didn't make any statements in front of you

14  about what Jeffrey Hanes might have been like in high

15  school when he knew him or something like that?

16    A    No.

17    Q    Now, during your conversation with Mr. Hanes,

18  did you make any statements as to how long you have been

19  waiting for him?

13

20    A    I tried to.

21    Q    And what were you saying?

22    A    I started to say to him, because he asked me

23  why I was so nice to the other customer, that I thought

24  that was uncalled for.  And I said to him, sir, we have

25  been sitting here waiting for you.  And that's all I got

1    out.  And then he said -- Jeffrey Hanes says, what, you

2    have been sitting here waiting on my black ass.  I said,

3    I never said that.  He said, but that's what you wanted

4    to say.

5        Q    And then what occurred after that?  Was the

6    police called before or after that statement?

7        A    I don't know.

8        Q    Well, you know where Matt was when he called

9    the police.  Is that correct?

10        A    I don't even think Matt was there for that

11    statement.  I think Matt was out checking the van in --

12    no, he couldn't have been because I had the keys.  I

13    don't know.  I can't recall where Matt was.

14        Q    So then obviously the police were called after

15    that fact?

16        A    Yes.

17        Q    And because you are saying that he asked you

18    did you say or want to say I was waiting on your black

19    ass, that's why you quit Apple Chevrolet?

20        A    No.  The reason I quit is because I wasn't

21    going to put up working with people like that anymore.

22        Q    And that's what you are describing, people

23    like that.  Isn't that correct?

24        A    Yes, very upset customers coming in there and

25    just jumping all over me for no reasons.

64

14

1      Q    So were you referring to Jeffrey Hanes or were

2   you referring to other customers you also dealt with?

3      A    Probably all of them, but this was the one

4   that drew the last straw with me.

5      Q    And why was that?

6      A    Because I was being accused of saying stuff

7   that I didn't say.  It just got into a long, drawn-out

8   thing that didn't need to even happen because there was

9   no reason for it.

10     Q    When did you become aware that the two-day

11  charge -- well, when Jeffrey Hanes came in, you told him

12  you were still charging him for two days.  Is that right?

13     A    I told him I was informed I had to.

14     Q    But previously, you had told him you were only

15  going to charge him for one day?

16     A    Yes, because I took that upon myself to do

17  that.

18     Q    And after the time -- so were you told that

19  you actually had to charge him for two days before he

20  came in?

21     A    Yes.

22     Q    And you didn't call him to say, look, I got to

23  charge you for these two days, I want you to know that?

24     A    The first -- he did know that.  And then he

25  called back and I said, listen, if you just bring the van

65

14

1   back, I will only charge you for one day.

2       Q    And I am asking you, did you -- but after

3   that, you were told no, you really have to charge him for

4   two days.  Is that right?

5       A    That's right.

6       Q    That is right?

7       A    That's right.

8       Q    Okay.  But the last thing you told Jeffrey

9   Hanes is he would only be charged for one day.  Is that

10  correct?

11      A    Yes.

12      Q    Did you -- once you received alternative

13  instructions, did you call back, call him back and say, I

14  really got to charge you for these two days?

15      A    No, I didn't, because he said he would be

16  there within twenty minutes.  He should have been there

17  any time.  At that point, he should have been there

18  within minutes.

19      Q    But he wasn't there?

20      A    No, he wasn't there.

21      Q    And you didn't call him?

22      A    No, I didn't.

23      Q    So you didn't tell him, there is a change, I

24  have to charge you the two days?

25      A    No.

66

14

1    Q    So from your knowledge, your last

2    conversation, he came in expecting a one-day charge?

3    A    Yes.

4    Q    Did you speak with Terrence Stewart shortly

5    after November 14th of '98?

6    A    Yes, Terry called me.

7    Q    And what was the substance of that

8    conversation?

9    A    Just about he was sorry that I went through

10    something like that and asked me if I -- if there was any

11    way I would return to work.  And I said, not at that

12    position, no.

13    Q    Did you explain to him that it wasn't just

14    that situation, it was dealing with customers in general?

15    A    No.

16    Q    So when is the first time that you said that

17    it wasn't just that situation, it was the fact that I

18    deal with these type of customers in general?

19    A    I deal with these customers every day like

20    that in general, but this was the situation that made me

21    quit, that I decided to quit, that I no longer wanted to

22    work under this situation.

23    Q    Well, my question was, when did you advise

24    someone that it wasn't just this situation?

25    A    It never came up.

| For Billing Inquiries<br>Call 1-888-461-3030 | Account Name<br>JEFFREY L HANES | Account Number<br>648486    -1 | Invoice Date<br>Jan 06, 1999 |
|---|---|---|---|

