# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jeffrey L. Hanes | : | CIVIL ACTION NO. 1:00-CV-2003 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| Apple Chevrolet, Inc. et al. | : | |
| | : | Judge Sylvia H. Rambo |
| Defendants | : | |

**FILED**
HARRISBURG, PA

JUL 2 9 2002

MARY E. D'ANDREA, CLE
Per _____
Deputy Clerk

### SUPPLEMENTAL SUPPORTING DOCUMENTS TO
### PLAINTIFF'S STATEMENT OF MATERIAL FACTS

AND NOW, on this 25th day of July 2002, here comes Plaintiff, Jeffrey L. Hanes, by and through his counsel, Sandra Thompson, Esquire, to file Supplemental Supporting Documents to Plaintiff's Statement of Material Facts, such as follows[1]:

6.   <u>See</u>, the April 4, 2002 deposition of Mark Green (hereinafter referred to as Exhibit A), p. 24-25; the April 4, 2002 deposition of Lionel Weathers (hereinafter referred to as Exhibit B), p. 11; and the April 4, 2002 deposition of Dimitrios Tomboris (hereinafter referred to as Exhibit C), p. 14.[2]

7.   Exhibit A at p. 10; Exhibit B at p. 10; Exhibit C at p. 14.

8.   Exhibit A at p. 11; Exhibit B at p. 12; Exhibit C at p. 17-18.

9.   (a).   Exhibit A at p. 12; Exhibit B at p. 19

     (b).   Exhibit A at p. 13; Exhibit B at p. 20; Exhibit C at p. 18.

---

[1] The numbered paragraphs in this document correspond to the numbered paragraphs in Plaintiff's Statement of Material Facts that was filed with this Honorable Court on June 17, 2002, which are hereby supplemented.

[2] Such supporting documents are attached hereto and incorporated herein as if stated in full.

(c).    Exhibit C at p. 19.

11.    Exhibit B at p. 13; Exhibit C at p. 14.; the April 4, 2002 deposition of Steve Jones

(hereinafter referred to as Exhibit D), p. 8.

13.    Exhibit C at p. 21; Exhibit D at p. 9.

14.    Exhibit B at p. 15.

15.    Exhibit A at p. 14-16, 24; Exhibit B at p. 15, 18, 22;  Exhibit C at p. 22; Exhibit D at p.

10.

16.    Exhibit B at p. 20.

18.    Exhibit D at p. 12.

19.    Exhibit A at p. 17, 19; Exhibit B at p. 16; Exhibit C at p. 23; Exhibit D at p. 12.

22.    Exhibit A at p. 17, 18, 21, 30; Exhibit C at p. 23, 26; Exhibit D at p. 10.

Respectfully Submitted:

DATED: July  25, 2002

Sandra Thompson, Esquire
Attorney for Plaintiff
P.O. Box 2361
York, Pennsylvania 17405
717-845-1408

# In The Matter Of:

*Jeffrey L. Hanes    v.*
*Apple Chevolet, Inc.*

---

*Mark Green*
*April 4, 2002*

---

*Key Reporters*
*1300 Garrison Drive*
*York, PA  17404*
*(717) 764-7801    FAX: (717) 764-6367*

*Original File A4APR02A.PRN, 34 Pages*
*Min-U-Script® File ID: 3270495235*

# Word Index included with this Min-U-Script®



**Jeffrey L. Hanes   v.**
**Apple Chevolet, Inc.**

**Mark Green**
**April 4, 2002**

Page 9

[1] van, or was it owned by someone who drove it?

[2]     **A:** No, Jeffrey Hanes rented the van.

[3]     **Q:** Okay. And who drove the van to

[4] Philadelphia?

[5]     **A:** Mr. Hanes did.

[6]     **Q:** Did he also drive it back from

[7] Philadelphia?

[8]     **A:** Yes, he did.

[9]     **Q:** Do you remember who was in the van

[10] besides yourself and Mr. Hanes?

[11]     **A:** I believe there were five other

[12] people in the van.

[13]     **Q:** Do you remember who they were?

[14]     **A:** Right offhand — I remember who they

[15] are, but I'm not really friends with them, so I

[16] could tell you first names maybe.

[17]     **Q:** Okay. Any information you remember.

[18]     **A:** Let's see. Jimmy, and, of course,

[19] Mr. Hanes, myself, Lionel. I want to say

[20] Steve. It seems to me there were like one or

[21] two other people, but I don't really recall.

[22]     **Q:** Okay. So you think there were five

[23] or six total?

[24]     **A:** Yeah, something like that.

[25]     **Q:** Okay. What time did you leave York?

Page 10

[1] Do you remember?

[2]     **A:** Sometime in the early morning. 8:30,

[3] 9:00, I believe, something like that.

[4]     **Q:** Where did you leave from?

[5]     **A:** I can't really recall where we got

[6] picked up from.

[7]     **Q:** You did not go to the dealer's where

[8] the van was rented from?

[9]     **A:** I did not.

[10]     **Q:** Okay. Do you know what time you were

[11] to return the van?

[12]     **A:** I'd have to check my notes. I

[13] believe it was 5:00.

[14]     **Q:** I just want what you recall.

[15]     **A:** Okay. 5:00.

[16]     **Q:** And how do you know that?

[17]     **A:** Just looking over my disposition

[18] (sic) and kind of remembering the conversation

[19] and Jeff saying we need to have the van back by

[20] five.

[21]     **Q:** Okay. Do you — What time did you

[22] leave Philadelphia on the 14th?

[23]     **A:** I don't recall.

[24]     **Q:** Do you know if it was morning,

[25] afternoon?

**Mark Green**
**April 4, 2002**

*Lawyer's Notes*

Page 11

[1]    **A:** It was afternoon.
[2]    **Q:** Okay. Do you recall at any point
[3] during the travel from Philadelphia to York any
[4] phone calls made between Mr. Hanes and the
[5] rental dealership?
[6]    **A:** Yes.
[7]    **Q:** Okay. Do you know — Do you have any
[8] idea what time the phone call or calls took
[9] place?
[10]    **A:** No, I do not. I just know it was in
[11] the afternoon.
[12]    **Q:** Okay. Do you know who initiated
[13] those phone calls? Who made the first call?
[14]    **A:** I believe Mr. Hanes called.
[15]    **Q:** Okay. Why did he call?
[16]    **A:** I believe because there was heavy
[17] traffic.
[18]    **Q:** Okay. Where was that traffic? Do
[19] you know where you were?
[20]    **A:** We could have been in Lancaster. It
[21] could have been anywhere during the journey,
[22] but I thought maybe it was in Lancaster.
[23]    **Q:** So closer toward York, you think,
[24] than Philadelphia?
[25]    **A:** Not really sure.

Page 12

[1]    **Q:** Okay.
[2]    **A:** I just remember it was pretty heavy.
[3]    **Q:** All right. Did you hear the phone
[4] conversation from Mr. Hanes' end, or could you
[5] not hear it from where you were sitting in the
[6] van?
[7]    **A:** I could hear him talking, but it was
[8] of no interest of mine really.
[9]    **Q:** Okay.
[10]    **A:** I mean, because I didn't rent the
[11] van, so it really didn't matter to me.
[12]    **Q:** Okay. So it was more background
[13] noise. You didn't really hear what was being
[14] said?
[15]    **A:** Yeah. I would have had no interest
[16] in really listening in because —
[17]    **Q:** Okay.
[18]    **A:** — I had nothing at stake really,
[19] so —
[20]    **Q:** Okay. So you didn't hear what was
[21] said. I mean, you knew there was a
[22] conversation, but you didn't really — you
[23] didn't hear what was said?
[24]    **A:** Pretty much. I mean, I heard him
[25] trying to explain to whoever it was that, look,