## Detail of Usage Charges (717-332-0375)

| Line | Date | Time | Call From | Call To | | No Called | Call Type | Rate Prd | Min | Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| 122 | 11-13 | 8:01A | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 123 | 11-13 | 8:48A | PCS1-PA | YORK | PA | 717-845-9773 | | P | 1 | 0.36 |
| 124 | 11-13 | 9:00A | PCS1-PA | YORK | PA | 717-845-9773 | | P | 1 | 0.36 |
| 125 | 11-13 | 9:19A | PCS1-PA | YORK | PA | 717-848-5896 | | P | 6 | 2.16 |
| 126 | 11-13 | 10:54A | PCS1-PA | YORK | PA | 717-757-7811 | | P | 2 | 0.72 |
| 127 | 11-13 | 10:55A | PCS1-PA | YORK | PA | 717-851-8166 | | P | 1 | 0.36 |
| 128 | 11-13 | 11:01A | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 4 | 1.44 |
| 129 | 11-13 | 11:04A | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 1 | 0.36 |
| 130 | 11-13 | 11:05A | PCS1-PA | YORK | PA | 717-845-2000 | | P | 3 | 1.08 |
| 131 | 11-13 | 11:08A | PCS1-PA | GETTYSBURG | PA | 717-334-4318 | | P | 4 | 1.44 |
| 132 | 11-13 | 12:03P | PCS1-PA | YORK | PA | 717-843-3389 | | P | 9 | 3.24 |
| 133 | 11-13 | 12:16P | PCS1-PA | YORK | PA | 717-851-8166 | | P | 1 | 0.36 |
| 134 | 11-13 | 1:37P | PCS1-PA | YORK | PA | 717-846-0329 | | P | 2 | 0.72 |
| 135 | 11-13 | 1:40P | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 136 | 11-13 | 3:11P | PCS1-PA | YORK | PA | 717-751-1374 | | P | 1 | 0.36 |
| 137 | 11-13 | 3:12P | PCS1-PA | YORK | PA | 717-843-2364 | | P | 2 | 0.72 |
| 138 | 11-13 | 4:36P | PCS1-PA | YORK | PA | 717-843-9853 | | P | 1 | 0.36 |
| 139 | 11-13 | 6:36P | PCS1-PA | YORK | PA | 717-751-1374 | | P | 1 | 0.36 |
| 140 | 11-13 | 6:37P | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 141 | 11-13 | 6:39P | PCS1-PA | YORK | PA | 717-845-4541 | | P | 2 | 0.72 |
| 142 | 11-13 | 6:42P | PCS1-PA | YORK | PA | 717-851-8166 | | P | 1 | 0.36 |
| 143 | 11-13 | 6:43P | PCS1-PA | YORK | PA | 717-843-9853 | | P | 1 | 0.36 |
| 144 | 11-13 | 7:15P | PCS1-PA | YORK | PA | 717-846-7024 | | O | 7 | 0.70 |
| 145 | 11-13 | 7:32P | PCS1-PA | WILMINGTON | DE | 302-777-4439 | D | P | 14 | 5.04 |
| 146 | 11-13 | 7:46P | PCS1-PA | YORK | PA | 717-846-1224 | | O | 3 | 0.30 |
| 147 | 11-13 | 9:25P | PCS1-PA | YORK | PA | 717-848-4635 | | O | 2 | 0.20 |
| 148 | 11-13 | 9:30P | PCS1-PA | YORK | PA | 717-851-9063 | | O | 1 | 0.10 |
| 149 | 11-13 | 9:31P | PCS1-PA | YORK | PA | 717-851-9063 | | O | 1 | 0.10 |
| 150 | 11-13 | 9:33P | PCS1-PA | YORK | PA | 717-845-9773 | | O | 1 | 0.10 |
| 151 | 11-13 | 9:35P | PCS1-PA | YORK | PA | 717-851-9061 | | O | 1 | 0.10 |
| 152 | 11-13 | 9:35P | PCS1-PA | YORK | PA | 717-851-9061 | | O | 1 | 0.10 |
| 153 | 11-13 | 9:38P | PCS1-PA | YORK | PA | 717-751-1374 | | O | 1 | 0.10 |
| 154 | 11-13 | 9:39P | PCS1-PA | INCOMING | CL | 717-332-0375 | | T | 1 | 0.10 |
| 155 | 11-13 | 9:40P | PCS1-PA | YORK | PA | VOICE MAIL | | T | 2 | FREE |
| 156 | 11-13 | 9:42P | PCS1-PA | YORK | PA | 717-751-1374 | | O | 1 | 0.10 |
| 157 | 11-13 | 9:43P | PCS1-PA | YORK | PA | 717-751-1374 | | O | 1 | 0.10 |
| 158 | 11-13 | 10:11P | PCS1-PA | YORK | PA | 717-843-9853 | | O | 1 | 0.10 |
| 159 | 11-13 | 11:36P | PCS1-PA | YORK | PA | 717-848-4635 | | O | 2 | 0.20 |
| 160 | 11-14 | 7:51A | PCS1-PA | YORK | PA | 717-843-3389 | | W | 1 | 0.01 |
| 161 | 11-14 | 8:02A | PCS1-PA | STEWARTSTN | PA | 717-993-3316 | | W | 2 | 0.02 |
| 162 | 11-14 | 8:09A | PCS1-PA | STEWARTSTN | PA | 717-993-3316 | | W | 1 | 0.01 |
| 163 | 11-14 | 8:37A | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 164 | 11-14 | 9:03A | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 4 | 1.44 |
| 165 | 11-14 | 9:46A | PA/NJ/DE | STEWARTSTN | PA | 717-993-3316 | | W | 5 | 0.05 |
| 166 | 11-14 | 9:52A | PA/NJ/DE | CAMDEN | NJ | 609-504-2119 | D | P | 4 | 1.44 |
| 167 | 11-14 | 10:13A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 168 | 11-14 | 10:14A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 169 | 11-14 | 11:41A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 2 | 0.02 |
| 170 | 11-14 | 11:42A | PA/NJ/DE | GETTYSBURG | PA | 717-334-7001 | | W | 1 | 0.01 |
| 171 | 11-14 | 11:43A | PA/NJ/DE | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 172 | 11-14 | 11:44A | PA/NJ/DE | GETTYSBURG | PA | 717-334-7401 | | W | 5 | 0.05 |
| 173 | 11-14 | 11:57A | PA/NJ/DE | YORK | PA | 717-848-5896 | | W | 1 | 0.01 |
| 174 | 11-14 | 11:58A | PA/NJ/DE | YORK | PA | 717-845-9773 | | W | 5 | 0.05 |
| 175 | 11-14 | 12:02P | PA/NJ/DE | YORK | PA | 717-845-8146 | | W | 15 | 0.15 |
| 176 | 11-14 | 12:17P | PA/NJ/DE | YORK | PA | 717-851-8166 | | W | 1 | 0.01 |
| 177 | 11-14 | 12:19P | PA/NJ/DE | YORK | PA | 717-851-8166 | | W | 1 | 0.01 |
| 178 | 11-14 | 12:26P | PA/NJ/DE | NEWARK | NJ | VOICE MAIL | | T | 1 | 0.10 |
| 179 | 11-14 | 12:27P | PA/NJ/DE | YORK | PA | 717-845-6611 | | W | 4 | 0.04 |
| 180 | 11-14 | 3:20P | PA/NJ/DE | YORK | PA | 717-848-1300 | | W | 1 | 0.01 |
| 181 | 11-14 | 3:22P | PA/NJ/DE | YORK | PA | 717-848-1300 | | W | 2 | 0.02 |

| Call Type: | CF=Call Forwarding | CW=Call Waiting | D=Domestic | DO=Voice Dial/Voice Mail Outdial |
|---|---|---|---|---|
| | F=Fax/Data | I=International | R=Roaming | 3C=3 Way Conference |
| | TN=Telephone Notification | | | |
| Rate Prd: | O=Off Peak | P=Peak | T=Mobile Terminating | M=Multiple Periods | W=Weekend |

Page 7

| For Billing Inquiries | Account Name | Account Number | Invoice Date |
|---|---|---|---|
| Call 1-888-461-3030 | JEFFREY L HANES | 648486    -1 | Jan 06, 1999 |