**Jeffrey I, Hanes   v.**
**Apple Chevolet, Inc.**

Page 13

*Lawyer's Notes*

[1] there's heavy traffic and — you know, he had
[2] said something — There was heavy traffic, and
[3] he said that somehow or another we might be
[4] late. Can we make some agreement or something
[5] like that where I can keep the van for an
[6] additional day? I'd be glad to pay for it.
[7]    **Q:** Okay. Was this on that first phone
[8] call? Let me backtrack. Was there only one
[9] call that you are aware of?
[10]    **A:** I can't remember that.
[11]    **Q:** Okay. Do you know what time it was
[12] when you arrived at the dealership on the
[13] return from Philadelphia?
[14]    **A:** I think it was around five.
[15]    **Q:** Who was there in the rental area when
[16] you returned the van?
[17]    **A:** A lady.
[18]    **Q:** Anyone else?
[19]    **A:** At the time — A manager came out
[20] later on, but that was — I think there might
[21] have been like one or two other people back in
[22] the office or whatever, but only — she's the
[23] only one I remember, and then there was a
[24] manager coming out later on.
[25]    **Q:** Okay. Did you, yourself, go into

Page 14

[1] that rental area?
[2]    **A:** Yes.
[3]    **Q:** Did everyone else in the van go into
[4] the rental area?
[5]    **A:** Yes.
[6]    **Q:** Okay. Why did you all go into the
[7] rental area?
[8]    **A:** I'm not really sure. We just all
[9] did.
[10]    **Q:** Okay. Okay. What happened when you
[11] all went into the rental area to return the
[12] van?
[13]    **A:** I guess there was some hostilities
[14] there. Conversations started. It seemed like
[15] it was pretty calm.
[16]    **Q:** Between who?
[17]    **A:** Between Mr. Hanes and whoever the
[18] sales lady was.
[19]    **Q:** Okay. You said it started calm?
[20]    **A:** Yeah, and it's like it got heated
[21] after a while. I thought maybe there was some
[22] miscommunication somewhere.
[23]    **Q:** Did you hear anything that was said?
[24]    **A:** Yeah. I heard Mr. Hanes and the
[25] sales lady talking about the agreement that

**Mark Green**
**April 4, 2002**

Jeffrey L. Hanes
Apple Chevolet,

*Lawyer's Notes*

Page 15

[1] they had, an additional agreement that they
[2] had.
[3]     From what I understand, we were
[4] supposed to have the van back by five or
[5] whatever it was. I had heard parts of Mr.
[6] Hanes' conversation in the van saying that
[7] we're in heavy traffic. Can we make another
[8] agreement where I can keep the van until the
[9] next day? I'd be glad to pay for it. Then, I
[10] believe, the sales lady said that there was a
[11] customer waiting for the van or whatever like
[12] that. And once we got back, I believe Mr.
[13] Hanes had said he was going to pay for it, but
[14] the customer, I believe, was in the parking lot
[15] and in the meantime he took off with the van.
[16]     **Q:** Did you see that customer?
[17]     **A:** Actually, I believe I did see him. I
[18] wasn't sure exactly who he was, but there was a
[19] guy sitting out in the parking lot. He was
[20] actually standing out in the parking lot. I
[21] mean, I don't think any of us knew who he was,
[22] but apparently he was the guy who was waiting
[23] for the van.
[24]     **Q:** Did he come into the rental office
[25] while you were in there?

Page 16

[1]     **A:** No. I believe he was just outside.
[2]     **Q:** Okay. Now, you said that after the
[3] discussion between Mr. Hanes and the lady was
[4] calm for a while and then it got heated, did
[5] you hear anything that was being discussed
[6] during this heated portion of the interaction?
[7]     **A:** Well, I know the one part after I
[8] guess it started to escalated a little bit is
[9] the lady got upset. She said, you know, I
[10] waited. I waited for your black and then Mr.
[11] Hanes finished it. He said, you waited for my
[12] black ass to come back.
[13]     **Q:** What did she say then?
[14]     **A:** I believe she argued a little bit
[15] more. I'm not sure exactly what she said, but
[16] obviously she was upset. Mr. Hanes seems like
[17] he — He really didn't get upset, but he was —
[18] it was like he was bothered by the whole
[19] conversation. And he kind of kept his cool,
[20] but he, you know, he kept after about, you
[21] know, the agreement. He was like, well, you
[22] agreed to do this and that.
[23]     **Q:** So he was upset about the monetary
[24] dealings?
[25]     **A:** I don't know if he was upset about

Jeffrey L. Hanes    v.
Apple Chevrolet, Inc.

Mark Gre[...]
April 4, 20[...]

*Lawyer's Notes*

Page 17

[1] it. I think he was trying to explain to her
[2] what they had talked about on the phone.
[3]     **Q:** So this was the same conversation
[4] that had started before that comment was
[5] supposedly made?
[6]     **A:** Yeah. And from what I understand, he
[7] thought it was all settled.
[8]     **Q:** Did it get resolved there in the
[9] rental office?
[10]     **A:** I would say no.
[11]     **Q:** Why do you say that?
[12]     **A:** Because she walked out. She was
[13] angry. The manager came in. And for the most
[14] part, he seemed like he was trying to get to
[15] the bottom of what was going on. I guess he
[16] had to call the police, so, you know, I guess
[17] things really didn't get out of hand.
[18]     **Q:** Were you there when the police were
[19] called?
[20]     **A:** I think we tried to wait around for a
[21] while, and I think they — I can't remember if
[22] they did show up or if we just left after a
[23] while, so I really can't recall that.
[24]     **Q:** Okay. You were there when the
[25] manager came in?

Page 18

[1]     **A:** Yeah.
[2]     **Q:** And you said this was a male,
[3] correct?
[4]     **A:** Right.
[5]     **Q:** Okay. What was his tone and behavior
[6] like?
[7]     **A:** He was just trying to get to the
[8] bottom of it. He really — I didn't think he
[9] was really all that upset. I mean, obviously,
[10] he is concerned. You know, I guess, you know,
[11] he wants to try to resolve the situation the
[12] best he can, but —
[13]     **Q:** Okay.
[14]     **A:** You know — But I know she was really
[15] upset. The guy, whoever he was in charge, he
[16] tried to keep both sides calm. I'll give him
[17] credit for that.
[18]     **Q:** Okay. Did it work? Was he able to
[19] keep both sides calm?
[20]     **A:** No. She was really upset, and I
[21] think she kind of, like, brushed by and, you
[22] know, she got in her car and she was yelling.
[23] Then she really started to, you know, yell and
[24] cuss and stuff like that on the way out. And I
[25] don't remember seeing the manager after that.

Mark Green
April 4, 2002

Apple Chevolet, Inc

Page 19

[1]    **Q:** Okay. Do you know why the manager
[2]  had to call the police?
[3]    **A:** Well, I guess maybe he thought
[4]  that —
[5]    **Q:** No, no, no. Remember, I don't want
[6]  you to guess. Do you know?
[7]    **A:** Do I know why he called?
[8]    **Q:** Yeah.
[9]    **A:** I don't know. I guess I can't really
[10]  answer that.
[11]    **Q:** Okay. And now, were you in the room
[12]  when he called the police?
[13]    **A:** No.
[14]    **Q:** Okay. So he did not do that from
[15]  that rental area, or you had left the rental
[16]  area at that point?
[17]    **A:** I don't know if he went to a back
[18]  office and called or not. But, I just know
[19]  that he said that he was going to call the
[20]  police.
[21]    **Q:** And was Mr. Hanes there at that time?
[22]    **A:** Yes.
[23]    **Q:** So he also heard that statement?
[24]    **A:** Right.
[25]    **Q:** Did Mr. Hanes try and talk the

Page 20

[1]  manager out of calling the police?
[2]    **A:** No. I believe he encouraged him to.
[3]    **Q:** Do you know why he encouraged that?
[4]    **A:** I guess because — Again, can I guess
[5]  in this case?
[6]    **Q:** No. If you know.
[7]    **A:** (No audible response).
[8]    **Q:** Okay. When did you leave the rental
[9]  premises?
[10]    **A:** I would say, you know, 15, 20 minutes
[11]  after the incident.
[12]    **Q:** Okay. Now, when you say incident, to
[13]  what are you referring?
[14]    **A:** The conversation, the argument
[15]  between the sales lady and Mr. Hanes.
[16]    **Q:** And were you inside the building that
[17]  whole 15 to 20 minutes?
[18]    **A:** No, I was not. For the first part,
[19]  after the initial argument, we were inside.
[20]  Then we went outside after the manager said
[21]  I'm going to call the police or whatever. She
[22]  came out a little bit later on, yelled some
[23]  more things, or whatever like that, got in the
[24]  car, and we were in the parking lot and then we
[25]  left.