### Detail of Usage Charges (717-332-0375)

| Line | Date | Time | Call From | Call To | | No Called | Call Type | Rate Prd | Min | Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| 182 | 11-14 | 3:26P | PA/NJ/DE | YORK | PA | 717-848-1300 | | W | 3 | 0.03 |
| 183 | 11-14 | 3:29P | PA/NJ/DE | 800 SERV | CL | 800-537-8477 | | W | 1 | 0.02 |
| 184 | 11-14 | 3:32P | PA/NJ/DE | STEWARTSTN | PA | 717-993-3316 | | W | 1 | 0.01 |
| 185 | 11-14 | 3:33P | PA/NJ/DE | YORK | PA | 717-854-2398 | | W | 2 | 0.02 |
| 186 | 11-14 | 3:34P | PA/NJ/DE | NEWARK | NJ | VOICE MAIL | | T | 1 | 0.10 |
| 187 | 11-14 | 4:22P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 188 | 11-14 | 4:23P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 2 | 0.02 |
| 189 | 11-14 | 4:25P | PCS1-PA | YORK | PA | 717-843-9853 | | W | 1 | 0.01 |
| 190 | 11-14 | 4:27P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 191 | 11-14 | 4:27P | PCS1-PA | YORK | PA | 717-848-1300 | | W | 2 | 0.02 |
| 192 | 11-14 | 4:30P | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 3 | 1.08 |
| 193 | 11-14 | 4:42P | PCS1-PA | YORK | PA | 717-843-9853 | | W | 3 | 0.03 |
| 194 | 11-14 | 4:49P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 2 | 0.02 |
| 195 | 11-14 | 5:13P | PCS1-PA | YORK | PA | 717-848-1300 | | W | 1 | 0.01 |
| 196 | 11-14 | 5:34P | PCS1-PA | CAMDEN | NJ | 609-504-2119 | D | P | 8 | 2.88 |
| 197 | 11-14 | 5:44P | PCS1-PA | YORK | PA | 717-843-3389 | | W | 1 | 0.01 |
| 198 | 11-14 | 5:56P | PCS1-PA | YORK | PA | 717-843-3389 | | W | 5 | 0.05 |
| 199 | 11-14 | 6:08P | PCS1-PA | MAYS LDG | NJ | 609-625-5610 | D | P | 5 | 1.80 |
| 200 | 11-14 | 6:15P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 201 | 11-14 | 6:16P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 1 | 0.01 |
| 202 | 11-14 | 6:17P | PCS1-PA | YORK | PA | 717-845-5527 | | W | 1 | 0.01 |
| 203 | 11-14 | 6:58P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 3 | 0.03 |
| 204 | 11-14 | 7:12P | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 205 | 11-14 | 7:14P | PCS1-PA | YORK | PA | 717-846-4026 | | W | 1 | 0.01 |
| 206 | 11-14 | 7:16P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 2 | 0.02 |
| 207 | 11-14 | 7:45P | PCS1-PA | YORK | PA | 717-848-5014 | | W | 3 | 0.03 |
| 208 | 11-14 | 7:50P | PCS1-PA | YORK | PA | 717-845-9504 | | W | 1 | 0.01 |
| 209 | 11-14 | 7:51P | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 210 | 11-14 | 7:52P | PCS1-PA | HARRISBURG | PA | 717-985-0559 | | W | 1 | 0.01 |
| 211 | 11-14 | 9:00P | PCS1-PA | HARRISBURG | PA | 717-985-0559 | | W | 5 | 0.05 |
| 212 | 11-14 | 9:47P | PCS1-PA | YORK | PA | 717-854-0932 | | W | 1 | 0.01 |
| 213 | 11-14 | 9:49P | PCS1-PA | YORK | PA | 717-848-3321 | | W | 7 | 0.07 |
| 214 | 11-14 | 9:56P | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 215 | 11-14 | 11:20P | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 216 | 11-14 | 11:46P | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 217 | 11-14 | 11:53P | PCS1-PA | YORK | PA | 717-751-1374 | | W | 2 | 0.02 |
| 218 | 11-14 | 11:54P | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 219 | 11-15 | 1:21A | PCS1-PA | YORK | PA | 717-851-9063 | | W | 1 | 0.01 |
| 220 | 11-15 | 1:42A | PCS1-PA | YORK | PA | 717-848-4635 | | W | 1 | 0.01 |
| 221 | 11-15 | 1:44A | PCS1-PA | YORK | PA | 717-852-9238 | | W | 1 | 0.01 |
| 222 | 11-15 | 1:49A | PCS1-PA | YORK | PA | 717-852-9238 | | W | 1 | 0.01 |
| 223 | 11-15 | 1:50A | PCS1-PA | YORK | PA | 717-846-2772 | | W | 2 | 0.02 |
| 224 | 11-15 | 1:52A | PCS1-PA | YORK | PA | 717-848-4635 | | W | 1 | 0.01 |
| 225 | 11-15 | 1:54A | PCS1-PA | YORK | PA | 717-846-1224 | | W | 1 | 0.01 |
| 226 | 11-15 | 1:55A | PCS1-PA | MAYS LDG | NJ | 717-846-1224 | | W | 1 | 0.36 |
| 227 | 11-15 | 11:40A | PCS1-PA | MAYS LDG | NJ | 609-625-5611 | D | P | 1 | 0.36 |
| 228 | 11-15 | 11:41A | PCS1-PA | GETTYSBURG | PA | 609-625-5610 | D | P | 1 | 0.01 |
| 229 | 11-15 | 11:43A | PCS1-PA | YORK | PA | 717-334-4318 | | W | 10 | 0.10 |
| 230 | 11-15 | 11:44A | PCS1-PA | YORK | PA | 717-848-5896 | | W | 2 | 0.02 |
| 231 | 11-15 | 11:54A | PCS1-PA | YORK | PA | 717-848-4635 | | W | 2 | 0.02 |
| 232 | 11-15 | 12:01P | PCS1-PA | YORK | PA | 717-848-5896 | | W | 7 | 0.07 |
| 233 | 11-15 | 12:19P | PCS1-PA | YORK | PA | 717-852-3130 | | W | 1 | 0.01 |
| 234 | 11-15 | 12:47P | PCS1-PA | YORK | PA | 717-845-9773 | | W | 1 | 0.01 |
| 235 | 11-15 | 1:08P | PCS1-PA | YORK | PA | 717-846-0351 | | T | 2 | FREE |
| 236 | 11-15 | 2:44P | PCS1-PA | YORK | PA | VOICE MAIL | | W | 1 | 0.01 |
| 237 | 11-15 | 2:45P | PCS1-PA | YORK | PA | 717-848-9220 | | T | 2 | FREE |
| 238 | 11-15 | 2:46P | PCS1-PA | YORK | PA | VOICE MAIL | | W | 1 | 0.01 |
| 239 | 11-15 | 2:51P | PCS1-PA | YORK | PA | 717-843-9853 | | W | 2 | 0.02 |
| 240 | 11-15 | 3:08P | PCS1-PA | YORK | PA | 717-848-4635 | | W | 1 | 0.01 |
| 241 | 11-15 | 3:12P | PCS1-PA | YORK | PA | 717-846-7024 | | | | |

| Call Type: | CF=Call Forwarding | CW=Call Waiting | D=Domestic | DO=Voice Dial/Voice Mail Outdial |
|---|---|---|---|---|
| | F=Fax/Data | I=International | R=Roaming | 3C=3 Way Conference |
| | TN=Telephone Notification | | | |
| Rate Prd: | O=Off Peak | P=Peak | T=Mobile Terminating | M=Multiple Periods    W=Weekend |

Exh 9

COPY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .

JEFFREY L. HANES,  .
          Plaintiff  .

                 .

     vs.  .    Civil No. 1:CV-00-2003

                 .

APPLE CHEVROLET, INC. and  .
TERRY STEWART, PRESIDENT/  .
OWNER,  .
          Defendants  .

. . . . . . . . . . . . . .

 

Deposition of:  MATHEW A. KUGLE

Taken by     :  Plaintiff

Date         :  May 10, 2002, 2:07 p.m.

Place       :  Mt. Moriah Baptist Church
               1165 East Prospect Street
               York, Pennsylvania

Before      :  Donna S. Elicker, RMR
               Reporter - Notary Public

APPEARANCES:

     SONDRA THOMPSON, ESQ.
         For - Plaintiff

     BLAKEY, YOST, BUPP & RAUSCH
     By:  SARA A. AUSTIN, ESQ.
         For - Defendants

ALSO PRESENT:
     JEFFREY L. HANES
     TERRENCE S. STEWART

EXHIBIT "G"

12

Q    Is that when you graduated high school?

A    No.

Q    What year did you graduate high school?

A    1986.

Q    And how old were you?

A    17.

Q    What high school did you go to?

A    I went to -- you need to rephrase the question because I went to more than one.  Are you asking me which high school I graduated from or which ones I have attended in York?

Q    I said go to.  That normally means attended.

A    Okay.  Is that graduated or all the ones I --

Q    It normally means attended.

A    I attended York High, which is William Penn. I attended York County Vo-Tech.  And I attended York Suburban.

Q    What were the time frames, like what grades were you in at York Suburban?

A    Senior, twelfth grade.  York Vo-Tech was tenth and eleventh.  William Penn was ninth.

Q    And you said that you knew Jeffrey L. Hanes before November 14th of 1998?

A    Yes.

Q    In what capacity?