**Min-U-Script®**    Key Reporters  (717) 764-7801

**Jeffrey L. Hanes   v.**
**Apple Chevolet, Inc.**

*Lawyer's Notes*

Page 21

[1]   **Q:** Okay. Did all of you leave together?
[2]   **A:** I believe so.
[3]   **Q:** Okay. Mr. Hanes included?
[4]   **A:** It seems to me I thought he said he
[5]   wanted to stay behind for some reason and talk
[6]   to the police.
[7]   **Q:** Okay. Have you ever been
[8]   discriminated against based on your race, in
[9]   your opinion?
[10]   **A:** I think so.
[11]   **Q:** When?
[12]   **A:** This is one of these questions that
[13]   come up all the time. A lot of times it's not
[14]   in your face, but you know it's going on. I
[15]   would say if not every day, almost every day.
[16]   **Q:** How do you know this? I mean, what
[17]   makes you think that?
[18]   **A:** First of all, it's something you can
[19]   feel. I guess it's one of those deals where
[20]   it's like you would have to walk a mile in
[21]   someone who's a — walk a mile in their shoes
[22]   for a minority, you know, be it Asian,
[23]   Hispanic, African American.
[24]   **Q:** Did you ever take any action based on
[25]   that discrimination that you felt?

Page 22

[1]   **A:** That's a good question. I would say
[2]   no.
[3]   **Q:** Okay. Have you ever been a party to
[4]   any type of lawsuit before; civil, criminal,
[5]   Court of Common Pleas, federal court, district
[6]   justice, anything?
[7]   **A:** No, ma'am.
[8]   **Q:** Did you have any conversations with
[9]   Mr. Hanes or his attorney before this
[10]   deposition today?
[11]   **A:** Yes.
[12]   **Q:** Okay. Did they tell you what to say?
[13]   **A:** No.
[14]   **Q:** What was the discussion about?
[15]   **A:** Just giving me an idea of what it
[16]   would be like.
[17]   **Q:** And was that a discussion with both
[18]   Mr. Hanes and his attorney?
[19]   **A:** No, his attorney.
[20]   **Q:** Okay. When was that discussion?
[21]   **A:** A couple months ago is the best I can
[22]   tell you.
[23]   **Q:** Was that after the first subpoena was
[24]   served on you? Do you recall?
[25]   **A:** I believe so, but not sure.

**Mark Green**
**April 4, 2002**

*Lawyer's Notes*

Page 23

[1]   **Q:** Okay. No further discussion since
[2]   then?
[3]   **A:** No, I haven't talked to her.
[4]   **Q:** And you have not talked to Mr. Hanes
[5]   about this case?
[6]   **A:** I have talked to him. And so far as
[7]   his attorney, I believe she left a message on
[8]   my machine talking about the first time it was
[9]   moved, and that was basically it.
[10]   **Q:** Okay. But you've not discussed your
[11]   testimony with anyone?
[12]   **A:** No.
[13]   **Q:** Okay. Let's go back for a second to
[14]   when all of you were inside the rental area,
[15]   after you had returned the van when the
[16]   conversation got heated, in your words. Was it
[17]   just the sales lady and Mr. Hanes who were
[18]   talking or were there other people talking?
[19]   **A:** It was just those two.
[20]   **Q:** Okay. What was their tone of voice?
[21]   Was it a little bit loud, a lot loud?
[22]   **A:** It started out fairly calm from what
[23]   I remember and it just escalated.
[24]   **Q:** Okay. Were they letting each other
[25]   complete their sentences?

Page 24

[1]   **A:** I would say for the most part. But,
[2]   you know, any time you're in an argument a lot
[3]   of times you don't get your full thoughts out
[4]   and full sentences out.
[5]   **Q:** Okay. How far away from those two
[6]   were you standing?
[7]   **A:** Probably about as close as you and I.
[8]   **Q:** Three feet or so?
[9]   **A:** Yes.
[10]   **Q:** Okay. Would you have missed any
[11]   words that either of them said?
[12]   **A:** No. I couldn't recall everything,
[13]   but I wouldn't have missed anything.
[14]   **Q:** Okay. So you're fairly sure who said
[15]   what during the heated exchange?
[16]   **A:** The part that sticks out in my mind,
[17]   yes.
[18]   **Q:** Do you remember what time you left
[19]   Philadelphia to get back to York?
[20]   **A:** I do not. I just remember it was
[21]   some time in the afternoon.
[22]   **Q:** Do you know when the conference was
[23]   over that day?
[24]   **A:** I don't know. I just remember it was
[25]   supposed to be over, like, around two or

*Lawyer's Notes*

Page 25

[1] 2:30. That's the only thing I can tell you.

[2]   **Q:** Okay. And did you guys stay until

[3] the end?

[4]   **A:** I believe we did, because I think I

[5] had to work that day.

[6]   **MS. AUSTIN:** Okay. Give us one

[7] second.

[8]   (Counsel confers with client

[9] privately).

[10]                    **BY MS. AUSTIN:**

[11]   **Q:** Just a few more questions for you,

[12] Mr. Green.

[13]   **A:** Okay.

[14]   **Q:** The conference that you went to with

[15] the others on November 14th, 1998, do you

[16] remember where it was held?

[17]   **A:** I want to say in a hotel. I can't

[18] remember exactly where.

[19]   **Q:** Okay. You don't remember which

[20] hotel?

[21]   **A:** No.

[22]   **Q:** Do you remember the street location

[23] or anything?

[24]   **A:** It just seemed to me it wasn't too

[25] far off the main highway. I can't remember.

Page 26

[1]   **Q:** Okay. And you said it was about

[2] public adjusting?

[3]   **A:** Insurance, yeah.

[4]   **Q:** Insurance. Okay. And who paid for

[5] the attendance at the conference?

[6]   **A:** I know I didn't have to pay anything,

[7] so — You know how at like a lot of

[8] conferences, you know, you might have to pay a

[9] fee to go to; but I don't remember having to

[10] pay anything.

[11]   **Q:** Okay. Did they give you any type of

[12] written materials or anything when you were

[13] there?

[14]   **A:** I'm sure they did. Probably like

[15] brochures and different pamphlets about the

[16] business.

[17]   **Q:** Do you remember who sponsored the

[18] conference?

[19]   **A:** Oh, it was so long ago. I can't

[20] remember the name of it.

[21]   **Q:** Okay. How did you find out about the

[22] conference?

[23]   **A:** Through Mr. Hanes.

[24]   **Q:** Okay. How did that occur?