2

1      A    He went to York High with me.

2      Q    And you attended York High in ninth grade?

3      A    Yeah.

4      Q    For one year?

5      A    Yes.

6      Q    So you knew him during that one year?

7      A    Yes.  I was aware of him, yes.

8      Q    So you didn't know him?

9      A    Well, I wouldn't say we were real close, but

3

10   yes, I knew of him.

11      Q    You knew of him?

12      A    Sure.

13      Q    The same class?

14      A    I can't recollect.  I am sorry.

15      Q    You don't remember if you were in homeroom or

16   anything together?

17      A    Honestly, I don't.

18      Q    Same functions, social functions?

19      A    I really don't recollect.

20      Q    Do you remember if you had any classes

21   together?

22      A    I don't.  I am sorry.

23      Q    How old were you in the ninth grade?

24      A    I probably would have had to have been

25   somewhere around 14, 13 or 14, something like that I

14

3    1    guess.

2        Q    Did you know how old Jeffrey Hanes was?

3        A    No.

4        Q    You didn't know his age?

5        A    (Shakes head)

6        Q    Did you know his grade?

7        A    No.

8        Q    So you didn't know any of that?

9        A    Not that I recollect.

10        Q    Did you have any contact with Mr. Hanes after

11    you left York High in ninth grade?

12        A    Not that I recollect.

13        Q    So from ninth grade to November 14th of 1998,

14    from which you recall was your first contact with him

15    since York High?

16        A    From what I remember.

17        Q    Was there anything that you heard of him or

18    knew of him from the time that you were in ninth grade to

19    November 14th of 1998?

20        A    Not that I recollect.

21        Q    So is there any reason that you might have

22    known anything about him between those years?

23        A    No, not that I recollect.

24        Q    What type of organizations do you belong to?

25        A    I don't belong to any organizations.

6

1          A     How would you like it?  Weekly or monthly

2    or --

3          Q     You can start with weekly.

4          A     They might call me once a week where they need

5    help with explaining a bill or -- wow, there is just a

6    number of --

7          Q     Now, would they call you after they tried to

8    explain the bill themselves to the customer and the

9    customer still would not accept it?  Is that when they

10   call you?

11         A     That could be the case or it could be -- wow,

12   there is just so many instances.  A customer might need

13   to get something out of a vehicle that is back in the

14   service department, you know, where they have left

15   something in there.

16         Q     We are talking about customer complaints

17   actually.

18         A     I am sorry.  What was the question again?

19         Q     We were talking about customer complaints to

20   where when, say, a cashier or someone would call you to

21   help.

22         A     Right.

23         Q     And you were explaining as far as the

24   different instances where a cashier might call you to

25   help with a complaint.

30

6

1          A     Where they don't understand why they were

2     billed for certain things in service, why their vehicle

3     wasn't ready on time.  They might -- I have had an

4     instance where customers would pick their car up, go out,

5     start the car up, and they might notice that either the

6     same problem exists or a different problem may have

7     arisen, so they will call me to come out and try to help

8     with the customer.

9          Q     Now, at these times, would customers be loud

10    sometimes?

11         A     Sometimes, yes.

12         Q     Can you estimate the number of times you have

13    dealt with a customer that was loud?

14         A     Percentagewise?

15         Q     However you feel comfortable.

16         A     I would guess maybe five percent of the time.

17         Q     So now you said that you deal with customer

18    complaints once a week.  So how often -- how many of

19    those then -- would that be one out of four?  Because

20    once a week is about four a month.  Is that correct?

21         A     Yes.

22         Q     So would it be one out of four customers?

23         A     That would be a little loud?

24         Q     Right.

25         A     Yes.

6 1  Q Would there be a time when customers -- you

2 are trying to explain a situation, they just don't want

3 to listen to you?

4  A Your question is, are there times when

5 customers won't listen to me when I am trying to explain

6 a bill?

7  Q Have there been, yes.

8  A Very, very, very, very rarely.

9  Q But there have been times?

10  A Honestly, I don't recollect any other than

11 this particular instance that we are talking about.

12  Q So when you said very rarely, that wasn't

13 true?

14  A Well, that would be very rarely.

15  Q So just one time in your ten years?

16  A That I can recall, yes.

17  Q So there might be some that you can't recall?

18  A There could be.

19  Q Are there times when you advised customers

20 that a price is what it is or a service is what it is

21 when they continued to ask for something different?

7 22  A Are you speaking in reference to service or to

23 sales?

24  Q Actually, I am speaking generally and I gave

25 you some examples.

7

1       A    To prices, yes.

2       Q    Were there situations where you kept telling

3  them what the price or so was and they kept asking for

4  something else?

5       A    Yes.

6       Q    Was there a time that you ever felt other than

7  this claim on November 14th of '98 that a customer might

8  have been threatening in any way in reference to

9  handling, dealing with the complaints?

10      A    I honestly don't recollect.

11      Q    Okay.  But there could have been?

12      A    Sure.

13      Q    What are the number of times that you called

14  the police to respond to Apple Chevrolet?

15      A    I don't recollect any exact number.  I am

16  sorry.

17      Q    More than one?

18      A    Yes.

19      Q    More than two?

20      A    Yes.

21      Q    More than three?

22      A    Is the question since I have started at Apple

23  Chevrolet, since my employment started?

24      Q    First my question is the number of times you

25  called police to respond.  That's where it is first.

33

7    1    A    I understand.  But I mean, do you mean since I

2    have worked for Apple?

3    Q    Exactly.

4    A    Yes, it has been more than three.

5    Q    What are the reasons why you would call the

6    police?

7    A    For vandalism, for theft.  I don't recollect

8    all the reasons.

9    Q    Besides November 14th of 1998, have you ever

10    called the police for a customer complaint?

11    A    I don't recollect.

12    Q    So according to your recollection, you have

13    never called the police to mediate a customer complaint?

14    A    I don't recollect.

15    Q    That was my question to you.  According to

16    your recollection, you don't recall ever calling the

17    police --

18    A    Correct.

19    Q    -- to mediate a customer complaint?

20    A    Right.

21    Q    Okay.  Now, are there any reasons or

22    justifications or defenses that you have to explain your

23    actions on November 14th of '98?

24    A    I don't understand your question.

25    Q    I am asking you basically why did you do what

35

7    1        A    I don't recollect in reference to Apple

2    Chevrolet.

3        Q    Okay.  So is that a no to do you recall ever

4    feeling that way before?

5        A    I don't recall.

6        Q    Now, what is it that made you feel threatened?

7        A    I never said that I felt threatened.  I am

8    sorry.

9        Q    Okay.  So you weren't threatened?

10        A    I don't recall being threatened.  I recall

11    being asked what I was going to do with the situation by

12    Jeffrey Hanes when I was trying to get everyone calmed

13    down.

14        Q    Okay.

15        A    I also recall responding to that with, I can

16    call the police.  And I can recall Jeffrey Hanes telling

17    me to do so.

18        Q    Okay.

19        A    And so I did.

20        Q    Okay.  But you didn't call the police because

21    you felt threatened?

22        A    No.

23        Q    Okay.  Did you call the police because you

24    felt that Joann Hall was threatened?

25        You were shaking your head no, but I don't

36

know if that was a response.

    A   No, I am thinking.

    Q   Okay.

    A   I can't say that I know that Joann was threatened.  I can say that I called the police because as I mentioned earlier, that was what I thought I should do and that's what -- when I informed Jeffrey Hanes that that's what I was going to do, he was in agreement.

    Q   So why is it that you felt that that's what you should do?

    A   As I stated earlier.

    Q   What was that?

    A   That a third party would be able to mediate or relieve the situation a little better than obviously I could.