[25]   **A:** I think just one day he saw me in the

**'Jeffrey L. Hanes   v.**
**Apple Chevolet, Inc.**

Page 29

[1]      **A:** At least. It could have been before
[2] that, but —
[3]      **Q:** Did he go to Philadelphia that day
[4] also?
[5]      **A:** He was there. He did not go with us
[6] though.
[7]      **Q:** Okay. Do you know how he got there?
[8]      **A:** Probably by his own personal car. I
[9] have no idea really.
[10]      **Q:** Did he travel back to York with you?
[11]      **A:** No, he did not.
[12]      **Q:** Okay. Now, when you got back to the
[13] dealership, after you had moved out into the
[14] parking lot, you said that the sales lady also
[15] came out and got into her car?
[16]      **A:** Right.
[17]      **Q:** Okay. Where were you standing in
[18] relation to her car?
[19]      **A:** Fairly close.
[20]      **Q:** And how about the others? Were they
[21] also fairly close?
[22]      **A:** Yes.
[23]      **Q:** Okay. What does fairly close mean?
[24]      **A:** Well, I'd say we were probably
[25] within—I don't know—ten, 15 yards. It's like

Page 30

[1] we were outside in the parking lot, she walked
[2] out, from what I understand, she yelled the
[3] entire way to her car. It's not like we knew
[4] what car she was getting into. It's like she
[5] just happened to get into her car and she drove
[6] away.
[7]      **Q:** Did you block her car from leaving
[8] the lot at all?
[9]      **A:** Oh, no.
[10]      **Q:** Did anyone else that was in your
[11] group?
[12]      **A:** No.
[13]      **Q:** Okay. How did you, yourself, leave
[14] the premises?
[15]      **A:** I believe we were picked up.
[16]      **Q:** Okay. Do you know by whom?
[17]      **A:** I can't remember.
[18]      **Q:** Was it a ride that you had arranged?
[19]      **A:** No.
[20]      **Q:** Do you know who arranged for that
[21] vehicle to come pick you up?
[22]      **A:** Mr. Hanes.
[23]      **Q:** Okay. I'm going to give you this
[24] blank piece of paper. If you will do me a
[25] favor, to the best of your recollection, draw

# In The Matter Of:

*Jeffrey L. Hanes   v.*
*Apple Chevolet, Inc.*

---

*Lionel L. Weathers*
*April 4, 2002*

---

*Key Reporters*
*1300 Garrison Drive*
*York, PA  17404*
*(717) 764-7801    FAX: (717) 764-6367*

*Original File A4APR02B.PRN, 41 Pages*
*Min-U-Script® File ID: 1859780071*

# Word Index included with this Min-U-Script®

**Jeffrey L. Hanes  v.**
**Apple Chevolet, Inc.**

Lionel L. Weather
April 4, 200

*Lawyer's Notes*

[1]  Philadelphia?
[2]      **A:** If I'm not mistaken, correct.
[3]      **Q:** Who all was in that van?
[4]      **A:** It was about five passengers. Their
[5]  names, I can't recall off the top of my head.
[6]      **Q:** Is that five including yourself?
[7]      **A:** Correct.
[8]      **Q:** And then Mr. Hanes?
[9]      **A:** Yes.
[10]      **Q:** Okay. What was the race of all the
[11]  people in the van?
[12]      **A:** African American and Greek.
[13]      **Q:** Okay. What time did you leave York
[14]  to go to Philadelphia?
[15]      **A:** We left York that morning about
[16]  seven, maybe a little bit before that.
[17]      **Q:** Where did you leave from?
[18]      **A:** Where did we leave from? I think, if
[19]  I'm not mistaken, he might have came by and
[20]  picked us up. I can't remember. I know it was
[21]  real early, but they told me to get up.
[22]      **Q:** You did not go over to the rental
[23]  dealership?
[24]      **A:** Me? I can't remember. No.
[25]      **Q:** Okay. What time did you arrive at

[1]  Philadelphia?
[2]      **A:** We got to Philadelphia about, like,
[3]  quarter to nine. It started at about 9:00, so
[4]  we got there about a quarter to nine.
[5]      **Q:** Okay. And the conference was two
[6]  days. It was that day and also the next day?
[7]      **A:** We just stayed for that day.
[8]      **Q:** Okay.
[9]      **A:** At that point in time, I don't know
[10]  if it was for the next day or not.
[11]      **Q:** Okay. And do you know what time the
[12]  van was supposed to be returned to the dealer
[13]  that day?
[14]      **A:** About five p.m. that day.
[15]      **Q:** And who told you that?
[16]      **A:** Who told me? I heard that over —
[17]  When we were on our way back, I heard him
[18]  talking about it over the phone.
[19]      **Q:** Okay. Prior to that, did you know
[20]  what time it was supposed to be returned?
[21]      **A:** Prior to that — Off the top of my
[22]  head, I can't remember. I'm not sure. He did
[23]  mention that we wasn't all gonna stay for the
[24]  whole thing because he had to get the van back
[25]  in time, so —

Lionel L. Weathers
April 4, 2002

Jeffrey L. Hanes v.
Apple Chevolet, Inc.

Page 11

[1] **Q:** Okay. So you had to leave the
[2] conference early?
[3] **A:** Yeah. The conference was over about
[4] 5:00. We had to leave early.
[5] **Q:** Do you know what time you left?
[6] **A:** I think we left probably about — Did
[7] I put this in here?
[8] **Q:** No, no, no. Don't look at any notes
[9] or anything, just what you remember.
[10] **A:** I think it was in between off the
[11] hour about 2:30 or 3:30, something like that.
[12] I'm not sure.
[13] **Q:** Okay. And did you come straight back
[14] to York?
[15] **A:** Yes. We all got stuck in traffic.
[16] **Q:** Do you know around where that traffic
[17] was?
[18] **A:** That was on Route 30 West. I think
[19] coming — as soon as you're getting into
[20] Lancaster. At the beginning of Lancaster we
[21] got stuck. Right around the — what is it?
[22] 222 and Route 30 as soon as you actually go off
[23] into several lanes, something like that.
[24] **Q:** Okay. Now, you said you heard a
[25] conversation that Mr. Hanes was having about

Page 12

[1] the time the van was to be returned. That was
[2] while you were in the van traveling back to
[3] York?
[4] **A:** Yes.
[5] **Q:** Did Mr. Hanes initiate that phone
[6] call, or did somebody else call him?
[7] **A:** Well, Mr. Hanes said he actually
[8] called Apple Chevrolet first to let them know
[9] that we all may be running a little late due to
[10] the traffic.
[11] **Q:** Do you know what time he made that
[12] phone call?
[13] **A:** This was in between, like, 4:00 and
[14] 4:15, something like that.
[15] **Q:** Okay. And where were you sitting in
[16] relation to Mr. Hanes in the van? Obviously,
[17] he was in the driver —
[18] **A:** There was a driver, there was a
[19] passenger. I was in the next seat like right
[20] there in the middle row, right behind the
[21] driver.
[22] **Q:** Okay. You were right behind Mr.
[23] Hanes?
[24] **A:** Yes.
[25] **Q:** Okay. All right. What time was it

**Min-U-Script®**

Key Reporters   (717) 764-7801

Jeffrey L. Hanes    v.
Apple Chevrolet, Inc.

Lionel L. Weathers
April 4, 2002

*Lawyer's Notes*

[1] when you arrived back at the dealer's that day?

[2]  **A:** About ten after five.

[3]  **Q:** Who was there when you arrived?

[4]  **A:** The lady, that's who I seen in the

[5] beginning, and the manager were there also.

[6] The person that was supposed to be renting the

[7] van right after us was waiting out front.

[8]  **Q:** Okay. When you got the van back to

[9] the dealer's premises, who went inside the

[10] rental area?

[11]  **A:** Jeff went inside and then everybody

[12] got out of the van. Jeff left first and I

[13] dragged along in the back.

[14]  **Q:** Okay. So it was just you and Mr.

[15] Hanes that went in or everyone?

[16]  **A:** I think, off the top of my head, I'm

[17] pretty sure someone else might have went in,

[18] but I'm not sure. At least they were closer

[19] than me. He was actually the one that went to

[20] return everything to the lady.

[21]  **Q:** Okay. And — but you also went into

[22] the rental area you said?

[23]  **A:** Yes.

[24]  **Q:** Okay. And how far were you away from

[25] Mr. Hanes in the rental area?

[1]  **A:** I was a couple of — maybe like 20

[2] feet.

[3]  **Q:** Okay. And how far were you away from

[4] the — Now, when you say the lady, that's the

[5] lady working the rental counter?