    Q   So you didn't think that maybe someone above you within your organization could be the mediator?

    A   There was no one else there, ma'am.

    Q   At that time.  Is that right?

    A   That's correct.

    Q   Are there persons that you could reach at any other day that could possibly mediate?

    A   There are other people that I could call, but under the circumstances that I recall there being, that was what I felt I should do at the time.  It was also

37

what -- when I had mentioned this, it was also what Jeffrey Hanes told me I should do as well.

Q    Actually, I was trying to figure out why would you mention it in the first place.  So who are the people that you could call?

A    At the time, probably the general manager, which I believe was John Franklin would have been the other person to call.

Q    Have you ever had to make contacts like to someone above you to mediate customer complaints before?

A    Yes.

Q    And have you ever -- if you didn't make the contact yourself, have you ever gave information to the customer who would not accept your rendition to contact someone above you?

A    I am sorry.  Repeat the question.

Q    Okay, sure.  If you did not contact someone above you yourself, have you ever advised the customer in a dispute that you could not settle that they could contact someone in a higher position than you?

A    Yes.

Q    Now, from your recollection, I believe you stated that the dispute that you saw you referred to was between Mr. Hanes and Joann Hall.  Was that correct?

A    There is a dispute over a rental bill.  I

10

1    Sargen to inquire and that's when she told you it was

2    prior damage.  So I am asking you, is that still your

3    testimony or would you like to correct that?

4         A    My testimony is Joann called me to help her

5    with this situation.  I don't recall who asked me to

6    check the van in.

7         Q    When you say help you with the situation, what

8    did that mean?  What situation?

9         A    The rental bill dispute.

10        Q    Okay.  The dispute?

11        A    Um-hum.

12        Q    So when you previously wrote a statement,

13   Saturday, Joann Hall called my extension and asked if I

14   would help her check a van when the customers arrived, is

15   that accurate or not?

16        A    It could be because I don't recollect how many

17   times she called me or what the reasons they all were

18   for.  I am sorry.

19        Q    How often would she or any other cashier call

20   you to help check in a vehicle?

21        A    I can't recall a specific number, but it did

22   happen before.

23        Q    Okay.  So at least once before?

24        A    Yes.

25        Q    And that's before November 14th of '98?

58

12

1   you described where her vehicle was.  Is that right?

2        A    (Nods head)

3        Q    Do you recall where everybody was in relation

4   to Joann Hall's vehicle?

5        A    No, ma'am.

6        Q    Do you recall any attempts to block Joann Hall

7   from getting into her vehicle?

8        A    No, ma'am.

9        Q    Do you recall any threats of bodily injury or

10  anything like that made to yourself?

11       A    Not that I remember.  I don't -- like I said,

12  it has been so long.  I don't remember everything that

13  went on.

14       Q    Do you recall any made to Joann Hall?

15       A    I am sorry.  Any threats made to her?

16       Q    Threats, yes.

17       A    I don't remember.

18       Q    Do you recall telling Joann Hall to wait there

19  since you were calling the police?

20       A    I don't remember.

21       Q    Would you have asked her to wait since you

22  were calling the police?

23       A    I don't know the answer to that.  Sorry.

24       Q    Well, actually I am asking you, would you

25  have?  Is that something normal for you to do?  If you

12

13

1   were calling the police about a dispute between her and

2   another customer that she witnessed, would you have asked

3   her to wait for the police to arrive?

4       A    Depending on the circumstance, it could be yes

5   or no.

6       Q    What circumstances would make it no?

7       A    Probably if she had told me that she just

8   really wanted to leave.  Or if she would have just left,

9   then I wouldn't have had a choice in the matter.

10      Q    But you don't recall if she would have just

11  left even though you called the police?

12      A    Do I recall if she just left?

13      Q    Um-hum.

14      A    No, I don't remember.  I am sorry.

15      Q    Okay.  Do you recall having any conversations

16  with her after she had left?

17      A    I recall calling her at home because the

18  police instructed me to do so.

19      Q    And did you speak with her or did the police

20  officers speak with her?

21      A    The police officer.

22      Q    Now, I asked you, did you have any

23  conversations with her after she left on November 14th of

24  '98?

25      A    I had to explain to her why the police were

63

13

1   cashier charges for a rental?

2      A   No.

3      Q   Have you ever done it before?

4      A   I have the authority to -- I have the

5   authority to make decisions whether to let a customer --

6   yeah, I have the authority to reduce a charge on a

7   customer's bill.

8      Q   Now, I asked, have you ever done it before?

9      A   For a rental?

10     Q   Yes.

11     A   I don't recall.

12     Q   Okay.  But you recall you have the authority?

13     A   Absolutely.

14     Q   And who gave you the authority?

15     A   Terry Stewart.

16     Q   And when was that?

17     A   When I became sales manager.

18     Q   Did you -- on November 14th of '98 or prior

19   to, did you recall who Jeffrey Hanes was by his name?

20     A   Say the question again, please.  I am sorry.

21     Q   Was it the name Jeffrey L. Hanes that

22   refreshed your recollection of your high school days?

23     A   When I went back to the cashier area, no, I

24   didn't know his name.  I recognized Jeffrey Hanes because

25   I recognized him from high school.

Exh 10

I Dimitrios Tavloirs was present on the day of Nov 14 when Metro rented a van from Apple Chevrolet in the van we rented from apple chevrolet I personally made several phone calls from Jeff Hanes telephone from the turnpike to state were going to be late becouse of traffic. Eventually we got through and told the lady we are going to be late. She said she was going to charge us for two days if we didn't have it back by m 5.00. Then Jeff told her we will keep for 2 days if were going to get charged for 2 days and that was the end of the Convessation. Then she called back and she stated she had a contomer waiting for it and then she said just bring it back and I'll charge for one day. Then Jeff made arangements for the Steve Jones to come to Apple chevrolet to pick us up. So we wouldn't waste no time dropping everybody off to their diffrent designations.

Dimitrion

1

When we arrived to Apple Chevrolet we asked somebody outside that worked for Apple Chevrolet where do they want the van. And he said I'll get to it them. Then we all went inside to pay the bill. And there was a women behind the counter and a costomer standing there. Jeff gave the keeps to her and she gave the keys to the customer that was waiting who was a white male. She gave him the keys and he left. Then she told us were going to get charged for 2 days. When we told her to give the keys back and well bring the van back Tomorrow she said to late just gave it to the customer sercasticly. Then things got out of hand Jeff told her dem nonpaying for 2 days. Then she said Yes you are couse I waited on your black and then she stopped. And Jeff said let me finish for you. black ass. is that what you wanted to say.

D-2

She started saying fuck this fuck us.
fuck apple chevrolet then the
employee came in from outside that we seen
in the begining and said if you do not
whant to pay 8 days get a lower.
that you came in after 5:00. It was
like 5:10-15. We got you on video.
you better get a lawyer lawyer.
Then he said you either pay it
or I'm calling the police Jeff said
yes call them so they can here our.
side. We all went outside waiting for
the police. The lady was calling
at us fuck yous and this jon.
I asked her personally to wait while
the police comes and while getting in
her car parked in front of the the
garage she said fuck you and the
police and left. We waited several
while she was leaving
it looked like she was thaying to
hit Steve Jones with her car..