[6]  **A:** Yes.

[7]  **Q:** How far were you away from her when

[8] you went into the rental area?

[9]  **A:** About 25 feet. Well, to give you a

[10] description you come in, and it's like a garage

[11] door.

[12]  **Q:** Here. Let's do it this way.

[13]  **A:** All right. Say over here is the

[14] counter area here (indicating). Up here is

[15] like the garage door (indicating). The van was

[16] parked right here (indicating). The person

[17] waiting was right here (indicating). Jeff came

[18] in towards the counter. I stayed back close to

[19] the garage door. There was about four or five

[20] of us sitting back here.

[21]  **Q:** Okay. Now, is that inside the door

[22] or outside?

[23]  **A:** No, this is outside the door.

[24]  **Q:** Okay.

[25]  **A:** I was like the only person that was

Lionel L. Weathers
April 4, 2002

Jeffrey L. Hanes  v.
Apple Chevrolet, Inc.

Page 15

[1] like, you say, in between the door. He came
[2] over, conversation started out. Once it
[3] started getting like loud, I started to walk
[4] closer. And as I started to walk closer,
[5] that's when everything erupted. It was started
[6] to erupt. By the time I got there, both
[7] tempers flared up, and a few choice words were
[8] being said.
[9]    **Q:** What was being said?
[10]   **A:** Well, actually what I heard was
[11] basically — When he came back to return the
[12] van, the lady mentioned, I waited on your black
[13] and she said — I started to move a little
[14] closer. He said, what do you mean? You waited
[15] on my black what? Finish what you were saying.
[16] Did you wait on my black ass? I'm like whoa.
[17]    And at that point in time the manager
[18] came out, and he threatened about notifying the
[19] police and everything. It was settled, and
[20] eventually we ended up — everybody ended up
[21] leaving. She came out. When I was walking out
[22] the door, we waited on our car for about 20
[23] minutes, she came out right in back of us. And
[24] then when the car was pulling up, she came out
[25] and sped right off. She was like right beside

Page 16

[1] us.
[2]    **Q:** Okay. Well, let's go back inside.
[3] You said after things got heated and words were
[4] exchanged, someone threatened to call the
[5] police?
[6]    **A:** The manager had — I guess, he heard
[7] the conversation erupting as well, and he
[8] mentioned to call 911. At that point in time,
[9] I think Jeff had spoke out and asked him what
[10] was going on, and it just got settled. Now, at
[11] that point in time, this is dated from February
[12] of '99, mostly everything I said on there was
[13] put on this paper.
[14]    **Q:** Do you know if the police were,
[15] indeed, called that day, November 14th, 1998?
[16]    **A:** 1998.
[17]    **Q:** The day that you were there returning
[18] the van.
[19]    **A:** Do I actually know if they had made
[20] the call? No, I don't.
[21]    **Q:** Okay.
[22]    **A:** They might have been.
[23]    **Q:** What time was it when you left the
[24] premises there?
[25]    **A:** What time did we leave the premises?

Jeffrey L. Hanes    v.
Apple Chevolet, Inc.

*Lawyer's Notes*

Page 17

[1] It was probably close to 5:30.

[2] **Q:** Okay. How?

[3] **A:** His brother-in-law came to pick us

[4] up.

[5] **Q:** Whose brother-in-law?

[6] **A:** Jeff's brother-in-law.

[7] **Q:** Okay. How did he know to come get

[8] you there?

[9] **A:** Jeff had called him on the way

[10] back — well, right when we got there saying

[11] that we were going to need a ride.

[12] **Q:** Okay. And did all of you leave then?

[13] **A:** Yes.

[14] **Q:** Including Mr. Hanes?

[15] **A:** Yes.

[16] **Q:** Okay. When this heated exchange was

[17] going on between Mr. Hanes and the lady at the

[18] rental counter, how far away were you? I know

[19] you said you were moving closer, but about how

[20] far were you at that point?

[21] **A:** At the time the conversation erupted,

[22] I was probably within about ten feet.

[23] **Q:** Okay.

[24] **A:** I was probably from that window to

[25] about right here (pointing).

Page 18

[1] **Q:** Okay. Was anyone else in the room

[2] talking?

[3] **A:** At the time Jeff and the lady was

[4] speaking? No.

[5] **Q:** Okay. Was there any other noise, any

[6] music, anything like that?

[7] **A:** No music, no noise. Probably could

[8] hear the way it was for, like — for yards.

[9] **Q:** Okay. Now, you said at some point

[10] the lady left and got into her car?

[11] **A:** Yes.

[12] **Q:** When was that?

[13] **A:** That was — Actually as soon as

[14] everything quieted down — Actually, let me —

[15] If you want to, I can back up and let you know

[16] how everything went down.

[17] **Q:** Please do.

[18] **A:** Okay. After we left the seminar on

[19] the way back, once we found out that traffic

[20] was, like — it started to get, like, a little

[21] traffic jam, Jeff called her up and let her

[22] know that he was going to be a little late or

[23] we may be a little late.

[24] At that point in time, I overheard

[25] them talking. Okay. If you're going to be

Lionel L. Weathers
April 4, 2002

Jeffrey L. Hanes    v.
Apple Chevrolet, Inc.

Page 19

[1] late — if you're not going to get here at
[2] 5:00, I'm going to have to charge for an extra
[3] day.
[4]    **Q:** Now, how did you overhear that?
[5]    **A:** How did I overhear it? Because Jeff
[6] had mentioned it. And he was, like, you mean
[7] you're going to charge me an extra day.
[8]    **Q:** Okay. So you heard what he said.
[9] You didn't hear the other side?
[10]    **A:** I heard Jeff's side. Now, at that
[11] point in time, he was, like — I guess, the
[12] conversation ended. She called him back
[13] several times on his pager, and he returned her
[14] phone call. It was back and forth. Okay.
[15] Just bring the van back as soon as you can.
[16] I'm not going to charge you an extra day, I'm
[17] going to charge you an extra day, back and
[18] forth. At that point in time, after they hung
[19] up the last time, we had the intention of
[20] coming back and not being charged an extra day
[21] and just dropping the van off as soon as
[22] possible.
[23]    **Q:** And you knew that based on what you
[24] heard Mr. Hanes say into the phone?
[25]    **A:** I heard a little bit of the

Page 20

[1] conversation being that the cell phone he was
[2] using was, like, a Nextel and you can just,
[3] like, hear it clearly. When we got back, I
[4] guess, that's when it came up in the
[5] conversation about being charged an extra day
[6] again. He was like, well, if you're going to
[7] charge me an extra day, I'm not going to return
[8] the van today. I'm gonna keep the van until
[9] tomorrow. I mean, that's only right. I guess
[10] the guy who was waiting on the van — at that
[11] point in time, he was waiting so we got out of
[12] the car. He was ready to get into the van, and
[13] I guess go take care of whatever he needed to
[14] take care of. Throughout that —
[15]    **Q:** When did the customer leave with the
[16] van? Was it while you were still there?
[17]    **A:** The customer left with the van, yes,
[18] while we were still there.
[19]    **Q:** When? I mean, was it right after you
[20] got there? Was it a while later? When was it?
[21]    **A:** If I'm not mistaken, I'd say within,
[22] like, about five or ten minutes, five to 15
[23] minutes, somewhere in that area that he had
[24] left with the van.
[25]    **Q:** Was that before, during, or after the