D-3

We remained and waited for the
police. Then we after 10 minutes
we left. there was no room
in the C vehicle to drop so Jeff
remained waiting on the police. Then
I came back and pick him up
after 15-20 minutes later when I
got my car. I as a Greek American
every successful in the York Community
feel hurt that in our times and in
a country that the world feels that
it is 500 years ahead of its time.
we are so many years behing on the
credentials that apple chevrolet uses on
hiring their employees. We personally
after Nov-14. 1998. I have felt hurt and
disisted with life and stressed out
knowing that people at this age
and time are still getting away with
something worse than murder. Which is
descrimination and peegidicyou

Thankyou.

Demetrion

Johnhovis

D-2

Exhibit 11

To whom it may concern:

I Mark Sheen, was very shocked at the situation that occured on november 14, 1998. As a news reporter for a C.B.S. station in a local market, you often hear about discrimatory incidents but to witness it in person, was very shocking. On the date mentioned above, Mr Hanes rented a van from apple Chevrolet/Geo in order to attend a seminar in Philadelphia. Mr Hanes told us the van was to be returned by 5:00 pm, so we left the seminar in ample time. On the way back from Philadelphia, we hit heavy traffic. Hanes, called apple Chevrolet to let them know we'll be late. The matter was discussed, and he decided (Hanes) he would keep the van and pay for two days rental rather than hurry back. later on the employee from apple called back and said she would only charge us for one day if we bring it back that day. When we arrive at the dealer, the employee who was a white female, sought to change the previous agreement, by charging him for two days rental instead of one. Mr. Hanes stated he would pay for the two days, but intended on keeping the van for the additional day. It seemed only right.

The employee ● now got angry, and said I waited for your black... then she paused, and Hanes finished it for ~~you~~ her., black ass. There were five african-american there, including myself and we were all offended.

There was a customer also present at the time waiting on the van ~~who~~ happened to be caucasian. As the employee and Hanes continued to discuss the matter, the customer took the van. I couldn't understand why she would make Mr. ~~Hanes~~ pay for an additional day while she had already rented the van out to the customer who left the scene.

The employee grew even louder in her discussion as the manager came out and kept loud with Mr Hanes as well, although he was not fully aware of the situation. The manager said he would call the police. Mr. ~~Hanes~~ encouraged him to do so. Our group waited for the police to arrive. ~~approximate~~ ~~20 minutes~~ for several minutes, as the rowdy employee angrily brushed by us on her way out to her car, yelling expletives as she pulled away in disgrace.

Sounds like a nice discrimination story to me., one in which my colleagues would love to get their hands on.

Exhibit 11

Sincerely:
Mark Green

2-28-99
Exhibit 12

I Lionel Weathers, was a passenger in the van rented from
Apple/Chev (1-day rental) on the Sat. of Nov. ~~21, 1998~~. Nov. 14 1998
This van was used for transportain to a seminarin    in
Philadelphia, PA that was held by METRO Public Adjustment

Durng the middle of the seminar the crew of 5, including
myself,left to return the van back to Apple/Chev of York,  Pa,
(1200 Loucks Rd. York, Pa 17404) by 5:00pm.  While on the
highway we ran into a traffic jam (Rte 30w).  Part of that
mishap was being that the "State/County" was doing road work.
This occured between the times of 4:15-4:30pm.  So to be on the
safe side Jeff L. Hanes made several attempts to contact
Apple/Chev to let them know our present situation.

Apple/Chev  then made an attempt to centact JeffL.  Hanes
by pager.  Jeff returned  the "page" and during the conver-
sation, I overheard statements of being charged an extra day
rental feeif   the van was not returned by % 5pm... and if
that would be the case keeping the van for an extra day to
offset that charged

At that time an agreement was made to only charge for the day
rental...just bring the van back ASAP, since they had someone
waiting on the same van.  We returned the van at approx. %5:10pm

Once  ew we were back  Jeff L. Hanes went to qthe service desk
to take care of the van.  Conversation started about being late
again... and extra day rental fee... (Meanwhile, I was about  10-1
yards away from the conversation and began to move closer once I
felt the tension from the conversation staryt to errupt. )

When I was about 10ft within the two, both tempers were flared up.
At this time , the lady (white) employee began to use a ~~free~~ few
choice words in regards to skin color.  These words were exactly:
"I waited on your BLACK..."  Jeff then finished her  remark, "You
waited om my black... BLACK ass..."

Threats were made to call 911 because of the arguement by the
"so-called" manager.  We waited about 20-min. then left, once our
ride came.

*Lionel Weathers*

Exhibit 13

I, STEVEN A. JONES WAS CALLED BY MY BROTHER-IN-LAW JEFFERY L. HANES AT APPROX. 4:30 PM 14NOV98 AT WHICH TIME HE STATED TO ME "IF I MIND PICKING HIM UP FROM APPLE CHEVROLET AT 5:00 PM" I STATED TO HIM THAT I WOULD BE THERE, I ARRIVED AT APP. 4:50 PM ON THE ABOVE DATE AND WAITED, HE ARRIVED AT APPROX. 5:10 PM AT WHICH TIME I WENT INTO THE OFFICE OF THE RENTAL AREA SO JEFF COULD RETURN THE VAN. WHEN JEFF WAS ABOUT TO PAY THE BILL SHE STATED THAT "SHE WAS GOING TO CHARGE JEFF FOR 2 DAYS" AT WHICH TIME THE TWO OF THEM GOT INTO A VERBLE DISAGREEMENT CONCERNING THE BILL. DURING THIS DISAGREEMENT THE LADY STATED THAT SHE WAS "WAITING FOR YOUR BLACK." AND STOPPED AND BECAME HOSTILE TOWARDS JEFF AND STATED SHE DOES'NT NEED THIS SHIT AND LEFT THE BUILDING AND GOT INTO HER CAR AND LEFT.
(END OF STATEMENT)

1 MAR

STEVEN JONES

Exhibit 14

Date: May 9, 2002

The following is a written statement provided for deposition regarding Jeffery Hanes vs. Apple Chevrolet (Case No. 1:00-CV-2003). The following document is provided to inspecting parties as a result of a subpoena served to me. The following information is accurate to the best of my knowledge and recollection.

On November 14, 1998 at approximately 1725 hours, I was dispatched to Apple Chevrolet in the City of York for an irate/disorderly customer. Upon my arrival on scene, shortly before 1800 hours, the manager on duty (Matthew Kugle) and employee (Joann Hall) met me. It was explained to me that a customer, identified as Jeffery Lynn Hanes via a photocopy of a driver's license, had just left prior to my arrival. While inside the store, Hanes disputed a charge that Apple Chevrolet was assessing and became very irate and disorderly. Hall and Kugle indicated that Hanes continually cursed and yelled as the conversation ensued. Hall and Kugle were visible upset as a result of this incident and requested charges brought against Hanes. As a result of this interview of the complainants, I filed a citation by mail against Hanes for Disorderly Conduct (PACC 5503(a)(3)) on the information I received on the scene. After a summary trial in January of 1999 in front of District Justice Martin, Hanes was found guilty of summary Disorderly Conduct and sentenced to pay a monetary fine.