**Jeffrey L. Hanes   v.**
**Apple Chevolet, Inc.**

**Lionel L. Weathers**
**April 4, 2002**

*Lawyer's Notes*

[1] discussion between Mr. Hanes and the lady got
[2] heated?
[3]    **A:** If I'm not mistaken, this may have
[4] been during.
[5]    **Q:** Okay.
[6]    **A:** Because we had to hurry up and get
[7] our stuff out and he was getting his stuff
[8] ready to go to take care of what he had to take
[9] care of.
[10]    **Q:** Okay.
[11]    **A:** At that point in time, the choice
[12] words that she has said I felt myself — I felt
[13] a little offended by it because that was
[14] unprofessional what she said. And being that
[15] Apple Chevrolet — that's actually made me put
[16] a black cloud over my head about them. My
[17] mother had actually rented cars from them in
[18] the past and did business with them in the
[19] past, but after that incident, I stopped doing
[20] business completely with them.
[21]    **Q:** Now, you said at some point the lady
[22] left in her car?
[23]    **A:** The lady left in her — Now, I could
[24] see the lady was probably upset. It was
[25] Saturday. She probably wanted to go home. We

[1] called her up, let her know that we may be
[2] running a little bit late. When we got there,
[3] it was about ten minutes after five, and she
[4] was probably just, like, look, I had a long
[5] day. I want to get out of here. Or she was
[6] probably just mad about that. But the words
[7] she said, I mean, they could have been
[8] different. She could have used something else.
[9] She didn't have to say black or whatever else.
[10]    **Q:** Are you sure you heard her say that?
[11]    **A:** Yes, I heard her say that. I heard
[12] her say that just as I'm hearing you speak
[13] right now. That's how clear it was.
[14]    **Q:** Even though you were ten feet away or
[15] 20 feet away?
[16]    **A:** Ten feet away from here — from that
[17] window to about right there (indicating). I
[18] heard her say that.
[19]    **Q:** Okay. Even though she and Mr. Hanes
[20] were having this heated exchange?
[21]    **A:** Loud heated exchange. I mean, this
[22] is — The fact that she said I waited on your
[23] black — I heard her say that completely. So,
[24] yes, I mean, I'm pretty sure about that.
[25]    **Q:** Okay. When did she leave to get into

# In The Matter Of:

*Jeffrey L. Hanes    v.*
*Apple Chevolet, Inc.*

---

*Dimitrios Tomboris*
*April 4, 2002*

---

*Key Reporters*
*1300 Garrison Drive*
*York, PA   17404*
*(717) 764-7801     FAX: (717) 764-6367*

*Original File A4APR02C.PRN, 39 Pages*
*Min-U-Script® File ID: 2083742912*

# Word Index included with this Min-U-Script®



Jeffrey L. Hanes    v.
Apple Chevolet, Inc.

Dimitrios Tombor
April 4, 200

Page 13

[1] van?
[2]    **A:** I think black. I'm almost positive
[3] they were all black.
[4]    **Q:** Okay. What time did you leave York
[5] that day?
[6]    **A:** Morning. I think it was morning.
[7]    **Q:** Do you recall what time?
[8]    **A:** Like around — If I don't recall,
[9] should I take a guess?
[10]    **Q:** Nope. I don't want you to guess.
[11]    **A:** It was morning.
[12]    **Q:** Okay.
[13]    **A:** That's all I remember.
[14]    **Q:** Okay. And from where did you leave?
[15]    **A:** West Market Street outside the Metro
[16] building.
[17]    **Q:** Okay. Did you know at that point
[18] what time the van needed to be back to York
[19] that day?
[20]    **A:** No.
[21]    **Q:** Okay. Did — At any point during the
[22] day did you find out what time the van needed
[23] to be returned?
[24]    **A:** Yes.
[25]    **Q:** When? When did you find out?

Page 14

[1]    **A:** Like I think it was around two or
[2] three in the afternoon.
[3]    **Q:** Okay. How did you find out?
[4]    **A:** From Jeff saying we have to leave
[5] because we have to have the van back by five.
[6]    **Q:** He said five?
[7]    **A:** Yeah.
[8]    **Q:** Okay. What time did you arrive back
[9] at the dealers?
[10]    **A:** It was after five.
[11]    **Q:** Do you recall was it a lot after, a
[12] little after?
[13]    **A:** Like 15 to 20 minutes.
[14]    **Q:** Okay. Who was there when you arrived
[15] in the rental area?
[16]    **A:** I think they were either closing or
[17] they were closed because the only person that
[18] was there it looked like employees, but they
[19] looked like — it was a gentleman I guess that
[20] parks the cars that was, like, on the outside
[21] because when we arrived we asked him what he
[22] wants us to do with the van, and he said just
[23] leave it there. I'll get to it. And then
[24] there was an employee inside the area, you
[25] know, where you register.

Jeffrey L. Hanes    v.
Apple Chevolet, Inc.

Dimitrios Tombori
April 4, 2002

Page 17

[1] questions that you haven't asked me what
[2] happened in between the — on the highway and
[3] between the time we got back to the
[4] registration area. Do you want —
[5]     **Q:** Sure.
[6]     **A:** Okay.
[7]     **Q:** We'll get into that now. Tell me
[8] what happened on the drive back.
[9]     **A:** Because you, like, went — You know
[10] what I'm saying? You skipped.
[11]     **Q:** Um-hum.
[12]     **A:** Okay. Basically Jeff was calling to
[13] let her know — Because there was traffic on
[14] the highway, he was calling the rental area and
[15] telling her how we're going to be a little bit
[16] late. And she was, like, well, I already
[17] rented the van. You need to, you know, bring
[18] it back.
[19]     **Q:** Now let me ask you a question.
[20]     **A:** Okay.
[21]     **Q:** First of all, do you know what time
[22] he made that call?
[23]     **A:** I think it was like around 4:00. We
[24] started making calls between 3:30 and four.
[25]     **Q:** Okay. And how do you — Did you hear

Page 18

[1] what Mr. Hanes was saying?
[2]     **A:** No. He had me calling in the
[3] beginning because he was driving.
[4]     **Q:** Okay.
[5]     **A:** So, you know — and it kept being
[6] busy or —
[7]     **Q:** Okay.
[8]     **A:** You understand? We couldn't get
[9] through; where the reception wasn't good on the
[10] highway, but he had me kept calling and
[11] calling.
[12]     **Q:** Okay. But you didn't actually talk
[13] to the lady, he did, or whoever was on the
[14] other side?
[15]     **A:** Either the second or third time I
[16] talked to the lady.
[17]     **Q:** Okay. And what happened during that
[18] conversation?
[19]     **A:** Well, first they started — I don't
[20] know what was said between Jeff and that lady
[21] on the first two conversations, but I remember
[22] Jeff saying, well, if I'm going to get charged
[23] for two days, I'll just bring it back tomorrow.
[24] That was basically what — you know, there was
[25] no yelling, no nothing, like that.

**Dimitrios Tomboris**
April 4, 2002

**Jeffrey L. Hanes**  v.
**Apple Chevolet, Inc.**

Page 19

[1]     **Q:** Okay.
[2]     **A:** And they were pretty short, you know,
[3] basically we called the first time to say that
[4] he is late, and I guess the girl told him,
[5] well, you're going to get charged after five or
[6] whatever. And then he said, well, I'll just
[7] keep it a second day. And that was the end of
[8] the conversation. Then she called back. I
[9] don't know if it was her or somebody from Apple
[10] Chevrolet, and they said just bring it back
[11] even if it's a little bit late, nobody is going
[12] to charge you.
[13]     **Q:** Now, were you on the phone?
[14]     **A:** Yeah, I think that time I was on the
[15] phone.
[16]     **Q:** Okay. So you heard that said?
[17]     **A:** Um-hum.
[18]     **Q:** Okay. Were there any further phone
[19] calls after that?
[20]     **A:** Yeah. Jeff called his brother-in-law
[21] because of all the people that was in the van,
[22] you know, each person had to be dropped where
[23] their house was or where they started from, and
[24] Jeff called his brother-in-law, Steve Jones, to
[25] come pick us up from Apple Chevrolet, so he can