Respectfully Submitted,

P.O. Nicholas A. Hansel

EXHIBIT "14"

Exhibit 15

## COMMONWEALTH OF PENNSYLVANIA

### NON-TRAFFIC SUMMONS

**CITATION NO.** P1177542-2

| 1. Magisterial District Number | 2. Docket Number | 3. Social Security Number |
|---|---|---|
| 19-1-02 | NT-0822-98 | 209154355 |

| 4. Address of Magisterial District Office | 5. Driver's Number | 6. State |
|---|---|---|
| 515 Maryland Ave. Suite 2, York PA | 21-255-216 | PA |

**7. Defendant's Name - First** Jeffery **Middle** Lynn **Last** Hanes

**8. Defendant's Address (Street-City-State-Zip Code)** 516 W. King St. York PA 17404

| 9. Race/Ethnicity | 10. Sex | 11. Date of Birth (MM/DD/YR) | 12. Resident Status | 13. Type of Arrest |
|---|---|---|---|---|
| (W) White (A) Asian (B) Black (H) Hispanic (I) Native American (U) Unknown | (M) Male (F) Female | 06/06/76 | (D) Resident (N) Non-Resident (U) Unknown | (O) On-View (S) Summoned/Cited |

| 14. JUVENILE | 15. Parents Notified | 16. Parent's Name | | 17. Date Notified | 18. Time |
|---|---|---|---|---|---|
| Yes | Yes | | | | |

**19. Charge**
- ☒ Disorderly Conduct
- ☐ Criminal Trespass
- ☐ Theft of Services
- ☐ Criminal Mischief
- ☐ Harassment
- ☐ Public Drunkenness
- ☐ Scattering Rubbish
- ☐ Retail Theft
- ☐ Purchase, Consumption, Possession or Transportation of Liquor or Malt or Brewed Beverages
- ☐ Other

| 20. Nature of Offense | 21. Pa. Code | 22. CRIMES CODE TITLE 18 |
|---|---|---|
| DEF. did w/ the intent to cause public inconvenience annoyance or alarm, continually curse at (2) employees at a public business. | | ☐ |
| | | **23. SECTION** 5503 **24. SUB SEC** (a)(G) |
| | | **25. FINE** 150.00 |
| | | **26. COSTS** 76.00 |
| | | **27. J.C.P.** 1.50 |
| | **29.** ☐ Lab Services Requested | **28. TOTAL DUE** $227.50 |

| 30. Date | 31. Time | 32. Day | 33. City-Twp-Boro | 34. Zone | 35. Zone |
|---|---|---|---|---|---|
| 1/14/98 | 1725 | SAT | YORK | 301 | W |

| 36. Location | 37. County | 38. County Code |
|---|---|---|
| APPLE CHEVROLET | YORK | 67 |

| 39. Defendant's Signature - Acknowledges Receipt of Citation | 40. Date | 41. |
|---|---|---|
| X — FILED | 1/14/98 | ☐ Issued ☒ Filed ☐ Filed on Info. received |

**42.** I verify that the facts set forth in this citation are true to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa. C.S.A. Section 4904) relating to unsworn falsification to authorities.

| OFFICER'S SIGNATURE | BADGE NUMBER | ORI NUMBER |
|---|---|---|
| Richard H. Hensel | 179 | PA0670200 |

**43. Station Address** 50 W. King St. York PA 17401

| 44. Offense Code | 45. Property Record No. | 46. Systems Code | 47. | Indictment No. |
|---|---|---|---|---|
| | | | | |

EXHIBIT "15"

Exhibit 15

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF: **YORK**

**ORDER IMPOSING SENTENCE**

**COMMONWEALTH OF**

**PENNSYLVANIA**

Mag. Dist. No.:
**19-1-02**

DJ Name: Hon.
**RICHARD E. MARTIN, II**
Address: **577 MARYLAND AVENUE**
**SUITE 2**
**YORK, PA**
Telephone: (**717**) **771-4792      17404**

**VS.**

DEFENDANT:     NAME and ADDRESS
**HANES, JEFFERY LYNN**
**516 W KING ST**
**YORK, PA 17404**

JEFFERY L. HANES
516 W KING ST
YORK, PA 17404

Docket No.: **NT-0000822-98**
Date Filed:  **11/16/98**

Charge(s):

**18 §5503 §§A3 DISORDER CONDUCT OBSCENE LANG/GEST**

## THIS IS TO NOTIFY YOU THAT:

☐ On _____ , your trial on the above charge(s) was held in the Magisterial District Court listed above in your absence pursuant to PA.R.Crim.P. 84.  You were found guilty and sentenced to the following:

☒ On ____**1/21/99**____ , you were convicted of violating the above charge(s) and I sentenced you to the following

☒ Sentenced to Fines, Costs, and Restitution

| | |
|---|---|
| Collateral Amt Set: | **$.00** |
| Fines: | **$151.50** |
| Costs: | **$115.90** |
| Restitution: | **$.00** |
| Total | **$267.40** |
| Paid to Date: | **$.00** |
| Adjusted to Date: | **$14.45-** |
| Case Balance | **$252.95** |

☐ You are hereby ordered to make payment to this court on _____ .

☒ You are hereby ordered to make an initial payment to this court in the amount of $ ____**252.95**____ on ____**2/22/99**____ .
Refer to the District Justice Time Payment Order for additional payment schedule information.

☐ You are hereby ordered to make an initial payment of $ _____ due on or before _____ .  Thereafter, a minimum payment of $ _____ shall be made to this court _____ with a final payment on _____ .
Refer to the District Justice Time Payment Order for additional payment schedule information.

☐ Alternate Sentence
An alternate sentence of _____
_____
_____
to commence on _____ and conclude on _____

☐ Sentenced to Imprisonment
A jail sentence of _____ in the _____ .  You must appear for the execution of your jail sentence on _____ .
(If you file an appeal, the execution of your jail sentence will be stayed pending the outcome of your appeal, and the issuing authority may set bail or collateral.  Refer to the Order to Appear for Jail Sentence for further information.)

You have the right to appeal to the Court of Common Pleas within 30 days for a trial de novo.  You must appear for the trial de novo in the Court of Common Pleas or your appeal may be dismissed.  If you are found not guilty, any money previously paid in this case will be returned to you. If you have any questions, please call this office immediately.

____**JAN 29 1999**____ Date     ____*Richard E Martin*____ District Justice

My commission expires first Monday of January, **2004** .