Page 20

[1] drop everybody off.
[2]     **Q:** And that phone call was made while
[3] you guys were in the van?
[4]     **A:** Yes.
[5]     **Q:** Okay.
[6]     **A:** For his brother-in-law to meet us at
[7] Apple.
[8]     **Q:** Okay. Do you know, as far as the
[9] first phone call, if Mr. Hanes called the
[10] dealer or if the dealer called Mr. Hanes?
[11]     **A:** No, Mr. Hanes — We called first.
[12]     **Q:** Okay.
[13]     **A:** You're talking about the rental
[14] place, right?
[15]     **Q:** Yes.
[16]     **A:** Yes.
[17]     **Q:** Okay. When you all got there at the
[18] dealers, you said it was probably about 5:15 or
[19] 5:20?
[20]     **A:** Yes.
[21]     **Q:** Something like that. You all went
[22] inside.
[23]     **A:** Um-hum.
[24]     **Q:** What happened?
[25]     **A:** Everything was pretty normal. I

**Min-U-Script®**

**Jeffrey L. Hanes   v.**
**Apple Chevolet, Inc.**

Page 21

*Lawyer's Notes*

[1]  think Jeff just wanted to sign the paper that
[2]  — you know how when you return something back?
[3]  And that's when the lady said that she was
[4]  going to charge for two days, and that's when
[5]  things just — You know, he was like, well, you
[6]  said if we bring it back it was going to be
[7]  like one day. And she was, like, well — You
[8]  know, it was just like a little bit of
[9]  bickering between the employee and Jeff.
[10]     **Q:** Okay. Now, how far away from them
[11]  were you standing?
[12]     **A:** Maybe like two, three feet, four
[13]  feet.
[14]     **Q:** Okay. And what happened as they were
[15]  going around about that?
[16]     **A:** It just got a little bit heated over
[17]  that, you know, one day, two day. Jeff said,
[18]  well, why did you say on the phone that you
[19]  were only going to charge for one day, and, you
[20]  know, if I could have had it for the second
[21]  day, I could take everybody — I would have
[22]  took everybody to their destination. I
[23]  wouldn't have my brother-in-law coming, and
[24]  this and that. And she just like blew up a
[25]  little bit. That lady said, well, I've been

Page 22

[1]  waiting here, waiting for your black, and then
[2]  she just stopped. She caught herself. And
[3]  then Jeff said, well, let me finish that
[4]  sentence for you. What are you trying to say?
[5]  Black ass, and that was it. And then just, you
[6]  know —
[7]     **Q:** Was anyone else talking in the room
[8]  while this was going on?
[9]     **A:** No. But that gentleman that was
[10]  waiting for the van, I'm almost positive he was
[11]  in that room when that — He might not have
[12]  been there when, you know, that lady started
[13]  saying I was waiting for your black whatever
[14]  she was meaning; but he was there waiting
[15]  because when Jeff brought the keys, right away,
[16]  or, you know, the lady gave him the keys or the
[17]  employee brought the keys to the lady and she
[18]  gave them to him and he left. You know what I
[19]  mean? Then it was our turn to sign the papers.
[20]     **Q:** Okay. After this comment that was
[21]  allegedly made, what happened then?
[22]     **A:** When Jeff said, well, let me finish
[23]  the sentence for you, were you trying to say
[24]  black ass? And she started like losing it,
[25]  even — losing it. I mean, like she started

Dimitrios Tomboris
April 4, 2002

Jeffrey L. Hanes   v.
Apple Chevolet, Inc.

Page 23

[1] getting more like aggressive or mad, and she
[2] was like I don't need this bull shit. And, you
[3] know, just like cussing and fuck this job and
[4] this and that, and that's all.
[5]     **Q:** Okay. Then what happened?
[6]     **A:** Basically getting mad. And then we
[7] started walking — Oh, and then this other guy
[8] came in. That was the guy that was — when we
[9] first came, the employee, he came in, and he
[10] started saying — you know, putting his part in
[11] the conversation. Started saying, well, if you
[12] don't want to pay two days get a lawyer, get a
[13] lawyer. It was like, you know, and after he
[14] said get a lawyer, I guess I walked outside
[15] with, I think it was three or four other
[16] gentlemen, we walked outside. And then he was,
[17] that same guy was saying about calling the
[18] police because of the argument, because of the
[19] lady.
[20]     **Q:** Now, had that guy walked outside with
[21] you?
[22]     **A:** No. He was inside there. When that
[23] lady started, you know, like, tripping out like
[24] yelling and stuff, he came — he was in the
[25] room there, and that's when he was like just

Page 24

[1] call the police, call the police. They don't
[2] want to pay the second day call the police.
[3]     **Q:** Okay.
[4]     **A:** And that was like his part mostly to
[5] say get a lawyer and call the police. That's
[6] it.
[7]     **Q:** Did anyone either encourage or
[8] discourage him from calling the police?
[9]     **A:** No, no. I mean, he was behind the
[10] counter.
[11]     **Q:** Okay.
[12]     **A:** You can't discourage him. I mean,
[13] you can't grab him.
[14]     **Q:** No one said don't do it, or go ahead
[15] and do it?
[16]     **A:** No. Jeff was saying call the police,
[17] and they can hear my side of what happened.
[18]     **Q:** Okay. And do you know if the police
[19] were called or not?
[20]     **A:** I know that his brother-in-law showed
[21] up. This is outside after everything happened,
[22] and that lady left when we were outside in the
[23] parking lot. She got in the car and even
[24] though my statement that I wrote back then, it
[25] seemed like she was trying to hit his

**Jeffrey L. Hanes   v.**
**Apple Chevolet, Inc.**

Dimitrios Tombor
April 4, 200

Page 25

[1] brother-in-law, Steve Jones, because she was
[2] parked like right at the — where the rental
[3] place is at the entrance. Her car was parked
[4] there. I think it was like a white Camaro or
[5] something like that. And she got in and she
[6] was, like, still yelling fuck you guys, fuck
[7] this job. I mean, she was like really upset,
[8] you know. And you know how you speed off, and
[9] Steve like jumped out of the way so he didn't
[10] get hit.
[11]     It looked like — She probably didn't
[12] try to hit him, but it looked like, you know,
[13] like you see in the movies or something like
[14] that.
[15]     **Q:** How close were you all standing to
[16] where she was parked?
[17]     **A:** Oh, like one, two feet, three feet.
[18]     **Q:** Okay.
[19]     **A:** I mean, that's all in the entrance, I
[20] think. But when we got there, her car wasn't
[21] there so I think that guy, that employee — I
[22] call them gophers, you know, go for this, go
[23] for that — I guess brought her car in the
[24] front entrance there.
[25]     **Q:** Was her car blocked by where you all

Page 26

[1] were standing at that point so that she
[2] couldn't leave?
[3]     **A:** It's not at the driveway. It's all
[4] opened so you can't really say blocked. It was
[5] just like two or three feet waiting for the
[6] police. I guess it was that point where we
[7] were waiting outside for the police and they
[8] closed the shop.
[9]     **Q:** When did you leave the premises?
[10]     **A:** With his brother-in-law, Steve Jones,
[11] that came. He showed up, and we got —
[12] everybody got in the car except for Jeff Hanes
[13] because he was going to wait for the police and
[14] everything, so Steve gave everybody a ride to
[15] their destination, gave me a ride to my
[16] automobile. I came back. It was like 20, 25
[17] minutes later, and he was still waiting there.
[18] No police had showed up or anything.
[19]     **Q:** Now, you only know what you were
[20] told. You weren't there, right?
[21]     **A:** Yeah, I wasn't there.
[22]     **Q:** Okay. Do you know — Do you remember
[23] approximately what time it was when you all
[24] left with Mr. — with Steve Jones?
[25]     **A:** Maybe around 5:40.

# In The Matter Of:

*Jeffrey L. Hanes    v.*
*Apple Chevolet, Inc.*

---

*Steven Jones*
*April 4, 2002*

---

*Key Reporters*
*1300 Garrison Drive*
*York, PA   17404*
*(717) 764-7801    FAX: (717) 764-6367*

*Original File A4APR02D.PRN, 23 Pages*
*Min-U-Script® File ID: 2684865475*

# Word Index included with this Min-U-Script®



Steven Jones
April 4, 2002

Jeffrey L. Hanes   v.
Apple Chevolet, Inc.