**SEAL**

AOPC A581-98

*Exhibit 16*



1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
. . . . . . . . . . . . . .
JEFFREY L. HANES,                .
            Plaintiff            .
                                 .
                                 .
      vs.               .        Civil No. 1:CV-00-2003
                                 .
                                 .
APPLE CHEVROLET, INC. and        .
TERRY STEWART, PRESIDENT/        .
OWNER,                           .
            Defendants           .
. . . . . . . . . . . . . .
```

Deposition of:  KATHY L. SARGEN

Taken by      :  Plaintiff

Date          :  May 10, 2002, 4:02 p.m.

Place         :  Mt. Moriah Baptist Church
                 1165 East Prospect Street
                 York, Pennsylvania

Before        :  Donna S. Elicker, RMR
                 Reporter - Notary Public


APPEARANCES:

     SONDRA THOMPSON, ESQ.
          For - Plaintiff

     BLAKEY, YOST, BUPP & RAUSCH
     By:  SARA A. AUSTIN, ESQ.
          For - Defendants

  ALSO PRESENT:
     JEFFREY L. HANES
     TERRENCE S. STEWART

16

3

1     Q   Okay.  If they give you a credit card, then

2  what do you mark on a contract?

3     A   The credit card number.

4     Q   And how does that differ, if at all, between

5  the individual who walks in or walks in on behalf of a

6  certain company?

7     A   No difference.

8     Q   Okay.  So how do you determine who is

9  responsible for that contract for payment?

10     A   Whoever is giving me the credit card for

11  payment.

12     Q   They are the ones responsible?

13     A   Yes.

14     Q   Okay.  Now, what on the contract holds a

15  person responsible for payment?

16     A   I am sorry?

17     Q   What makes a person responsible to pay Apple

18  Chevrolet rental fees?  What needs to be on a contract to

19  make the person responsible?

20     A   What information?

21     Q   Um-hum.

22     A   Driver's license, proof of insurance, and

23  credit card.

24     Q   Okay.  So if you just had that information,

25  does the person need to do anything else to become

16

18

4

1    Q   And have you ever had a situation where a

2   person gave you a credit card and the credit card didn't

3   go through?

4    A   Yes.

5    Q   Okay.  Now, I am asking you, who then do you

6   seek payment from?

7    A   We would have to contact the person who gave

8   us the credit card.  Or the person that is actually

9   driving the van, we would question them.

10    Q   So either of those persons would be

11   responsible for making payment?

12    A   Correct.

13    Q   And then don't you in fact, because it's a

14   contract, whoever signs the contract, they are held to

15   the terms of that contract.  Wouldn't that be right?

16    A   Correct.

17    Q   So you definitely could go after payment for

18   them?

19    A   Correct.

20    Q   Now, as far as where the rental or service

21   area is located, are there any type of surveillance

22   cameras, video cameras, anything like that?

23    A   No.

24    Q   Have there ever been?

25    A   There is a video camera in the cashier booth,

16

29

6

1    Pollack did.

2         Q    Whose signature was on the contract?

3         A    But Mr. Hanes drove the vehicle.

4         Q    Whose signature was on the contract?

5         A    Mr. Hanes.

6         Q    Was Pollack's signature anywhere on the

7    contract?

8         A    No.

9         Q    When the vehicle was rented, was Joann Hall

10   present?

11        A    No.

12        Q    To your knowledge, the first time Joann Hall

13   saw Mr. Hanes was when he brought the vehicle back.

14   Would that be correct?

15        A    Yes.

16        Q    And if I understood you correctly, you said

17   your last conversation -- one of your last conversations

18   before Mr. Hanes actually arrived, you told her to go

19   ahead and only charge him for the one day as long as he

20   brought the van back?

21        A    Yes, that I would get with Jesse Pollack on

22   Monday in regards to the charges.

23        Q    Now, what did that mean?

24        A    That I would do the billing on Monday when I

25   came in.

17

responsible for payment?

    A   As long as we have the credit card, that gives us -- that gives Apple the right to charge the credit card when the vehicle comes back.

    Q   Okay.  What if the credit card is denied?  Then who is responsible for paying?

    A   The customer.  We would go back to the customer.

    Q   Okay.  Now, how do you know who to go back to?

    A   The person's whose credit card that was given.

    Q   The name on the credit card?

    A   Um-hum.

    Q   Or the name on the contract?

    A   The name on the credit card.

    Q   So if the name on the contract is different from the name on the credit card, then you only charge the person with the name on the credit card for the rental fees?

    A   Yes.

    Q   So then you do not hold the person liable who actually signed the contract?

    A   I don't understand.

    Q   I am asking you basically about payment.  You say a person who rents, they may give you a credit card.

    A   Right.

7

1    Q    So how many times did you instruct her to

2    charge for two days?

3    A    Once.

4    Q    Okay.  And that would have been the first time

5    she told you he was running late?

6    A    Correct.

7    Q    So your statement is you had no knowledge

8    until you are saying he arrived that she authorized a

9    one-day charge?

10   A    Correct.

11   Q    Now, had you known that Joann Hall authorized

12   a one-day charge, would you expect that authorization to

13   be upheld?

14   A    Considering the circumstances.

15   Q    What?

16   A    That I would get with Mr. Pollack on Monday in

17   regards to the charges.

18   Q    When you made that statement, did you know at

19   that time that you made that statement you would get with

20   Mr. Pollack, did you know what Joann Hall had said to Mr.

21   Hanes, that she would only charge for one day?

22   A    Yes.

23   Q    You did know that?

24   A    Yes.  I think I understand your question.

25   Q    Can you explain what you are saying yes to to

disputing a bill?

    A    No.

    Q    Have you ever had a customer in loud voice or -- strike that.  Have you ever had a customer who would not listen to you explain the charges in the bill?

    A    No.

    Q    How many complaints have you dealt with from customers?

    A    None.

    Q    You have never dealt with any customer complaints?

    A    (Shakes head)

    Q    Was that a no to that?

    A    Yes.

    Q    So you have never had a customer complain to you about a rental contract, condition of the vehicle, billing, or anything like that?

    A    No.

    Q    And you were in that position for eight years?

    A    Yes.

    Q    Working Monday through Friday?

    A    Yes.

    Q    Have you ever seen anyone else dealing with a customer who disputed bills or anything else?

    A    Our service area.

40

Q    Have you ever seen those customers become loud or anything?

A    Yes.

Q    How many times have you seen police officers being called for loud customers?

A    None to my knowledge.

Q    Now, in your capacity, your position, do you also prepare or are involved in reports of profits from rentals?

A    Not reports, no.

Q    Do you have any knowledge about profits from rentals or what money is made or comes in from rentals?

A    Yes.

Q    And on, say, a month or so, what type of business does the rental do?

ATTY. AUSTIN:  Again, I will note for the record my objection to this pursuant to our earlier deposition, but I will permit the answer subject to a possible later court filing.

A    You mean as far as total income?

Q    Yes, however you can communicate it about the income from rental vehicles.

A    Are you talking gross profit or --

Q    Do you know that?

A    We get a dock statement every month.

8

1     A     A voice.

2     Q     And could you determine what was being said?

3     A     No.

4     Q     Did you also hear Joann Hall's voice?

5     A     No.

6     Q     And what was the scuttle that was described to

7  you?

8     A     It was just a heated conversation.  I couldn't

9  pick out words.  And Matt had told somebody, and that was

10  Mr. Hanes, to calm down.

11     Q     Was it actually described to you or was it

12  just what you could overhear?

13     A     Just what I could overhear.

14     Q     So then when you use that word scuttle, then

15  you are just referring to some loud voices you heard in

16  the background?

17     A     Right.

18     Q     Okay.  No fighting or anything like that?

19     A     Right.

20     Q     Just loud voices?

21     A     Yes.

22     Q     Did you hear any threats or anything like that

23  being made?

24     A     No.

25     Q     How did Matt sound when he spoke with you?

Exhibit 17

**Interrogatory #2:**

a.    Plaintiff sought medical treatment when the headaches became recurrent and unbearable.

b.    Plaintiff does not possess any supporting documents, other than what was attached to

Plaintiff's Answers to Defendants' First Set of Interrogatories for Interrogatory #4.

**Interrogatory #3:**

a.    Costs of fine that was imposed by the district justice.

b.    Costs of impaired health, which is immeasurable.

c.    Costs of lost of dignity, which is immeasurable.

b.    Costs of pursuing accountability by Defendants for their action, such as:

1.    Court costs,

2.    Filing fees,

3.    Cost of deposition, and

4.    Lost wages of $166.00 for each missed day of work, because of administrative

hearings, court hearings, attendance at depositions, and other associated with this

action.

Calculated at $21.00/hour a day for 8 hour/day

e.    Plaintiff does not possess any supporting documents, other than what was attached to

Plaintiff's Answers to Defendants' First Set of Interrogatories for Interrogatory #5.

**Interrogatory #4:**

a.    The evidence that connects Plaintiffs headaches to Defendants action of November 14,

1998 and continuing is the affirmation of Plaintiff as to the source of said headaches.

Also is the lack of medical evidence of Plaintiff suffering headaches prior to November

14, 1998.

EXHIBIT "17"