Page 7

| | | Lawyer's Notes |

[1] brother-in-law.
[2]     **Q:** Okay. Obviously, you knew him prior
[3] to becoming his brother-in-law.
[4]     **A:** Yes.
[5]     **Q:** Okay. Would you say that you two had
[6] a social or friendly relationship prior to
[7] becoming his brother-in-law?
[8]     **A:** Yes, ma'am.
[9]     **Q:** And that has continued through this
[10] relationship by marriage?
[11]     **A:** Yes, ma'am.
[12]     **Q:** Okay. Did you ever attend any
[13] seminars or conferences with Mr. Hanes?
[14]     **A:** No, ma'am.
[15]     **Q:** Okay. Did there ever come a time
[16] when you had to pick up Mr. Hanes or some other
[17] people from the Apple dealership in York?
[18]     **A:** No, ma'am. That was the first time
[19] that I had to do that.
[20]     **Q:** Okay.
[21]     **A:** That he called me for it.
[22]     **Q:** Okay. And that was the time in
[23] November 1998?
[24]     **A:** Yes.
[25]     **Q:** Okay. When did he call you and ask

Page 8

[1] you to pick them up?
[2]     **A:** I'll say he called me about four,
[3] between 4:30, 5:00.
[4]     **Q:** Do you know where he was when he
[5] called?
[6]     **A:** He said he was coming from Philly.
[7] He said, he's coming from Philadelphia and to
[8] meet him. He's on his way back to Apple
[9] Chevrolet and to meet him at Apple Chevrolet so
[10] he could turn the truck in.
[11]     **Q:** Okay. And did you, indeed, meet him
[12] at Apple?
[13]     **A:** Yes, ma'am. Yes, I did.
[14]     **Q:** About what time did you get there?
[15]     **A:** Approximately 5:10, a little after
[16] 5:00.
[17]     **Q:** And was Mr. Hanes there at that time?
[18]     **A:** Yes, ma'am. Yes, he was there. They
[19] were pulling in, and I was there maybe a minute
[20] or two before he got there.
[21]     **Q:** Okay. So you were waiting for the
[22] van to arrive?
[23]     **A:** Yeah. I was probably there for like
[24] a minute or so.
[25]     **Q:** Okay. Where were you waiting?

Jeffrey L. Hanes   v.
Apple Chevolet, Inc.

Steven Jones
April 4, 2002

*Lawyer's Notes*

[1]  **A:** Right where the — I guess it's their
[2]  service department, I guess.
[3]  **Q:** Okay.
[4]  **A:** Their service department.
[5]  **Q:** Were you inside? Were you outside?
[6]  **A:** No. No. I was outside because I
[7]  wasn't sure where to go at.
[8]  **Q:** Okay.
[9]  **A:** So I just sat there and just waited.
[10]  **Q:** Okay. And then shortly after that
[11]  the van pulled in?
[12]  **A:** The van pulled in, yes, ma'am.
[13]  **Q:** What happened then? What did you see
[14]  or hear?
[15]  **A:** Nothing. I just seen him. I said,
[16]  hey, you know, what's up? How did it go?
[17]  Whatever. Where they were at. He said, it
[18]  went pretty good; and he had to turn his van in
[19]  so
[20]  we — he actually went in first into the
[21]  office, I guess. And I was going to stay
[22]  outside, but they were like come on in. So I
[23]  came on in with everybody else, and he handed
[24]  the van into the lady, and the lady was talking
[25]  about I guess, charging for two days. She was

[1]  talking about charging for two days, and they
[2]  got into some argument about why are you
[3]  charging? She told him that on the phone
[4]  coming from Philadelphia that I didn't have to
[5]  pay for another day, and he said he was going
[6]  to keep the van if he had to pay for another
[7]  day, and she said that she was sitting here
[8]  waiting — I was sitting here waiting on your
[9]  black and she stopped short of saying whatever.
[10]  After that and black and everybody was like
[11]  looking and she said — He said, black what?
[12]  He told her black what? Black what? And she
[13]  said I don't need this shit. I don't need this
[14]  shit, and was gathering her stuff up, and got
[15]  in the car. Some other man came out too,
[16]  during this here too. I don't know who he was,
[17]  but he came out, and —
[18]  **Q:** Is this another employee or customer?
[19]  **A:** No, it was an employee. It had to be
[20]  an employee because —
[21]  **Q:** Okay.
[22]  **A:** Yeah. He came out and then she went
[23]  and got into her car, and just like took off.
[24]  **Q:** Okay. Now, who was inside when you
[25]  guys all went inside?

---

**Steven Jones**
**April 4, 2002**

*Jeffrey L. Hanes* v.
*Apple Chevolet, Inc.*

Page 11

**Lawyer's Notes**

[1]     **A:** I just seen her.
[2]     **Q:** Okay.
[3]     **A:** I just seen her when we first went
[4] inside. She was behind the counter then.
[5]     **Q:** Okay. And you and Mr. Hanes and
[6] whoever else was in the van?
[7]     **A:** It was me, Jeff, Lionel, I believe,
[8] Jimmy. There was some guys I didn't know. If
[9] I didn't know them, I just — They were with
[10] that group that came out of the van. I didn't
[11] know them.
[12]     **Q:** Okay. Was there anyone else in the
[13] area, in that rental area?
[14]     **A:** No, no. Not in that little office
[15] there, no.
[16]     **Q:** Not on either side of the counter?
[17]     **A:** No. I just seen that lady there.
[18]     **Q:** Okay. Now, you said another employee
[19] came out at that point?
[20]     **A:** Yeah, there was some man. Some man
[21] came out.
[22]     **Q:** Okay. Do you have any idea who he
[23] was?
[24]     **A:** No. No, I don't.
[25]     **Q:** Okay. Do you know if he and Mr.

Page 12

[1] Hanes knew each other at all?
[2]     **A:** No, no. I believe he was, like, sort
[3] of like an Apple employee because he came from
[4] out through the back area like.
[5]     **Q:** Okay. And then what happened after
[6] that gentleman came out?
[7]     **A:** Well, he wanted to know what was
[8] going on, and he was — Jeff was like talking
[9] to her — talking to him about, you know, what
[10] she had just said, and that's when she came out
[11] and said I don't need this shit, and was
[12] gathering her stuff — gathering her stuff
[13] together and took off.
[14]     **Q:** Okay.
[15]     **A:** Went outside and took off.
[16]     **Q:** And then what happened to you guys?
[17] Were you all still inside then?
[18]     **A:** We were — No, I was walking.
[19] Everybody was walking out because actually when
[20] she left, we were sort of congregating around
[21] there, like somebody — Either her or the man
[22] said something about calling the police or
[23] something.
[24]     **Q:** Why? Do you know why?
[25]     **A:** And Jeff was like — I don't know

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Jeffrey L. Hanes | : CIVIL ACTION NO. 1:00-CV-2003 |
| | : |
| Plaintiff | : |
| | : |
| v. | : |
| | : |
| Apple Chevrolet, Inc. et al. | : |
| | : Judge Sylvia H. Rambo |
| Defendant | : |

## CERTIFICATE OF SERVICE

I, Sandra Thompson, Esquire, counsel for Plaintiff, do hereby certify that I have

served upon Defendants a true and correct copy of Plaintiff's Supplemental Supporting

Documents for Plaintiff's Statement of Material Facts by postage prepaid first class mail,

addressed as follows:

        Sara A Austin, Esquire
        Blakey, Yost, Bupp, and Rausch, LLP
        17 East Market Street
        York, Pennsylvania 17401

        Respectfully Submitted:

DATED: July 25, 2002

        Sandra Thompson, Esquire
        Counsel for Plaintiff
        PA ID No. 84345
        P.O. Box 2361
        York, Pennsylvania 17405
        717-845-1408